```
1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
2                          WESTERN DIVISION


3
     UNITED STATES OF AMERICA,      Case No. 3:21-CR-00205-JZ
4                                   Toledo, Ohio
               Plaintiff,
5
          vs.                       Friday, May 19, 2023
6


7    KEVIN CLAY,


8               Defendant.


9


10            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
               BEFORE THE HONORABLE JACK ZOUHARY
11            SENIOR UNITED STATES DISTRICT JUDGE


12

     APPEARANCES:
13
     For the Government:      Gene Crawford,
14                            Jody L. King,
                              Assistant United States Attorneys
15


16

17   For the Defendant:      Richard M. Kerger, Esquire
                             Joshua S. Lowther, Esquire
18


19


20

21   Official Court Reporter:  Stacey L. Kiprotich, RMR, CRR
                               United States District Court
22                             1716 Spielbusch Avenue, Suite 120
                               Toledo, Ohio 43604
23                             (419) 213-5520


24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
```

1                            **I N D E X**

2
   **GOVERNMENT'S WITNESSES**                              **PAGE**

3
   1.  AMY SMITH
4        DIRECT EXAMINATION BY MS. KING                     20
         CROSS-EXAMINATION BY MR. LOWTHER                   28
5
   2.  KIMBERLY CARTER
6        DIRECT EXAMINATION BY MS. KING                     36

7  3.  BRAD THOMPSON
         DIRECT EXAMINATION BY MS. KING                     42
8        CROSS-EXAMINATION BY MR. KERGER                    48

9  4.  MATTHEW MALUCHNIK
         DIRECT EXAMINATION BY MR. CRAWFORD                 52
10       CROSS-EXAMINATION BY MR. KERGER                   112
         REDIRECT EXAMINATION BY MR. CRAWFORD              129
11
   5.  JAMEIL AOSSEY
12       DIRECT EXAMINATION BY MS. KING                    130
         CROSS-EXAMINATION BY MR. LOWTHER                  136
13       REDIRECT EXAMINATION BY MS. KING                  138

14 6.  SPECIAL AGENT ERIN MARCINIAK
         DIRECT EXAMINATION BY MS. KING                    139
15       CROSS-EXAMINATION BY MR. KERGER                   169

16 7.  STEVE WORLEY
         DIRECT EXAMINATION BY MS. KING                    179
17       CROSS-EXAMINATION BY MR. LOWTHER                  187

18   **DEFENDANT'S WITNESSES**                              **PAGE**

19   (None)

20

21

22

23

24

25

1              **Friday, May 19, 2023**

2                    **-   -   -**

3         **(Proceedings began at 9:08 a.m.)**

4                    **-   -   -**

5              THE COURT:  You can be seated, ladies and

6       gentlemen.  Once you come in, you can sit and get

7       comfortable.  Everyone may be seated.

8          Thank you very much.  Welcome back.  Note the

9       temperature of the courtroom.  It may be a little chilly for

10      some.  We try to do what we can with this older building,

11      and sometimes it is too hot and sometimes it is too cold, so

12      bring what you need, accordingly.

13         We're ready now for the opening statements of counsel,

14      and we'll start with the Government.

15              MS. KING:  Thank you, Your Honor.

16         May it please the Court, counsel, ladies and

17      gentlemen, good morning.

18         This case is about a scheme to make money by paying

19      people to be medical patients, paying people to buy

20      prescriptions.  Now, you may ask, "How do you make money by

21      paying people to get prescriptions?"  Well, you start with a

22      compounding pharmacy, people with good insurance plans, and

23      you add volume.

24         As you'll hear over the next few days, a compounding

25      pharmacy is a pharmacy that specializes in custom

1    prescriptions, and that means that they can often charge as

2    much as a patient's insurance is willing to pay because you

3    can't just go down the street to Rite Aid or Walgreens.

4    Those compound prescriptions are supposed to be specialized

5    for the patient, usually prescribed for someone who maybe

6    has an allergy or sensitivity to standard medications.  And

7    because it's a custom product, they can charge a lot more

8    for it.

9         Defendant Kevin Clay and his business partner knew

10   this when they were pharmaceutical sales reps.  And back in

11   2013, they heard some people were getting paid to buy their

12   own prescriptions, and they wanted in on the action.

13        Compounding pharmacies would pay people to get

14   prescriptions to drive business to the pharmacy so that the

15   pharmacy would make money, the people marketing would make

16   money, and the patients would make money.

17        So what did Kevin Clay do?  He and his partner met

18   with a compounding pharmacy in Cleveland called Central Rx

19   that could ship specialized prescriptions, in theory, to

20   patients here and around the Toledo area and elsewhere, and

21   they arranged to be the marketers for Central Rx.

22        And then what did they do?  As a test run, they went

23   to a doctor and asked for these prescriptions, pain and scar

24   creams, compound creams, purportedly specialized substances.

25   They asked for these pain and scar creams and got the

1    prescription filled through Central Rx, and then he got a

2    commission on the purchase of his own prescription, a big

3    one.  His partner did the same thing.  They got paid so well

4    off of their first attempt at seeing how this worked, that

5    they realized that rather than do the ordinary sales rep

6    thing of recommending the product to the doctor and

7    explaining why the doctor should recommend it to their

8    patients who had an actual need for it, they pay the

9    patients -- pay the patients -- to go and ask the doctor for

10   the prescription, a prescription the patient didn't even

11   need, and that would drive the volume.

12        The evidence will show that all the patients needed to

13   do was to go to the doctor, ask for this pain and scar

14   cream, give the doctor a specialized prescription form, not

15   the ordinary little prescription form the doctor might

16   otherwise use, but a specialized prescription form that

17   would designate a pharmacy chosen by Kevin Clay and his

18   partner to send the prescription to get it filled there so

19   Kevin Clay and his partner would get a cut and so would the

20   patient.  Paid for prescriptions.

21        As the evidence will show, having made more money that

22   he ever imagined off this pay for prescription scheme, the

23   defendant didn't want to pay taxes on all that.  So what did

24   he do?  He created a sham public charity so that he could

25   take a deduction.  He took $400,000, a portion, $400,000 and

1      put it in a bank account for the Kevin Clay Foundation.  And

2      what did Kevin Clay do with the Kevin Clay Foundation money?

3      Not much.  Not much at all.  As you will see, the single

4      biggest payout from that bank account was used to buy gold

5      and silver bars purchased in his own name and found in his

6      bedroom during a search.

7            Ladies and gentlemen, I'm Jody king.  Together, with

8      my co-counsel Gene Crawford, we represent the United States,

9      and we'll be presenting the evidence to you.

10           Also at counsel table is Special Agent Erin Marciniak

11     of the FBI, the case agent assigned to this matter.

12           So let me give you a little preview of the evidence

13     you will hear and see over the next few days, evidence that

14     will prove beyond a reasonable doubt that Kevin Clay

15     committed the crimes charged in the indictment:  One count

16     of conspiracy to commit health care fraud, one count of

17     health care fraud, two counts of making false statements to

18     the IRS.

19           So let me tell you a little bit about the defendant.

20     You'll hear testimony that at the time he and his former

21     best friend and business partner, Matt Maluchnik, started

22     the pay for prescription scheme, Kevin Clay was working as a

23     pharmaceutical rep for Pfizer, a job he later quit because

24     he made so much money from the scheme.

25           You'll see and hear evidence of how Kevin Clay and

1    Matt started putting this together, first, under a company

2    they called City Wide, a company they already had for some

3    of their other business; and then later called Theramedical,

4    using a compound pharmacy in Cleveland -- Central Rx -- and

5    then adding some others so they could expand their reach,

6    have patients in other states also earning commissions on

7    this pay for prescription scheme.

8         You'll hear testimony that as soon as they realized

9    people could get paid for prescriptions and how much, they

10   quickly recruited people.  They called them sales rep, but

11   they were really patients, and they recruited as many as

12   they could to generate the commissions and take their cut

13   off the top.

14        You'll hear and see the evidence from some of these

15   patient sales reps who will explain they were happy to go to

16   the doctor, happy to pay doctor co-pays, happy to pay

17   pharmacy co-pays because they were going to make so much

18   money.

19        You will hear how some patients got prescriptions for

20   the whole family, even the kids, because they could earn so

21   much on each order.  These patients made thousands; some,

22   tens of thousands; a few, hundreds of thousands over the

23   course of the year by going to the doctor and getting

24   expensive pain and scar creams.

25        Some patients also recruited other patients so they

1    could get another slice of commission.  And at the top of

2    this whole structure earning the most of the scheme for all

3    these commissions for compound prescriptions was

4    Theramedical and its owners, including Kevin Clay, all for

5    prescriptions these patients didn't need and never would

6    have gone to the doctor for.  You will hear testimony that

7    some of these patients simply through the bottles of cream

8    away.  Think about that -- medicine worth thousands of

9    dollars.

10          In addition to hearing from Theramedical's other

11    partner and patient sales reps, you'll hear from folks who

12    administer health care benefit plans for the Jeep plant here

13    in Toledo where Theramedical recruited a large number of

14    employees.  Why?  Because they had really good insurance

15    that would pay well for these pain and scar creams.

16          You'll also hear from others that worked with Kevin

17    and enabled Theramedical to grow and expand into other

18    states.  You'll see evidence of how these recruits in other

19    states were also encouraged to get their own prescriptions

20    and get prescriptions for their families to drive sales.

21          Finally, you'll hear from some lawyers and accountants

22    that Kevin Clay worked with to create the Kevin Clay

23    Foundation when he realized how high the taxes would be on

24    all the money that he made.

25          But you'll also hear how he didn't exactly disclose

1     everything or not everything that this foundation was doing.

2     You'll see where he didn't disclose the facts -- facts that

3     might have caused the IRS looking at his charity application

4     to take a second look and wonder what was that Kevin Clay

5     Foundation really doing.

6          You'll see the IRS letter granting the Clay Foundation

7     public charity status and telling Kevin Clay what he needed

8     to do, what the filing requirements were to maintain that

9     status.  You'll see he didn't do any of it.

10          Finally, we'll show you where the defendant used the

11     money he parked into the Kevin Clay bank account to take a

12     big deduction on his tax return, a deduction that he

13     couldn't have claimed had he not already lied on his public

14     charity application.

15          Now, in order to prove Kevin Clay engaged in health

16     care fraud, health care fraud conspiracy, and lying to the

17     IRS, the Government has to prove that Kevin Clay acted

18     knowingly and willfully, that is, knowingly and

19     intentionally.  "And how do you do that?" you may ask.  "We

20     can't read someone's mind."  Well, what you can do is look

21     at what someone does and what they say.  And the evidence

22     the United States will present over the next few days about

23     what Defendant Kevin Clay did and didn't do, said and didn't

24     say will show he knew Theramedical was making money by

25     paying people to go to the doctor and get prescriptions that

1    they didn't need.  And he knew -- he knew how he was making

2    that money.

3         Defendant Clay's words and actions, things he said or

4    didn't say, did or didn't do will show that he didn't want

5    to pay taxes on it, and so he lied to the IRS so he could

6    get a big deduction off the money he owed.

7         You'll hear Kevin Clay knew his company was paying

8    people to get prescriptions because he did it himself.

9         You'll see the spreadsheets he got in emails so he

10   could see how all these patients were also making money.

11        You'll have a chance to see for yourselves the

12   documents, the prescription pads that they gave the patient

13   sales rep to take to the doctor to get more prescriptions,

14   the bank account statements that will show huge amounts of

15   money coming in from Central Rx and other compounding

16   pharmacies.

17        You'll also see the false filings with the IRS.

18        By the time the lawyers stand up again to make their

19   closing arguments at the end of trial, you'll have seen

20   documents and exhibits and heard testimony that will prove

21   beyond a reasonable doubt that Kevin Clay is guilty of

22   health care fraud conspiracy, health care fraud, and making

23   false statements to the IRS.

24        Once you have seen and heard the evidence, we are

25   confident you'll find the defendant guilty on all charges.

1          Thank you.

2                    THE COURT:  Next, we'll hear from defense

3     counsel.

4                    MR. KERGER:  I will limp over there, Judge.

5          Good morning.  I'm Rick Kerger, and if, in fact, the

6     evidence you're going to hear would do what's been

7     suggested, we should be out of here, but it's not.  It's

8     like that radio commentator over in Chicago years ago would

9     say, "And now let's find out about the rest of the story."

10         Since he was about nine, Kevin Clay has had one desire

11    as a professional, to be a barber.  He cut hair for

12    30 years, and right now that's how he supports himself.  He

13    loves it.  "Well, Mr. Kerger, why you talking about cutting

14    hair?  This is about prescriptions."  Because you're having

15    to judge the whole person.  You are having to try to

16    understand what it is he knew, what it is he thought he was

17    doing when his partner, unbeknownst to him, was doing a lot

18    of bad things.  He was running a tax scam that Kevin never

19    knew about.  He was getting people who were sales reps to

20    write checks to his, Matt Maluchnik's, charitable foundation

21    and paying them that same amount in cash so that he could

22    get a deduction and scam the IRS.

23         And you're find out, as a result of his cooperation

24    here, Matt Maluchnik plead guilty to one count of insurance

25    fraud, Medicare fraud, and nothing to do with tax fraud,

1          even though you'll hear from the evidence he was the

2          lynchpin of that scam -- the scam he carried out without

3          letting Kevin know anything about it.

4                  After he went to UT and graduated, Kevin did go to

5          work for Pfizer, big pharmaceutical company, and he sold

6          products in Southern Michigan, Northern Ohio, and was doing

7          well.  And his friend, Matt Maluchnik, who he met in college

8          and became good friends with had gone on and wound up

9          ultimately down in Southern Ohio selling pharmaceuticals.

10                 Now, when he's in Southern Ohio, Matt also picks up a

11         master's degree in business, and that's going to be relevant

12         a little later.

13                 They came -- Matt got moved back to Toledo area, and

14         they hooked up and started talking about, "You know, it

15         would be nice to have our own business," so didn't want to

16         work for anybody else.  "Now, what could we do?"  Well,

17         Matt, the missing Matt until he testifies today, found out

18         about a company in Cleveland called Central Rx run by a man

19         named Lemma Gettachew who came from Ethiopia and opened a

20         business.  He's a pharmacist, trained in Ethiopia, and he

21         was doing a big business in Ohio and in Northwest Ohio,

22         before Kevin got in, in selling pain and scar creams.

23                 The scar creams are used for a variety of purposes,

24         not uncommonly for women for stretch marks.  The pain creams

25         are used to help people with pain, and the advantage they

1    have is they are not addictive.  We've all read about the

2    opiate crisis over in Cleveland.  It's not the creams that

3    do that.  So you get relief.  It made sense.

4         Both Matt and Kevin, before they got into work with

5    Central Rx, put in some test scripts to see how it worked,

6    and it did work, and they were satisfied it was legitimate.

7    And they arranged an appointment with Mr. Gettachew over at

8    a delicatessen across the street from his business to talk

9    about it.  And he explained how he did business, explained

10   because they had gotten money from their own prescriptions.

11   This is not from Theramedical; this is from Central Rx.

12   They got money for their prescriptions.  Okay.  That's the

13   way it works because he's in business.  He's not shut down.

14   He's not charged with a crime.  That's the Government's

15   choice.

16        But as far as Kevin and Matt knew, Central Rx was

17   doing the same thing they were doing unmolested.  And

18   Central Rx had a number of different companies in Northwest

19   Ohio selling their products.  And Mr. Gettachew told them

20   when they came on, "You know, you are a little late in the

21   game.  And you are going to have to work for somebody else

22   other than me."  And Matt, he'll tell you, he said, "No.  We

23   should work directly for you because we can do a good job

24   for you," and Matt convinced him that was the case; so they

25   became direct underneath Lemma Gettachew.

1          Now, they never ran a business together before, and

2     they got into it by sort of dividing responsibilities.

3     Evidence is going to be Matt, with his master's degree, took

4     care of finance and administration.  Kevin was the big

5     picture guy.  He was out to find people to help sell it, to

6     find other pharmacies to work with them, and that's what

7     they did.  And Kevin will tell you he is not interested in

8     math.  He just was relying on his friend, Matt, to do things

9     right.

10          Another thing Matt didn't tell him, by the way, is

11     that Matt was paying money -- cash money -- to the office

12     manager of Dr. Huenefeld.  Dr. Huenefeld was Matt's doctor.

13     Dr. Huenefeld was a doctor for a bunch of Matt's family.  He

14     had known her from before.  And Matt went to her, after they

15     got their business started, and he said, "How would you like

16     to help?  We can send patients to you," and "Sure."  She

17     needed more patients.  That was fine, and so Matt steered it

18     form there.

19          Did Kevin know about it?  Generally, yeah.  He had

20     heard of Dr. Huenefeld.  He had met her once before back

21     when he was selling for Pfizer, but he let that go to Matt,

22     and Matt did run it.

23          Everything got going pretty well.  The sales were

24     good, and he was impressed.  And Gettachew had told them the

25     way you do it is you have the reps and you pay them

1    commissions, and Kevin will tell you that's what they did.

2    They had sales reps.  Were they patients?  May have been.

3    But to his understanding, the reason they were paid was

4    because they were selling prescriptions, and they would get

5    a percentage paid back to them.

6         And another witness you are not going to hear -- and

7    keep in mind, we don't have the burden of proof; the

8    Government does.  Another witness you are not going to hear

9    is Dr. Huenefeld, the person who is writing the scripts, the

10   person who is certifying they were necessarily -- medically

11   necessary because Kevin will tell you they didn't know

12   anything about the scripts.  And folks may have heard of

13   HIPAA.  It is a privacy deal with medical insurance.  They

14   couldn't know what was going through.  And that's the way it

15   went, and it's going along just fine.

16        But then the insurance companies -- and by the way,

17   who dealt with the insurance companies?  Central Rx.  They

18   submitted the bills, not Theramedical.  Theramedical would

19   send to Central Rx.  Central Rx would send it through.  But

20   the companies got a little upset with the prices they were

21   paying, and so they did what insurance companies do, some of

22   them started peeling back, and they wouldn't cover that

23   anymore.

24        And so they've got this force of people experienced in

25   selling in the medical field, and Kevin and Matt decide,

1     "Well, what other allied business could we get into?"  And

2     they decided to look at urine testing, something that

3     happens all the time these days in businesses, and they

4     would set up a lab, and they figured a structure and knew a

5     person running the lab to make more money than they did

6     otherwise.  And they tried to get that going, but it didn't

7     work.

8          Now, you should know that when Kevin is trying to set

9     up this business back in 2014, he's working full time for

10    Pfizer, so he's working on Pfizer.  On the weekends, he's

11    cutting hair, and the other times he's trying to keep

12    Theramedical going.  It's a pretty busy plate, and we think

13    he did a good job.  He did a fair job.

14         But then, as they're trying to find these

15    alternatives, the FBI comes in and does a raid in June of

16    2016, seizes all their money, all their records, and they

17    didn't know what the problem was because Gettachew is

18    running just fine.  He's not being harassed.  The other

19    distributors in the area are running fine.  "What's the

20    problem with us?"  They also took all the money from the

21    foundation.

22         And a little bit about the foundation.  There are a

23    couple of things that got left out.  Kevin was interested in

24    the foundation because that was the only way he was able to

25    go to college.  Ted Turner, the cable magnet, set up a

1   foundation to aid people like Kevin who needed funds, and

2   Kevin will tell you that's how he got through college, and

3   he decided, "I want to be able to do that for people

4   myself."  And he became particularly interested in South

5   Africa, and so they started talking.  "Okay.  We're going to

6   give scholarships.  His wife came in and helped him get that

7   business up and running.

8          The problem is, it was just getting started running

9   when the FBI came in and seized all the money and the assets

10  and put them pretty much out of business, except they

11  weren't out of business because Kevin will tell you at the

12  time the FBI seized them, the foundation was talking with

13  two young men in South Africa about being scholarship

14  recipients, to pay for their education.  And you will find

15  that Matt and Kevin went to South Africa and met with these

16  guys.  You are going to see pictures of one of them on the

17  Cape of Good Hope, the two of them, because that's what he

18  was trying to do was get it started.  And he didn't quit

19  after they seized the money.  He felt he had a commitment to

20  those two men to get them their scholarships, and he did.

21  He raised money from other sources, and eventually those

22  scholarships were awarded, and, indeed, one of the young man

23  came to The University of Toledo to complete his education.

24          They say it wasn't a public foundation.  What they

25  omit telling you is that a public foundation has three years

1     to generate income that they can measure.  And Kevin will

2     tell you, I was going to generate that," and he did have

3     some public donations already.  But then with the search and

4     the seizure, it kind of slammed the brakes on his

5     foundation.  He struggled to make it happen, and he did.

6          He didn't lie any time.  The foundation was certified

7     as a legitimate not-for-profit in August of 2015.  Less than

8     18 months later, the FBI came in and did their search.  It

9     was a hard time to get that going when you're fighting

10    against those odds.

11         You are going to find that Matt's family did pretty

12    well off Theramedical.  His family, through sales, generated

13    close to $800,000, not counting what Matt made, not Kevin's

14    family.  He had his wife in there for a relatively nominal

15    salary, and she did work for both Theramedical and the

16    foundation.  You are going to hear her testify as to what

17    she did and why.

18         Matt was a friend, and Matt's going to come in here

19    and tell you things about Kevin that, frankly, aren't true.

20    And why does he do that?  I don't think he's a bad guy.  I

21    think Matt's very intelligent, a basically good young guy,

22    except he's got a wife and new children, and he was looking

23    at some fairly lengthy time in a federal prison, but he

24    decided he could come up and give them information on Kevin.

25    And what you are going to find is that Matt knew -- Matt

1   knew all that.  Kevin didn't.  Why?  Because Kevin trusted

2   him.  He thought he was finding out about everything, and he

3   wasn't.  I don't know if it's deliberate or just the way it

4   was, but Kevin knew what Matt was doing was okay, and Matt

5   knew what he wasn't telling Kevin, and that worked just

6   fine.

7        At the end of this case, you are going to look at what

8   was produced, and I'm going to ask you to think about what

9   wasn't.  As the Government lawyer said, they have the burden

10  of proof, not us.  And so if there's witnesses you think you

11  should have heard, it's not our problem; it's their problem.

12  And you are entitled to wonder why you didn't hear it.

13       And when you're done, I think at the end of the day,

14  you are going to find Kevin Clay is not guilty of the

15  charges they brought against him.

16       Thank you.

17            THE COURT:  Government may call its first

18  witness, please.

19            MS. KING:  The Government calls Amy Smith.

20                 (Witness was sworn)

21            THE COURT:  By the way, ladies and gentlemen,

22  your seats are adjustable.  At the break, if you think you

23  need to be adjusted, Laura can show you.

24            **DIRECT EXAMINATION OF AMY SMITH**

25  **BY MS. KING:**

**Smith (Direct)**

1    **Q**    Good morning.

2    **A**    Good morning.

3    **Q**    Could you please state your name for the jury.

4    **A**    Amy Smith.

5    **Q**    And where are you currently employed?

6    **A**    CVS Caremark.

7    **Q**    And how long have you been with CVS Caremark?

8    **A**    Almost 12 years.

9    **Q**    Can you summarize your educational history?

10   **A**    I am a licensed certified pharmacy technician, and I

11   have a bachelor's degree in criminal justice.

12   **Q**    Okay.  And you may want to just pull the microphone a

13   little bit closer to you.

14   **A**    Pull the seat closer.

15   **Q**    Thank you.

16        So have you all -- what is your current position at

17   CVS?

18   **A**    I'm a senior manager for network performance.

19   **Q**    And how long have you been in that position?

20   **A**    In that official capacity, a little over a year.

21   **Q**    Okay.  And what were you doing prior to that?

22   **A**    I was an advisor in network performance in the audit

23   department -- pharmacy audit department.

24   **Q**    And in those two roles, what exactly do you do for CVS

25   Caremark?

**Smith (Direct)**

1    **A**    I do a lot of data analysis.  So we review all of the

2    claims that come through that are submitted by pharmacies

3    nationwide -- triage, allegations of fraud, waste or

4    abuse -- to determine if an audit is warranted, and also act

5    as a Government liaison between our audit department and

6    regulatory agencies.

7    **Q**    And what business does CVS Caremark engage in with

8    other companies?

9    **A**    We are a pharmacy benefits manager known as a PBM.  We

10   are underneath the CVS Health umbrella.  So there is CVS

11   Health, and then there is the CVS retail pharmacies, the

12   local stores, and then there is the pharmacy benefits

13   manager.

14   **Q**    And how many companies does CVS Caremark provide that

15   service for?

16   **A**    Can you clarify what you mean by "companies"?

17   **Q**    How many companies does CVS Caremark act as a pharmacy

18   benefits manager?

19   **A**    Okay.  I apologize.  I refer to companies as clients.

20   We have clients that we provide our pharmacy benefits

21   services, and we have approximately 2,000 different clients.

22   **Q**    Okay.  And is one of those clients a company known as

23   Stellantis?

24   **A**    Yes.

25   **Q**    And do you happen to know what Stellantis used to be

**Smith (Direct)**

1  called?

2  **A**    Chrysler Fiat.

3  **Q**    And what exactly does CVS Caremark do for Chrysler

4  Fiat, also known as Stellantis?

5  **A**    So CVS Caremark, we act kind of as a middleman is the

6  best way to describe it.  We contract with pharmacies

7  nationwide, and then we contract with our clients, Chrysler

8  Fiat, and we provide access to the clients' beneficiaries to

9  have access to our network pharmacies.

10  **Q**    And is part of that managing the flow of money from

11  when people get their prescriptions and how it gets paid

12  for?

13  **A**    Yes.  So a network pharmacy, they will submit a claim

14  for a prescription.  They will submit it online.  It

15  actually gets transposed over to us electronically, and then

16  Caremark originally pays the claim, and then the client or

17  Chrysler Fiat would pay Caremark.

18  **Q**    Okay.  And as part of CVS Caremark services for Fiat

19  Chrysler, did you monitor claims for possible fraud?

20  **A**    Yes.

21  **Q**    And what types of things do you do in order to

22  monitor?

23  **A**    So that's -- there's a lot of different things we do.

24  We have our daily review team.  We have an entire team of

25  daily review auditors that look at real time claims that are

**Smith (Direct)**

1    being submitted.  We have a team of onsite auditors that are

2    located nationwide that actually go to pharmacies onsite to

3    conduct an audit and review of claims that are being

4    submitted.  And then we have a team of we call them

5    investigative auditors, and they do a more robust audit

6    verifying prescriber claims.

7    **Q**    Based on your knowledge and experience, what are

8    compound drugs, and how are they different than an ordinary

9    prescription?

10   **A**    So an ordinary prescription that most of us would get

11   is a, you know, something that's already manufactured at a

12   big pharmaceutical company.  You go to the store.  They put

13   it in the vile.  You leave.  You take your prescription

14   that's made.

15        A compound is a custom product that is made in the

16   pharmacy and it's to meet the needs of the specific patient.

17   **Q**    And back in 2013, how did CVS Caremark process claims

18   for compound drugs?

19   **A**    They were also submitted electronically.

20   **Q**    Okay.  And was there anything different about the

21   processing of claims for compound prescriptions that changed

22   since 2013?

23   **A**    So you might be referring to D.0 where a pharmacy, and

24   maybe you are not referring to that, but where -- so years

25   ago, pharmacies only had to submit a claim for the highest

**Smith (Direct)**

1    ingredient or the most expensive ingredient that was

2    submitted.  They call it D.0.  Don't ask me why.  But that

3    required pharmacies to submit claims and to actually -- we

4    call it adjudicating -- but to actually submit each

5    individual ingredient, including the quantities and the

6    cost.

7    **Q**    And why had that changed over time?

8    **A**    It was actually a requirement by CMS.

9    **Q**    Okay.  Did it have anything to do with activity by

10   some of the compounding pharmacies?

11   **A**    Yeah.  One of the issues with the way that things were

12   being submitted previously was that you didn't see the

13   underlying ingredient.  So when you looked at the claim's

14   data, you only saw the one ingredient paid.  And then when

15   we went to D.0, we could actually see everything that was

16   being submitted, including if it was a bulk powder or a

17   tablet that was being crushed up and put into a medication,

18   the specific National Drug Code, which is an NDC, that was

19   being submitted for that product.

20   **Q**    And what was the reason for wanting to have all that

21   additional information about what was actually going into

22   these compound prescriptions?

23   **A**    Well, aside from a patient's safety concern, I mean,

24   you definitely want know exactly what's leaving with the

25   patient before they're using a compound, whether it's

1    topically or orally.  But we also wanted to make sure that

2    the claim that was being submitted had an accurate pricing

3    that was being submitted for payment.

4    **Q**    That, in fact, the customer was getting what the

5    insurance plan was paying for?

6    **A**    Exactly.

7    **Q**    Are you familiar with a compounding pharmacy known as

8    Central Rx?

9    **A**    I am.

10   **Q**    And how do you know of it?

11   **A**    Caremark conducted an audit on that pharmacy and

12   ultimately terminated our contract with that pharmacy in

13   June of 2015 due to significant findings.

14   **Q**    And what did those findings include?

15   **A**    One of the main things was that the pharmacy was

16   submitting for a very expensive product within the

17   compounds, but they were actually utilizing a lesser

18   expensive or a cheaper version of the medication.  So they

19   were price gouging, essentially.

20   **Q**    Were they also engaging in activity related to

21   customer co-pays?

22   **A**    Yes.  They were waiving or reducing the member's

23   co-payment.

24   **Q**    And why was CVS Caremark concerned about that?

25   **A**    So it's contractually required for the patient to

**Smith (Direct)**

1    pay -- for the pharmacy to collect the patient's co-payment

2    to ensure that the entire claims process and prescription

3    process is completed.  Our plans are our clients.  They have

4    an expectation that those co-payments are being collected

5    upon.  It gives it an understanding of what the patient's

6    out of pocket is and. . .

7    **Q**    And why is ensuring that the patient has some out of

8    pocket important?

9    **A**    For lack of a better term, the patient has skin in the

10   game.  Is it important to you to have that medication?  If

11   you're willing to pay that co-pay, then it's important.  An

12   example that we frequently use is if your child has an ear

13   infection and they need the Amoxicillin, you are going to go

14   and pay that co-pay because your child needs that

15   medication.

16   **Q**    Did CVS lose any money as a result of compounding

17   creams being prescribed through Central Rx?

18   **A**    Caremark's clients lost a lot of money.

19   **Q**    And was one of those clients Fiat Chrysler?

20   **A**    Yes.

21   **Q**    And let me show you what's been marked Exhibit 43.

22        Hang on a second.  I'm going to see if I can get rid

23   of -- there we go.

24        CVS -- one moment.  We seem to be having a small

25   technical problem, so I'm going to give you a hard copy.

**Smith (Direct)**

1  **A**    Okay.

2  **Q**    And can you identify that document I've just given

3  you?

4  **A**    You want me to identify it by what it is?  Or call out

5  the trial exhibit number?

6  **Q**    What is Trial Exhibit 43?

7  **A**    Okay.  This appears to be claims data for CVS

8  Caremark.

9  **Q**    Okay.  Here we go.  It is up on your screen.  And if I

10  could draw your attention --

11  **A**    Uh-huh.

12  **Q**    -- to the column on the far right side.  What pharmacy

13  are these claims related to?

14  **A**    Central Rx Pharmacy & Medical Supply.

15  **Q**    Okay.  And if we look at the two columns immediately

16  next to where it says "Central Rx Pharmacy."

17  **A**    Uh-huh.

18  **Q**    What provider -- what doctor prescribed all of these

19  prescriptions listed here?

20  **A**    Dr. Suzette Huenefeld.

21             THE COURT:  Can you blow up those columns so

22  it is easier for the jury to read that?

23  **BY MS. KING:**

24  **Q**    Okay.  And then if we could go to the last page of

25  this exhibit, and if we could blow up the column with the

Smith (Cross)

1    dollar.

2         Thank you.

3         And what does the number at the bottom of that column

4    that we've zoomed in on represent?

5    **A**    So since the header is not on this page, it is the

6    pharmacy total reimbursement amount.  That's the column that

7    it's in.  So that is indicating that the pharmacy was

8    reimbursed 7.7 million for the claims within this data set.

9    **Q**    And if we look at the column immediately adjacent to

10   where it totals over 7 million, what company were all of the

11   patients listed here working for?

12   **A**    So these are all -- and I'm just going to verify

13   really quick.  That 7.7 million is all for Chrysler.

14              MS. KING:  No further questions.

15         Thank you.

16              THE COURT:  Cross-exam?

17                **CROSS-EXAMINATION OF AMY SMITH**

18   **BY MR. LOWTHER:**

19   **Q**    Okay.  So good morning, Ms. Smith.

20   **A**    Good morning.

21   **Q**    My name is Joshua Lowther, and I represent Mr. Clay.

22   **A**    Uh-huh.

23   **Q**    How many claims does CVS adjudicate every year,

24   roughly?

25   **A**    Oh.  Well, we have over 68,000 network pharmacies

**Smith (Cross)**

1    nationwide, so each one of those -- I mean, you're talking

2    in the millions.

3    **Q**    Okay.  So all those claims have to be adjudicated

4    promptly; correct?

5    **A**    Yes.

6    **Q**    All right.  And because of the number of claims and

7    the fact that they have to be adjudicated promptly,

8    obviously, there has to be an auto adjudication.  You

9    can't -- you don't have people who physically process those

10   claims.  It's not possible; correct?

11   **A**    Can you clarify that?

12   **Q**    When all of these pharmacies submit claims, there's an

13   auto adjudication process; correct?

14   **A**    When they hit enter on, yes.

15   **Q**    Right.  So if the claim appears to be an order, it's

16   paid?

17   **A**    I don't think I'm following the question.

18   **Q**    Okay.  So a pharmacy submits the claim.  It goes to

19   CVS.  There's an auto adjudication process.  A live person

20   doesn't review each claim for what's paid; correct?

21   **A**    Correct.  Claims are reviewed retrospectively when

22   they are adjudicated electronically.  We do have a papers

23   claims department, however, that claims can be submitted

24   through a paper claim where it does have a person physically

25   adjudicating.

**Smith (Cross)**

1    **Q**    But the vast majority are submitted electronically?

2    **A**    Yes.

3    **Q**    Because, literally, there are millions of claims?

4    **A**    I don't know that there's billions.

5    **Q**    I said millions.

6    **A**    Millions.  Yes, there's a lot of claims.

7    **Q**    Right.  So you don't have staff to physically process

8    each of these million claims; you have to do some through

9    the automatic adjudication process?

10   **A**    So to clarify, having worked in a pharmacy for ten

11   years prior to this role, I, as a person, manually enter in

12   the prescription information; so I am the person who is

13   adjudicating that claim.  It goes to what we call a switch,

14   which feeds it over to the correct PBN and then

15   electronically kicks back to the pharmacy that it's

16   successfully adjudicated and moves on.

17   **Q**    Basically an auto adjudication?

18   **A**    I don't agree with the word "auto" adjudication.

19   **Q**    Okay.  Not an important issue.

20   **A**    Okay.

21   **Q**    Just trying to clarify the process.

22          So claims are submitted.  Claims are reviewed

23   automatically, not automatically.  There are millions, and

24   they are paid promptly however that's done; correct?

25   **A**    Did you say "promptly"?

**Smith (Cross)**

1    **Q**      Promptly.  I'm sorry.

2    **A**      No.  That's okay.  I just wanted to make sure.  They

3    are paid.  So it's the minute that the pharmacy gets that

4    adjudication, that positive adjudication, they do not

5    immediately get paid.  It goes into a billing cycle.

6    **Q**      Relatively promptly?

7    **A**      Yes.

8    **Q**      Okay.  So you don't review every claim before it's

9    paid.  It's a bit of an honor system you would say for lack

10   of a better phrase?

11   **A**      Claims are not reviewed as they are paid, correct.

12   They are reviewed retrospectively.

13   **Q**      So the claim is received by CVS -- or when the claim

14   is received, if it appears to be in order, it is paid.  It

15   may or may not be reviewed later; correct?

16   **A**      Correct.

17   **Q**      Okay.  So for a claim to be proper, let's say --

18   **A**      Uh-huh.

19   **Q**      -- a few things have to happen:  The prescription must

20   be medically necessary.  Would you agree with that?

21   **A**      That is the intent, correct.

22   **Q**      Okay.  And the product, the prescription, whatever it

23   is, must be provided to your beneficiary; correct?

24   **A**      By the pharmacy?

25   **Q**      Yes.

**Smith (Cross)**

1  **A**     Correct.

2  **Q**     Okay.  And the claim itself, whoever does the billing,

3  whether it is the pharmacy or a third party, it obviously

4  has to be coded correctly and submitted as such?

5  **A**     Correct.

6  **Q**     Okay.  Now, if the claims are in order, you have to

7  assume at that point, before you pay them, that they are

8  correct?

9  **A**     Can you say that again?

10  **Q**     When you receive a claim, if it appears to be in

11  order, you assume those things -- correct? -- and then pay

12  it?

13  **A**     When claims are adjudicated, they then get -- so a

14  pharmacy will get a successful adjudication, and then my

15  personal team, we don't assume that they are correct.

16  That's why we have that daily review team where we actually

17  review claims in real time to make sure that there are not

18  any blatant errors with the claims.

19  **Q**     Right.  But you are looking for blatant errors.  So

20  you are not reviewing such as if you were doing an audit.

21  It's not that level of review; correct?

22  **A**     It sometimes can will pass to that level of review.

23  **Q**     I'm sorry?

24  **A**     It sometimes will pass to that level of review.

25  **Q**     But that's for a small portion of those claims.  You

**Smith (Cross)**

1    can't do that for millions of claims a year; correct?

2    **A**    We can't do an investigative audit for millions of

3    claims a year, no.

4    **Q**    Okay.  So if you do find, again, some red flag, let's

5    say --

6    **A**    Uh-huh.

7    **Q**    -- at that point, you've got a few options.  You can

8    perform an audit?

9    **A**    Uh-huh.

10    **Q**    Okay.  You can even put a pharmacy on a prepayment

11    review?

12    **A**    We do not have a the ability to do a prepayment

13    review, no.

14    **Q**    So you would do an audit at a minimum?

15    **A**    Ask that again.

16    **Q**    You would do an audit at a minimum, if you suspected

17    there was some fraud, waste or abuse?

18    **A**    Not at a minimum.  Within our role as a PBM, we do

19    have capacity to suspend payments to a pharmacy or terminate

20    the contract of a pharmacy.

21    **Q**    Okay.  So when you do an audit, for example --

22    **A**    Uh-huh.

23    **Q**    -- you're looking at each individual claim subject to

24    that audit in great detail?

25    **A**    The auditors look at a lot of different --

**Smith (Cross)**

1   **Q**     And when I say "you," I don't mean literally you.  I

2   just mean CVS or whoever does it for CVS.

3   **A**     The auditor will review the actual -- the claims

4   information that was submitted.  They will reach out to the

5   prescriber to get -- to verify that this prescription was

6   written for this patient, and this is how you prescribed it.

7   They will review drug invoices to ensure that the product

8   that was being billed to Caremark was actually the product

9   being purchased by the pharmacy.

10  **Q**     Right.  So you would agree that the provider -- the

11  doctor, nurse practitioner, whomever -- the doctor or nurse

12  practitioner is responsible for medical necessity?

13  **A**     Yes.

14  **Q**     And the pharmacy would be responsible for actually

15  providing the product to the beneficiary, whether it's pain

16  cream, any type of prescription; correct?

17  **A**     Within the realm of the pharmacist's professional

18  judgment.  The pharmacist does have the capacity to refuse

19  to fill a prescription.

20  **Q**     Assuming there's no issue by the pharmacist that

21  there's a problem --

22  **A**     Uh-huh.

23  **Q**     -- the pharmacist would essentially fill the

24  prescription and give the medicine to the beneficiary?

25  **A**     Correct.

**Smith (Cross)**

1  **Q**     Okay.  And, lastly, the biller, whomever that may be,

2  the pharmacy or third party, the biller would be responsible

3  for properly coding the claim and sending it to CVS?

4  **A**     Can you clarify what you mean by the biller?

5  **Q**     The billers responsibility -- the person who submits

6  the claim to CVS for payment is responsible for coding it

7  correctly, whether that's a pharmacist, or if the pharmacy

8  hires a third party?

9  **A**     We might be getting lost on terminology.  So coding in

10  my world is actually coding, like, a program.  The

11  pharmacist would not be responsible for coding.  The

12  pharmacist would be responsible for ensuring that the

13  medication that's leaving the pharmacy is accurate prior to.

14  **Q**     I'm sorry.  The claim should reflect what the

15  pharmacist gave the beneficiary?

16  **A**     Correct.

17  **Q**     Okay.  That's what I was trying to say.

18  **A**     Okay.

19  **Q**     Now, you testified you're familiar with regard with

20  Central Rx, obviously.  There was an audit.  CVS eventually

21  terminated its contract with Central Rx; correct?

22  **A**     Correct.

23  **Q**     Okay.  You are not familiar with Theramedical outside

24  of what the Government may have told you about this case

25  though; correct?

**Carter (Direct)**

1    **A**    Say that again.

2    **Q**    You're not familiar with Theramedical outside of what

3    the Government may have told you about this case; correct?

4    **A**    We don't conduct audit on the medical, side correct.

5    **Q**    I'm sorry?

6    **A**    Caremark does not conduct or review the medical side.

7             MR. LOWTHER:  All right.  Thank you.

8         That's all the questions.

9             THE COURT:  Any redirect?

10            MS. KING:  No, Your Honor.

11            THE COURT:  You may step down.

12        Thank you.

13        Next witness, please.

14            MS. KING:  The Government calls Kimberly

15   Carter.

16            (Witness was sworn)

17        **DIRECT EXAMINATION KIMBERLY CARTER**

18   **BY MS. KING:**

19   **Q**    Good morning.

20   **A**    Good morning.

21   **Q**    Could you please provide your name to the jury.

22   **A**    Kimberly Carter.

23   **Q**    Okay.  And I think you may need to put microphone up

24   there a little closer.  There you go.

25        Thank you.

37

**Carter (Direct)**

1    Ms. Carter, where are you currently employed?

2  **A**    Blue Cross Blue Shield of Michigan.

3  **Q**    And how long have you been with Blue Cross Blue

4  Shield?

5  **A**    33 years.

6  **Q**    And before you joined that company, can you summarize

7  your educational history?

8  **A**    I'm sorry?

9  **Q**    Your educational background?

10 **A**    I have a master's in health care, so all the way

11 through.

12 **Q**    And what is your current position with Blue Cross?

13 **A**    I'm the account manager for the FCA account.

14 **Q**    And FCA, what does that stand for?

15 **A**    Fiat Chrysler Automobiles.

16 **Q**    Okay.  And how long have you been the account rep?

17 **A**    I've been servicing the account for the last 14 years.

18 **Q**    Okay.  And could you summarize your job duties in that

19 position?

20 **A**    From within the position, I've been responsible for

21 troubleshooting, implementing benefits into the system,

22 helping employees with any type of claim errors, anything

23 that's required to assist Fiat Chrysler employees.

24 **Q**    And what geographic area does Blue Cross Blue Shield

25 work with Fiat Chrysler on?

**Carter (Direct)**

1   **A**      We're nationwide because Fiat Chrysler is spread out

2   across the United States.

3   **Q**      And so it's beyond Blue Cross Blue Shield of Michigan;

4   there's other Blue Crosses that service other plants in

5   other locations?

6   **A**      Yes.  We all work together doing an inner plan

7   arrangement.

8   **Q**      Is Fiat Chrysler what is known as self-insured?

9   **A**      Yes.

10  **Q**      And can you explain to the jury what that means?

11  **A**      For a self-insured account, all claims that are

12  incurred are actually paid by Blue Cross, but then it's

13  billed to Fiat Chrysler, and then they send us the payment

14  for the entire amount.  So it's self-funded.  So, typically,

15  let's say you have an office visit and it is $75.  We pay

16  $75 on your behalf.  Fiat Chrysler will refund Blue Cross

17  that $75.  So they pay for the total cost of the claim.  I

18  just used an office visit as an example.

19  **Q**      So it is fair to say that instead of paying premiums,

20  they actually just reimburse the total cost of the bill?

21  **A**      They cover the total cost of the bill, yes, minus any

22  applicable co-pays, but the total cost.

23  **Q**      Now, from the perspective of an employee of Fiat

24  Chrysler, does it work similar to other insurance plans?

25  Can they walk into the doctor or the pharmacy with an

**Carter (Direct)**

1    identification card?

2    **A**    It works the same.  They go in with their insurance

3    card.  If it's medical, there could be applicable co-pays or

4    deductibles in some cases for medical services.  And when

5    it's pharmacy, it's just the co-payment that's related to

6    the service, unless you are in a high deductible, then it

7    could be deductibles.

8                    (Court Reporter clarification)

9    **A**    So if you are a deductible for CVS, that's their

10   pharmacy vendor, so then the services could either be a flat

11   dollar co-pay for the prescription drug, or it could be

12   deductible co-insurance if they are in a high detectable.

13   **Q**    As part of its contract with Fiat Chrysler, does Blue

14   Cross Blue Shield monitor the health care claims it submits

15   to its customer?

16   **A**    Yes, we do.

17   **Q**    And what are you looking for when you monitor those

18   claims?

19   **A**    We're looking for anything that's any abnormality,

20   whether it's -- I don't know.  I want to stick with office

21   visit.  But if it's an office visit and

22   it's filled with an incorrect diagnosis, like, something for

23   preventive --

24   **Q**    Right.

25   **A**    -- then our system will kick it out.  But if it's an

Carter (Direct)

1    office visit bill with a medical diagnosis, then that claim

2    will just go right through our system.

3    **Q**    If someone wanted to report fraud related to claims to

4    Blue Cross Blue Shield, how could they do that?

5    **A**    We have a corporate fraud division, and we're

6    instructed as employees, anything that we see that may --

7    the smallest thing, to refer it and have them review.

8    **Q**    And in your work with Blue Cross Blue Shield for Fiat

9    Chrysler, did you ever coordinate review with Fiat

10   Chrysler's pharmaceutical provider?

11   **A**    Yes, we worked together.

12   **Q**    Is it fair to say that Fiat Chrysler, through Blue

13   Cross Blue Shield, will generally pay only if the medical

14   services being billed for are medically appropriate?

15   **A**    Yes.

16   **Q**    And if someone submitted a claim for a doctor's visit,

17   is the fact that an actual exam occurred something that Blue

18   Cross Blue Shield would want to know?

19   **A**    Yes.

20   **Q**    Why?

21   **A**    Well, they want to make sure that the service was

22   medically necessary and it was appropriate for the services

23   that were billed.

24   **Q**    And if someone submitted a claim for a doctor's visit

25   and they brought their own prescription pad with them for

**Carter (Direct)**

1    the doctor to use, is that something that Blue Cross Blue

2    Shield would want to know?

3    **A**    Yes.  I would say that they would want to know that.

4    We would want to know that.

5    **Q**    And why?

6    **A**    Well, just to make sure that nothing fraudulent was

7    occurring, because it is not normal for a patient to have

8    their own pharmacy script.

9    **Q**    And if a Jeep employee, a Blue Cross Blue Shield plan

10   participant, was being paid or incentivised to go to the

11   doctor to get a prescription for medical treatment, would

12   that be something that Blue Cross Blue Shield would want to

13   know?

14   **A**    From a fraudulent perspective, yes, Blue Cross would

15   definitely want to be made aware.

16                    MS. KING:  No further questions.

17                    MR. LOWTHER:  No questions.

18            Thank you.

19                    THE COURT:  You may step down.

20                    THE WITNESS:  Thank you.

21                    THE COURT:  Next witness, please.

22                    MS. KING:  The Government calls Brad Thompson.

23                    (Witness was sworn)

24            **DIRECT EXAMINATION OF BRAD THOMPSON**

25   **BY MS. KING:**

**Thompson (Direct)**

1    **Q**    Good morning.

2         Could you please provide your name to the jury.

3    **A**    Brad Thompson.

4    **Q**    Mr. Thompson, where are you currently employed?

5    **A**    Stellantis.

6    **Q**    And is Stellantis formerly known as Fiat Chrysler?

7    **A**    Yes.

8    **Q**    Does it have a plant here in the Toledo area?

9    **A**    Yes.

10   **Q**    Okay.  And what is your current position with

11   Stellantis?

12   **A**    I am currently the vice president of our health care

13   disability and medical operations group.

14   **Q**    And what do you do in that role?

15   **A**    We manage the health care plans that are -- provide

16   health care services to our employees and their dependents.

17   **Q**    And in the time frame of 2013 to 2015, did

18   Stellantis/Fiat Chrysler provide health care benefits in

19   particular to the ones that worked in the Jeep plant here in

20   Toledo?

21   **A**    The -- yes.  So we would have provided health care

22   benefits to employees -- eligible employees that would have

23   been working in the plants in Toledo, yes.

24   **Q**    Okay.  And did that include both medical and

25   pharmaceutical coverage?

**Thompson  (Direct)**

1    **A**     Yes.

2    **Q**     Does Stellantis pay premiums?  Or is it self-insured

3    in terms of its health care benefits?

4    **A**     We have -- most of our plans are self-insured.

5    Majority of our plans are self-insured.  There's a --

6    **Q**     Sorry.  Go ahead.

7    **A**     There's a few -- small percentage of our employees

8    that would be covered under fully insured plans, but most

9    are self-insured.

10   **Q**     And what does that mean?

11   **A**     What does self-insured mean?

12   **Q**     Yeah.

13   **A**     Self-insured means that we essentially take all of the

14   risk.  So we pay for all of the cost of medical care or

15   pharmacy care, less any deductibles or co-pays that the

16   employees would be, you know, responsible for as part of

17   their plan.

18   **Q**     And does Fiat Chrysler maintain the medical data that

19   it receives from its health care benefit plans?

20   **A**     So we have a vendor that we employ that manages --

21   that will warehouse all of the claims data.  So, for

22   example, if a person goes to a doctor or has a procedure

23   done, those claims would be all warehoused in a -- by a

24   third party, which we would access in an aggregate basis to

25   use for trends, for analysis, that sort of thing.  So, yes.

**Thompson  (Direct)**

1    **Q**     And is that partly to ensure the privacy of the

2    employees data or health care information?

3    **A**     That party does, absolutely, yes.

4    **Q**     And what's the name of that third-party holder of the

5    information?

6    **A**     The name has changed a bunch of times.  So it's

7    currently Merative.  It could be formerly known as IBM

8    Watson or Truven, but it's the same company.  It's changed

9    names over the years.

10   **Q**     Okay.  How many plan members does Fiat Chrysler

11   provide health care benefits for?

12   **A**     Obviously, it varies based on our employment, but

13   today we're around 130,000, so members would be employees

14   and their dependents.

15   **Q**     And you said -- we discussed Stellantis being

16   self-insured.  Can you give the jury a rough idea of how

17   much it spends, say, on an average week on health care

18   costs?

19   **A**     So from a medical cost perspective, we would spend

20   probably about 15 or -- today, about 15 or $16 million a

21   week on health care costs.  And then there's a pharmacy

22   component as well, would will be about $4 million a week.

23   So, you know, if you analyze that -- I know that is not your

24   question, but it ends up being a lot.

25   **Q**     And when you're talking about that number, what

**Thompson  (Direct)**

1    geographic area are you referring to?

2    **A**    That would be the -- all of our locations where we

3    have employees and their dependents, so in the United

4    States.

5    **Q**    Okay.  You said earlier that Stellantis doesn't pay

6    premiums.  What does it pay to get the health care benefits

7    managed?

8    **A**    So we pay fees, administrative fees to a third party

9    to administer those claims.  So -- and that goes back to the

10   concept of being self-insured.  So we pay a small fee to a

11   third party that owns the network of the providers, manages

12   the claims, processes the claims, and then we pay the value

13   of the total claims, but we also pay a fee for a third party

14   to manage them.

15   **Q**    And are some of the third parties, does that include

16   Blue Cross Blue Shield and CVS Caremark?

17   **A**    Yes.

18   **Q**    Are the health care benefits that are provided to Fiat

19   Chrysler employees, Stellantis employees, are they generally

20   limited to items that are considered medically appropriate?

21   **A**    Yes.  Yeah.  So there's a covered benefits that would

22   absolutely be, you know, for the purpose of medical care or

23   pharmacy for the benefit of that employee.

24   **Q**    And why is it being medically appropriate or medically

25   necessary, why is that important?

**Thompson  (Direct)**

1    **A**     I'm not sure I understand the question, but we

2    wouldn't want to pay for something that isn't for the

3    benefit of a person's health and well-being.

4    **Q**     If someone submitted a claim for a doctor's visit,

5    would Fiat Chrysler want to know whether or not an actual

6    exam had occurred during that doctor's visit?

7    **A**     Yes.

8    **Q**     Why is that?

9    **A**     If you're suggesting that an office visit didn't

10   occur, that would imply that we're paying for something that

11   wasn't provided, and I wouldn't want to do that.

12   **Q**     Okay.  And if someone submitted a claim for a doctor's

13   visit and the patient had brought their own prescription pad

14   with them, is that something that Fiat Chrysler or

15   Stellantis would want to know?

16   **A**     It depends on what they're doing with that

17   prescription pad.  Generally, in my experience, a doctor has

18   the prescription pad, not a patient or an employee.  So I

19   would want to know if there was some unusual activity going

20   on or if they for certain they had a doctor's appointment.

21   Yes.

22   **Q**     And if a Jeep employee, a plan participant was being

23   incentivised or paid to go to the doctor and buy a

24   prescription, is that something that Fiat Chrysler would

25   want to know?

**Thompson (Direct)**

1    **A**      Absolutely, yes.

2    **Q**      And why is that?

3    **A**      Because the health care benefits we provide are for

4    health care.  They are not for payment for other purposes.

5    **Q**      If someone wanted to report fraud related to health

6    care claims to Fiat Chrysler, how might they do that?

7    **A**      I'm sorry.  Could you repeat that?

8    **Q**      If someone suspected fraud and wanted to report it to

9    Fiat Chrysler, say an employee or plan member, how might

10   they do that?

11   **A**      Well, it depends on where they were, but there's

12   numerous avenues to report fraud.  Employees can talk to

13   supervisors.  There's business practice numbers, which are

14   confidential, you know.  It really depends, but there's

15   numerous avenues to report abuse.

16   **Q**      Thank you.

17          No further questions.

18          I'm sorry.

19          Can you identify some of the states where Fiat

20   Chrysler provides health care benefits?

21   **A**      Some of the states?

22   **Q**      Yeah.

23   **A**      I can list some of the big ones where we have

24   facilities.  I can't list all of them because it also

25   depends where people live, but we have, obviously,

**Thompson (Cross)**

1    facilities in Ohio -- big facilities in Ohio, big facilities

2    in Indiana, Michigan, Illinois.  We have some parts depots

3    scattered throughout the country on the west side of the

4    state -- or the west side of the country like California,

5    Florida.  And then stretching my knowledge of all of our

6    parts depots beyond that.  So those are the big locations

7    that we have employees.  But primarily most of our plants

8    are located in the Midwest and that's where those states

9    would be where we have the highest population.

10   **Q**     And you provide health insurance to the employees that

11   work in all those different states?

12   **A**     Yes.

13              MS. KING:  Okay.  No further questions.

14              THE COURT:  Cross-examine?

15              MR. KERGER:  Yes, Your Honor.

16         **CROSS-EXAMINATION OF BRAD THOMPSON**

17   **BY MR. KERGER:**

18   **Q**     Mr. Thompson, I'm Rick Kerger, and I represent Kevin

19   Clay in this case.

20         Health care for your workers is kind of an important

21   point for you, the company?

22   **A**     Is that a question?

23   **Q**     Yeah.

24   **A**     Yes, it is important for me.

25   **Q**     And it is something you have to negotiate with UAW?

**Thompson (Cross)**

1    **A**    Yes.

2    **Q**    And you, as a company, want to have your workers have

3    access to the treatments they need.  True?

4    **A**    I'm sorry.  Why do they have access to what?

5    **Q**    You want to work to make sure that they have access to

6    the treatments they need?

7    **A**    Correct.

8    **Q**    Now, despite your best efforts at Chrysler, your

9    workers get hurt on the job?

10   **A**    Yes.

11   **Q**    I mean, car --

12   **A**    I'm not a health and safety person in the plants, but

13   that statement seems appropriate that people get hurt in the

14   plants.

15   **Q**    A car plant can be a dangerous place; there's big

16   pieces of equipment moving, car bodies moving through?

17   **A**    I run our health care plan.  I don't run the plants.

18   That statement seems to be an accurate statement, but I'm a

19   health care -- I'm an HR person, so. . .

20   **Q**    And as a health care person, you know that some of

21   your workers get scarred?

22   **A**    That they what?

23   **Q**    They get an injury and suffer a scar?

24   **A**    They get injured in the plants?  Yes.

25   **Q**    And they get injuries that are painful?

**Thompson (Cross)**

1    **A**    I can't speak to that.

2    **Q**    Well, you do pay for pain medication in your health

3    care program.

4    **A**    I manage the pharmacy vendors that provide the

5    networks where employees can go and get pharmaceutical

6    goods, yes.

7    **Q**    Now, does Stellantis require the pharmacy to send them

8    records indicating that there's a medical necessity for a

9    prescription?

10   **A**    The medical necessity for the prescription would be

11   the prescription that would be issued by the physician so

12   the employee can get that.  So it would be a medically

13   necessary script issued by a doctor so that employee can go

14   get that prescription.

15   **Q**    But Stellantis, for example, doesn't have a check off

16   box for the pharmacy to say this was medically necessary?

17   **A**    That's correct.  We're not qualified.  A physician is

18   qualified to do that.

19   **Q**    And Stellantis doesn't require the pharmacist to say,

20   well, there was a doctor's visit to get this script; right?

21   **A**    It -- no, it doesn't, but the doctors are only

22   qualified to issue those scripts.

23   **Q**    Thank you.

24          And Stellantis doesn't ask their employees, "Are you

25   bringing a pad to the doctor's office for prescriptions?"

**Thompson (Cross)**

1    do you?

2    **A**    We do not.

3    **Q**    And you have people at Stellantis who are watching and

4    monitoring your expenses to make sure that they're

5    appropriate?

6    **A**    Well, CVS is our third-party vendor that is managing,

7    administering that.  So, yes, people at Stellantis are

8    managing the vendor, but under contract with CVS, they

9    administer the network, they administer the claims, they --

10                    (Court Reporter clarification)

11   **A**    -- manage the edits within the plan design.

12   **Q**    And you expect Blue Cross Blue Shield, as your

13   pharmacy benefit manager, to check on the people that are

14   writing scripts for -- or filling scripts for?

15   **A**    CVS Caremark is the vendor, so, yes, we expect them to

16   manage that.

17   **Q**    Mr. Thompson, thank you very much.  I have no more

18   questions.

19                    THE COURT:  Any redirect?

20                    MS. KING:  No, Your Honor.

21                    THE COURT:  You may step down.

22        Thank you.

23        Let's take our mid-morning break, please.  It is

24   10:30, according to that clock, and we'll be in recess for

25   15 minutes or so.  Please remember all the rules.

**Maluchnik (Direct)**

1         Thank you.

2         We're in recess.

3                   (Recess taken at 10:29 a.m.)

4                       -   -   -

5                   (Court resumed at 10:50 a.m.)

6                       -   -   -

7              THE COURT:  Government may call its next

8    witness.

9              MR. CRAWFORD:  The Government calls Matthew

10   Maluchnik.

11                 (Witness was sworn)

12        **DIRECT EXAMINATION OF MATTHEW MALUCHNIK**

13   **BY MR. CRAWFORD:**

14   **Q**    Would you state and spell your name for the record,

15   please.

16   **A**    Matthew Maluchnik, M-a-l-u-c-h-n-i-k.

17   **Q**    And where are you originally from?

18   **A**    Toledo area, Genoa, Ohio.

19   **Q**    And we'll talk about some offenses you've plead guilty

20   to, but did you plead guilty to some charges related to this

21   case?

22   **A**    Correct.

23   **Q**    And did two of those charges include tax offenses

24   related to a charitable foundation?

25   **A**    Correct.

**Maluchnik (Direct)**

1    **Q**     So if during the defense opening this morning the jury

2    heard you did not plead to any tax offenses, that would be

3    false; correct?

4    **A**     Correct.

5    **Q**     Could you tell the jury a little bit about your

6    educational history, please?

7    **A**     Sure.  How far back would you like me to go?

8    **Q**     College.

9    **A**     College.  Went to University of Toledo.  Studied

10   engineering there.  A couple years later I, went and got my

11   MBA at Ohio State.  And I'm currently in the Bowling Green

12   State University studying to be a doctor of organizational

13   behavior and change.

14   **Q**     And what year did you graduate from UT?

15   **A**     2005.

16   **Q**     And then starting there, if you could just give the

17   jury a brief employment history.

18   **A**     Right out of college, I got my first job with

19   Enterprise Rent-A-Car.  I was there for about a year until I

20   got in with Pfizer pharmaceuticals, at which time I moved

21   down to southeastern Ohio, was down there.  That's where I

22   got my MBA as well.  A few years later, after about 2010

23   when I finished the MBA, probably about two years later is

24   when I got on with Amgen, another pharmaceutical company

25   which relocated me back to the Perrysburg, Ohio, area.

**Maluchnik (Direct)**

1    **Q**     What made you want to get into pharmaceutical sales?

2    **A**     I had an uncle that was doing medical device sales,

3    and towards the end of my engineering degree, I kind of knew

4    that I wanted to be out and about more and connecting with

5    people, and he kind of took me on a job shadow day, and I

6    loved it.  It opened my eyes to a whole different world.  He

7    enjoyed it so much.  And I knew at that time, I just wanted

8    a little bit -- something with more autonomy where I could

9    be connecting with people and the decision was made.

10   **Q**     And while you were working at Pfizer and Amgen, what

11   sort of pharmaceuticals were you selling?

12   **A**     I sold Viagra, Detrol LA, Spiriva, Zyrtec.  There was

13   a bunch more at Pfizer.

14   **Q**     And what did selling for Pfizer/Amgen entail?

15   **A**     Usually had a set of doctors that you would call on

16   once or twice a week.  And "call on" basically means you

17   stop by their office, check in on them, see if they need any

18   samples, educate the doctor if they had any questions about

19   the pharmaceuticals that come up, educate the staff.  So it

20   was just a lot of education and, you know. . .

21   **Q**     Did you go out and look for patients and specifically

22   market the drugs to patients?

23   **A**     No.

24   **Q**     Did you pay patients to go to doctors and get

25   prescriptions?

**Maluchnik (Direct)**

1    **A**    No, sir.

2    **Q**    When did you first meet Kevin Clay?

3    **A**    I met Kevin while at college at The University of

4    Toledo, and I want to say it was probably roughly 2003 time

5    frame.

6    **Q**    Do you see him in the courtroom today?

7    **A**    Yes, I do.

8    **Q**    And where is he sitting?

9            MR. KERGER:  Stipulation to that, Your Honor.

10            THE COURT:  So noted.

11    **BY MR. CRAWFORD:**

12    **Q**    So you were both students at UT?

13    **A**    Correct.

14    **Q**    And where did you first meet?

15    **A**    In a weight room.  We were working out.

16    **Q**    Social?

17    **A**    Yeah.  So he actually approached me.  He was working

18    for a network marketing company.  And I think he asked me to

19    spot him, and I remember there was a ton more weight than I

20    could even lift, and I'm thinking, "Oh, my God.  I hope this

21    guy doesn't get choked and I'm going to have to save him,"

22    but we always kind of chuckled about that.

23            But he started talking about this company that he was

24    selling stuff for.  And I was like, "Cool."

25            And he said, "Well, let's sit down and, you know, meet

**Maluchnik (Direct)**

1    more and talk about it."

2         And at that point, he recruited me, and we became best

3    friends and worked together every day.

4    **Q**    Did you both graduate from UT?

5    **A**    Correct.

6    **Q**    What happened to that business?

7    **A**    Towards the end I want to say the last year, we both

8    decided we didn't want to do that anymore.

9    **Q**    What type of business was it?

10   **A**    It was a network marketing company.  It was called

11   Prepaid Legal.

12   **Q**    And after you both graduated, did you stay in touch?

13   Drift apart?

14   **A**    I want to say it was roughly a year or two that we

15   kind of went our own ways because I moved about four and a

16   half hours away, but we were both actually working for

17   Pfizer, so it wasn't, like, we never saw each other.  It

18   just wasn't as tight as we were in college.

19   **Q**    Did you both start working for Pfizer at the same

20   time?

21   **A**    No.  Kevin got in about a year before I did.

22   **Q**    Did you reconnect at some point?

23   **A**    Correct.

24   **Q**    With Kevin?

25   **A**    Yes.

**Maluchnik (Direct)**

1    **Q**    When did that happen?

2    **A**    I want to say it was probably, like, a year or two

3    after being in with Pfizer for a while.  I started making

4    trips back home a lot, and we would hang out.

5    **Q**    Were you living back in Northwest Ohio at the time?

6    **A**    At that time, I was living in Nelsonville, Ohio, which

7    is south of here about four and a half hours.

8    **Q**    And you were both working for Pfizer?

9    **A**    Right.  But Kevin was in the Toledo area.

10   **Q**    And at some point, did you ever work for Amgen?

11   **A**    Yes.

12   **Q**    How did that come about?

13   **A**    So the manager who hired me with Pfizer, she ended up

14   moving over to Amgen, and I lost contact with her for a few

15   years.  And I want to say it was roughly 2012 or 2013 when

16   she called me up and said, "Hey, weren't you from the

17   Perrysburg area?"

18          And I said, "Yeah, I've been trying to get back there

19   for a few years."

20          And she said, "Great.  I'm a manager at Amgen, and we

21   have a territory that opened up."

22          So she recruited me to come over.

23   **Q**    All right.  While working at Pfizer or Amgen, did you

24   ever sell compounded medications to physicians?

25   **A**    While working at Amgen, yes.

58

**Maluchnik (Direct)**

1    **Q**    What type of compound medication were they?

2    **A**    Pain creams, scar creams.

3    **Q**    And you indicated that Amgen did not pay patients to

4    go get prescriptions for those?

5    **A**    That's correct.  Oh, hold on.  Let me clarify.

6          While working at Amgen, I did not smell compounds for

7    Amgen.  While working at Amgen, I sold compounds for Central

8    RX Pharmacy, so I just wanted to clarify.

9    **Q**    All right.  Thank you.

10          Speaking of compound creams.  In 2013, so where were

11    you working and living?

12    **A**    In 2013, I was living in Perrysburg in an apartment.

13    I was working at Amgen.

14    **Q**    Okay.  And regular contact with Kevin?

15    **A**    Correct.

16    **Q**    How regular?

17    **A**    Like every day.  We were neighbors.

18    **Q**    Did you live in the same apartment complex?

19    **A**    Yes.

20    **Q**    How far apart?

21    **A**    Like 50 to a hundred feet.

22    **Q**    Where was Kevin working in 2013?

23    **A**    Pfizer.

24    **Q**    And out some point in 2013, did you learn about

25    compounding pain and scar cream?

**Maluchnik (Direct)**

1    **A**    Yes.

2    **Q**    When did you first hear about that?

3    **A**    I want to say it was roughly November-December time

4    frame is when I heard about it.

5    **Q**    Who did you hear it from?

6    **A**    I think originally it happened between two of the same

7    things.  It was almost, like, the same week.  So I had a

8    partner at Amgen -- his name was Tracy -- and we were doing

9    lunch -- lunches together, talking to physicians, doing what

10   our job entails which was marketing a drug called "Prolia"

11   for Amgen.  And while sitting at a lunch, towards the end of

12   the lunch, Tracy started talking about, "Hey, my wife is

13   selling some other pharmaceutical.  Here, Doctor, take a

14   look at this."

15        And I thought it was kind of odd, and he told me he

16   was just kind of helping his wife out, but it was a compound

17   pharmaceutical is what he was selling.

18        You look like you want to jump in there.

19   **Q**    Continue your thought.

20   **A**    So roughly in the same week, I got a call from Kevin,

21   who received a call from somebody else down in southeastern

22   Ohio who worked with Pfizer, that him and a buddy of his

23   opened up a compound pharmacy with a few doctors.  And their

24   intent was to recruit Kevin to recruit any reps and kind of

25   build his own sales team for their compound pharmacy.  Well,

**Maluchnik (Direct)**

1    Kevin knew the names, and he knew one of the names that I

2    might know, so Kevin called me and he said, "Hey, do you

3    know this guy named John Eaton?"

4         And I said, "Yeah.  I used to sell pharmaceuticals

5    with him down south when I worked for Pfizer."

6         He said, "Him and another buddy opened this pharmacy

7    and they're trying to get us to sell pharmaceuticals for

8    them."

9         And so after that conversation ended, I talked to John

10   Eaton, in which he explains, you know, what him and his

11   friend did, and they started a pharmacy with some doctors.

12   But that was the original conversations that kind of brought

13   me to learning about what compound pharmaceuticals were.

14   **Q**    Was this early 2013, mid-2013, late --

15   **A**    Towards the end.

16   **Q**    At that point in time, did you have any understanding

17   of what sort of the income revenue structure would be for

18   marketing these compound creams?

19   **A**    So after that conversation, I remember speaking to

20   John Eaton.  And he said, you know, "Basically we -- for any

21   pharmaceuticals that you sell these compounds, we'll give

22   you about $300 a piece."

23        So at that time, I started putting together, like,

24   "Oh, this was what Tracy was doing at this lunch."

25        So next time I had a lunch with Tracy, I asked him

**Maluchnik (Direct)**

1    about it and this was probably, like, two days later.

2    **Q**    Now, John Eaton was a person you met through who?

3    **A**    I met John Eaton originally while working for Pfizer

4    down in southeastern Ohio.

5    **Q**    And who introduced you to John Eaton?

6    **A**    We got introduced through Pfizer, so it was at a

7    Pfizer sales training and stuff.

8    **Q**    Had Kevin mentioned John Eaton to you?

9    **A**    Correct.

10   **Q**    Okay.  You mentioned that you learned some additional

11   information about how the sort of revenue structure worked

12   for selling these compound creams?

13   **A**    Correct.

14   **Q**    And what was the additional information?

15   **A**    So while sitting with Tracy at lunch, I said, "Is your

16   wife selling these compound pharmaceuticals?"

17            And he said, "Well, actually, we both are."

18            And I said, "Oh, because some guy from down south just

19   called me up and told me he wanted me to sell them, too."

20   And I said, "Well, where are you guys -- what pharmacy are

21   you guys using?"

22            And he said, "Oh, we're getting, like, thousands of

23   dollars a piece for selling these, and me and my wife got a

24   prescription, and we're getting paid for our prescription.

25   We're using this pharmacy out of Cleveland."

**Maluchnik (Direct)**

1      And so I called Kevin up and I said, "Hey, I found out

2    where these other people are selling from, and they're

3    getting paid a lot more than $300 a pop."

4      And so I told him the name of the pharmacy.  And he

5    says, "Okay.  I'll sit down with Tracy" at the time, and

6    Kevin put in a call to Central RX Pharmacy and within ten

7    minutes had set up a meeting with Lemma Gettachew, the owner

8    of that pharmacy.

9    **Q**    All right.  Did you actually have this meeting?

10   **A**    Yes.

11   **Q**    Where was it?

12   **A**    It took place in Cleveland, Ohio, I want to say it was

13   probably just a couple days later.

14   **Q**    And who contacted Lemma Gettachew first, you or Kevin?

15   **A**    Kevin.

16   **Q**    Who attended this meeting?

17   **A**    At -- it was me and Kevin, and we showed up, and we

18   met Lemma at the pharmacy, and then he actually escorted us

19   over to the Cleveland Clinic dining room area.  And we sat

20   down with him, and there was another younger guy there as

21   well that Lemma brought along.

22   **Q**    And what did you discuss?

23   **A**    So, originally, Lemma's intent was to get us to work

24   under this younger gentleman who he brought to the meeting.

25   About five minutes into the conversation, I think he quickly

**Maluchnik (Direct)**

1   saw, number one, we came from the pharmaceutical space,

2   where this other younger guy didn't.  Lemma saw that he

3   didn't need the other guy or us working under him because we

4   actually came with the intent of we wanted to set up our own

5   sales team, and this guy was just kind of going to be in the

6   way of that.

7   **Q**     What proposal did you and Kevin have for setting up a

8   business?

9   **A**     Our ask of Lemma was to receive a percentage of the

10   reimbursed amounts from the pharmaceutical company, but we

11   wanted exclusive rights over the Toledo area zip codes.

12   **Q**     And how did Lemma respond to that?

13   **A**     He was fine with it, absolutely.  He just -- I

14   remember he had one other rep in this area, and he said,

15   "You're just going to have to stay away from the doctors

16   that this current rep is already selling to."  So he reached

17   out to her, I believe, and got a list, and it didn't amount

18   to much.  There was only, like, two or three doctors on

19   there that we didn't know anyways.  So. . .

20   **Q**     Okay.  Did it become apparent to you at some point

21   that you could go to a doctor, get a prescription for pain

22   and scar cream in your name and then actually get reimbursed

23   from the pharmacy for your own prescription?

24   **A**     Yes.

25   **Q**     When did that become apparent to you?

1   **A**      So we signed the agreement I want to say it was

2   December of 2013, and roughly I want the say it was either

3   the end of December or January when I went to a physician

4   that I know -- Dr. Huenefeld -- and she wrote that

5   prescription for me.  They sent it into the pharmacy, and a

6   few days later, I got the cream, and it was probably 30 days

7   later or so where I also received a check from the pharmacy.

8   **Q**      How much was the check from the pharmacy?

9   **A**      The first check we got from them included not just my

10  own prescription, but a few other pharmaceutical sales reps

11  and friends of ours that we knew.  So it was -- this is a

12  rough guess, but it was probably at least $10,000 for that

13  first check for commission.

14  **Q**      And that was just one prescription for you?

15  **A**      No.  That included multiple prescriptions --

16  **Q**      Prescription for Kevin?

17  **A**      -- for a couple people.

18          Yes.

19  **Q**      Okay.  So your visit to this doctor, was a bit of a

20  test run?

21  **A**      Correct.

22  **Q**      Why did you do a test run?

23  **A**      I did a test run because I didn't quite believe that

24  these things were paying out so much and that we would

25  actually get paid.  I wanted to see it before talking to

**Maluchnik (Direct)**

1    people and trying to sell this to other people.

2    **Q**    Because in your previous experience in pharmaceutical

3    sales, there was no reimbursement to patients for getting a

4    prescription; correct?

5    **A**    Correct.  In my world, it didn't quite work like that.

6    **Q**    Okay.  Did Kevin do a test run?

7    **A**    Kevin also did a test run.

8    **Q**    How do you know that?

9    **A**    He went to a physician.  I mean, I could look at the

10   sales statements, but he went to a physician and got a

11   prescription.

12   **Q**    Did he tell you about that?

13   **A**    Yes.

14   **Q**    Did he also get paid for his own prescription?

15   **A**    Correct.

16   **Q**    What else did he tell you, if you can remember, about

17   going to this doctor?

18   **A**    I think it was Dr. Peyton.  That's about it.  I mean,

19   we didn't talk details about what was said in the room with

20   the doctor though.

21   **Q**    You mentioned going to -- which doctor did you go to

22   for your test run?

23   **A**    I went to Dr. Huenefeld.

24   **Q**    Okay.  How did you know her?

25   **A**    I had been selling Prolia to her for the past year or

**Maluchnik (Direct)**

1    so.

2    **Q**    Okay.  And what sort of practice did she have?

3    **A**    She had a small primary care practice.

4    **Q**    Okay.  Did it appear that -- well, did you get know

5    Dr. Huenefeld fairly well?

6    **A**    Yes.

7    **Q**    How?

8    **A**    Just seeing her once a week at her office, stopping

9    by, having lunches with her office staff.

10   **Q**    Did you take staff to dinner at times?

11   **A**    Yes, we did.

12   **Q**    Okay.  Dr. Huenefeld like to drink?

13   **A**    Yes, she does.

14   **Q**    Is there a particular incident that you recall that

15   sort of led you to bond with her staff?

16   **A**    Yeah.  This occurred probably shortly after I got

17   hired on with Amgen.  We had a meeting out at I want to say

18   Bravo.  It's a restaurant -- Italian restaurant at the

19   Franklin Park area, and we had a program -- me and Tracy had

20   a program to invite doctors to sell Prolia and talk about,

21   you know, Prolia.  We had a speaker there and everything.

22         Dr. Huenefeld showed up there kind of already a little

23   bit drunk with her staff.  And then at some point, the

24   waiter and the waitress almost kicked her out because she

25   just got so drunk.  And at that point, I kind of intervened,

**Maluchnik (Direct)**

1    smoothed it out, made sure, you know, nothing happened to

2    her or her staff and calmed the situation down.  And I think

3    because, you know, after walking them out to their cars and

4    everything, they didn't feel judged.  They felt protected.

5    They felt covered.  And after that, they just, you know,

6    just respected me and appreciated me.

7    **Q**    And this restaurant event, about how long was that

8    before you went to Dr. Huenefeld for a prescription for pain

9    and scar?

10   **A**    That was probably about a year.

11   **Q**    And when you went to Dr. Huenefeld for this test run,

12   what did you tell her?

13   **A**    I told her that -- number one, I told her I had some

14   back pain from sitting in my car all day driving around,

15   some lower back pain.  And I said, "I started selling these

16   creams.  I wanted to test this out, you know.  Will you

17   write a prescription for me?"

18        And she knew immediately what it was already.  She

19   didn't know the pharmacy, but she told me that she was

20   actually familiar with the compounds because another rep had

21   come in repping it for another pharmacy, and so she was

22   familiar with it.  She said, "No problem."  She did a quick

23   exam, and then wrote the prescription and then sent it off.

24   **Q**    Were you a patient of hers before?

25   **A**    I don't think so, no.

68

**Maluchnik (Direct)**

1    **Q**    Had you ever sought treatment for the back pain

2    before?

3    **A**    No.

4    **Q**    Was it important that she send the script to a

5    specific pharmacy?

6    **A**    Yes.  She had to send it to Central RX Pharmacy or we

7    would not get commissions.

8    **Q**    Did you have a prescription pad at that time from

9    Central Pharmacy?

10   **A**    Yes.

11   **Q**    Did you present that to her?

12   **A**    Correct.

13   **Q**    And what did she do?

14   **A**    She used the pad and wrote me the prescription, and

15   then her staff faxed it off.

16   **Q**    Was it about 30 days later you got a. . .

17   **A**    I want to say that the creams came within a week.

18   **Q**    Do you regularly use the cream?

19   **A**    I used it maybe once or twice, and then after that, I

20   stopped using it.

21   **Q**    Did you later come to find out how much those single

22   prescriptions cost?

23   **A**    Yes.

24   **Q**    What were they on the high end?

25   **A**    I want to say $15,000 is what they were billing.

**Maluchnik (Direct)**

1    **Q**    For a single prescription?

2    **A**    For a single prescription.

3    **Q**    Not including refills?

4    **A**    Correct.  We refill that every 30 days.

5    **Q**    Do you recall how much the refills were?

6    **A**    The same.

7    **Q**    Okay.  And what was the commission structure on that

8    $15,000 from Central Rx for you?

9    **A**    I want to say he would give us about 30 percent.  If

10   I'm doing the math.

11   **Q**    30 percent is about?

12   **A**    4,500?

13   **Q**    Nine thousand or so?  Well, plus a half.

14   **A**    Yeah.

15   **Q**    Do the math on the sheet here.

16         $4,500 sound correct?

17   **A**    Yes.

18   **Q**    Familiar with an individual named Dr. Nabity?

19   **A**    Yes.

20   **Q**    Who is he?

21   **A**    He is a doctor of up in Michigan.  I can't remember

22   his specialty.

23   **Q**    Did Kevin go to him at all?

24   **A**    He was a client that Kevin would call on while working

25   at Pfizer.  And he ended up recruiting Dr. Nabity to write

**Maluchnik (Direct)**

1   these pain creams for his patients.  If the question was did

2   Kevin get a prescription from Dr. Nabity -- that I don't

3   recall.

4   **Q**    Did Dr. Nabity ever do work for you and Kevin in terms

5   of your Theramedical business?

6   **A**    Yes.  We hired Dr. Nabity as a speaker.  And

7   originally at the beginning, we hired Dr. Nabity to help

8   make a slide deck, like, a training slide deck for anybody

9   that he recruited.

10  **Q**    Dr. Nabity is somebody you knew before Theramedical,

11  or someone that Kevin knew?

12  **A**    Kevin knew.

13  **Q**    All right.  So once you and Kevin do test runs to see

14  that you actually can get paid as much as $4,500 just for

15  going to a doctor and getting a script, did you develop a

16  plan to sort of make things bigger, so to speak?

17  **A**    Yeah.  I think the plan going in was to make things

18  big.  The plan originally was to hire other pharmaceutical

19  reps and form our own sales team.

20  **Q**    And in hiring these pharmaceutical reps, did you know

21  at the very beginning that these pharmaceutical reps, even

22  if they didn't have any of the prescriptions for other

23  patients, they could get paid for their very own

24  prescription?

25  **A**    Yes.

1    **Q**    Okay.  Did you and Kevin have a company called City

2    Wide Solutions?

3    **A**    Yes, but --

4    **Q**    What was that?

5    **A**    I was going to clarify.

6         So City Wide Solutions, back in -- we have to go back

7    to 2005 when I was graduating college.  My plan was to do

8    some things in real estate, so I set up this LLC called City

9    Wide Solutions.  Fast-forward, never did anything with it,

10   but the LLC, the business entity, remained open, operational

11   but never did nothing with it.

12        When it came to meeting with Lemma, because the

13   meeting got set so quickly, and now we're talking

14   fast-forward to December of 2013, Kevin got off the phone

15   with Lemma, set up a meeting.  We were going to head there

16   just a few days later.  We wanted to present ourselves

17   already as an entity that is ready to go and ready to sign

18   on with him.  So we originally used City Wide Solutions,

19   because it has been in existence for a while, to present

20   ourselves to Lemma as, "Hey, we're City Wide Solutions, and

21   this is how we want to do business."  So. . .

22   **Q**    Did you prepare some marketing materials to try to

23   recruit salespeople?

24   **A**    We did, but not at that meeting.

25   **Q**    Okay.

**Maluchnik (Direct)**

1    **A**    But later on, we prepared marketing materials, yes.

2    **Q**    If you look at your screen, let me show you Exhibit 6.

3    Well, is this document familiar to you?

4    **A**    Yes.

5    **Q**    What is it?

6    **A**    So. . .

7    Okay.  So after someone would sign up with our

8    company, this was a welcome letter that they would receive

9    in the mail accompanied with a prescription pad.

10   **Q**    Why did you give them a prescription pad?

11   **A**    Because if the prescriptions didn't go to that

12   particular pharmacy, then they wouldn't be able to get a

13   commission.

14   **Q**    Okay.  Was Central Rx the specific pharmacy?

15   **A**    Yes.

16   **Q**    Were there some other pharmacies that you used over

17   time?

18   **A**    Over time, to get national coverage -- so a

19   pharmacy -- that particular pharmacy, Central Rx, was just

20   registered in Michigan and Ohio, I believe.  And when we

21   started reaching out to recruit reps in other states, we

22   needed different pharmacies that were licensed in these

23   different states, so we used Denton pharmacy, which is also

24   known as Apothecary.  Some other ones -- names escape me

25   right now.

**Maluchnik (Direct)**

1  **Q**    Okay.  What's the date on this letter?

2  **A**    January 10th of 2014.

3  **Q**    And in the lifespan of the compounding cream business,

4  when would January 10th, 2014, have been?

5  **A**    This was literally, like, the first month of

6  operation.

7  **Q**    Did you make efforts to specifically recruit people

8  who were trained and experienced in the pharmaceutical

9  industry?

10  **A**    We did in the first couple months, yes.

11  **Q**    Okay.  And later on, did it matter whether or not they

12  had any experience in the pharmaceutical industry?

13  **A**    No.

14  **Q**    What's this information at the bottom?

15  **A**    Telling them that they are going to get ten percent on

16  every prescription after 100 prescriptions.  So trying to

17  incentivize them, "Hey, do more, and you will get a better

18  commission."

19  **Q**    Who is the contact listed there?

20  **A**    Kevin Clay.

21  **Q**    Is that Kevin Clay's phone number?  Do you recall?

22  **A**    I do not recall.

23  **Q**    Did Kevin eventually call him the CEO of Theramedical?

24  **A**    Eventually.

25  **Q**    Show you page 2 of Exhibit 6.  There isn't a page 2.

**Maluchnik (Direct)**

1          Let's go to Exhibit 49.  What is Exhibit 49?

2     **A**     So this looks like roughly the same thing, a little

3     bit more information, but you will see that the company has

4     changed to Theramedical.

5     **Q**     What was the genesis of changing the name of the

6     company?

7     **A**     City Wide Solutions was just a quick, fast, you know,

8     get it done that first month.  And once we started digging

9     into the industry more, there was a lot of people recruiting

10    different companies out there, and City Wide Solutions just

11    wasn't a name that we felt was going to be good.

12    **Q**     What's this information in the middle?

13    **A**     So this is talking about total net payables.  So the

14    pharmacy will bill whatever they bill.  They choose what is

15    billed, and a net payable is what the actual insurance

16    company will pay back.  So what we're telling them is on

17    average, depending on someone's insurance, for example, that

18    pain cream is going to pay out $1,000 to $3,000.  That's

19    what the pharmacy will get because just in the prior

20    paragraph, we told them what percentages they would get.  So

21    we're allowing them to do the math to kind of know what they

22    have the potential of making.

23    **Q**     And what about the scar care cream there, the second

24    one?  What's the high end?

25    **A**     That's the $15,000 one.

**Maluchnik (Direct)**

1   **Q**    And your arrangement with Central Rx was to make

2   30 percent on that 15,000?

3   **A**    Correct.

4   **Q**    So the more people that were recruited to go to the

5   doctor to get a prescription, the more 30 percent cuts you

6   get on the 15,000?

7   **A**    Correct.

8   **Q**    And that money goes to Theramedical?

9   **A**    Correct.

10  **Q**    Okay.  Owned by you and Kevin Clay?

11  **A**    Correct.

12  **Q**    And what was your agreement with Kevin about ownership

13  of Theramedical?

14  **A**    We were 50/50.

15  **Q**    What about the wound care -- well, do you recall which

16  ones of these are creams and which ones may not be creams?

17  **A**    Yeah.  The pain and scar creams are creams.  The wound

18  care, I don't remember.  I honestly -- I'm not sure we ever

19  ended up selling any of those.  The NasoNeb was an aerosol

20  you kind of spray into your nostrils.

21  **Q**    Okay.  Most of your income came from the first two,

22  pain care and scar care?

23  **A**    Yeah, which was mostly done at Central RX Pharmacy.

24  **Q**    And at the bottom, who is Kevin Andrew?

25  **A**    That was Kevin's pseudo name.  So my pseudo name was

**Maluchnik (Direct)**

1    Matthew Scott.  Kevin's was Kevin Andrew.  We did that

2    because we were still working for Pfizer and Amgen

3    respectively, so we didn't want our bosses to know that we

4    were selling other stuff on the side, so we kind of just

5    covered our name.  It's his middle name, too.

6    **Q**    What's page 2, specifically the topic "starter pack"?

7    **A**    So when someone signs up with us, the starter packs

8    would be shipped out to them, which would include the

9    prescription pad, which you will see there, and a couple

10   brochures, to help them understand the product and what they

11   were selling.

12   **Q**    What's "pharmacy script pad"?

13   **A**    That is what is faxed in to the pharmacy.

14   **Q**    Is that a prescription pad that --

15   **A**    Yeah.

16   **Q**    -- they were supposed to give to the physician?

17   **A**    Right.

18   **Q**    That's what you would have given to Dr. Huenefeld to

19   write your prescription when you first went to see her?

20   **A**    Correct.

21   **Q**    What's being conveyed here in the middle to the

22   prospective sales rep?

23   **A**    The bolded statement?

24   **Q**    Well, that paragraph there.

25   **A**    Oh, the whole paragraph?

**Maluchnik (Direct)**

1    **Q**     Sure.

2    **A**     Hinting to the fact that they can get a prescription,

3    if they want, and then bolding, "Hey, most people are able

4    to get one or even family members within the first week."

5    **Q**     If they can get a prescription, they can get paid for

6    that prescription?

7    **A**     Correct.

8    **Q**     So if a person signed up as a salesperson, and they

9    simply went to a doctor themselves and their families, how

10   much could they make for their own -- themselves and their

11   family members?  How much could they make on a single

12   prescription or a single set of prescriptions for their own

13   family?

14   **A**     A few thousand dollars.

15   **Q**     Per month?

16   **A**     Correct.

17   **Q**     And were some of the salespeople making tens of

18   thousands of dollars in a year by getting prescriptions?

19   **A**     Yes.

20   **Q**     Some, a couple hundreds of thousands of dollars?

21   **A**     There was a few, yep.

22   **Q**     Could they still make a lot of money even if they

23   never recruited or marketed to anyone else to go get the

24   pain creams?

25   **A**     Yes.

**Maluchnik (Direct)**

1  **Q**     Was the difference to you between recruiting or

2  marketing versus simply paying people to go to the doctor

3  the difference between making a lot of money and a lot more

4  money?

5  **A**     Yeah.

6  **Q**     All right.  Did there eventually come a time when you

7  expanded your recruitment into the Jeep plant?

8  **A**     Yes.  I want to say it was roughly about six months

9  in, Lemma -- from the very beginning, Lemma was very much,

10  "Hey, this has been going on for a few years.  You guys only

11  got so much time, so hurry up, recruit, recruit, recruit."

12  And roughly around six months, I approached my Aunt Loni,

13  and I said, "Hey, you know, we got a call from Lemma.  He

14  said Jeep is covering this product.  Can you go get a

15  prescription for me and see if it helps you?"  At the time,

16  she had bad knees, and plus I just wanted a commission.  And

17  so, you know, her being my aunt, she obliged, and she went

18  to the doctors and got a prescription.  And she called me

19  and she said, "Hey, this actually works, but can I sell

20  this, too?  Because there is a lot of people at Jeep who

21  ought to get this."

22      And at that point, we had to go back to Lemma and see

23  if it was okay that we could recruit my Aunt Loni and she

24  could sell, you know, these medications and everything; but

25  it didn't take a month or two before she just recruited so

**Maluchnik (Direct)**

1   many people from Jeep that were getting the prescriptions.

2   **Q**    So you mentioned that -- well, was it important to

3   identify groups that had insurance coverage that would cover

4   these scar creams?

5   **A**    Yes.

6   **Q**    Why?

7   **A**    Well, in pharmaceuticals, in general, you want to know

8   who is covering the product.  That's the same for Amgen,

9   Prolia, whatever, because if you show up to a doctor's

10  office, and let's say, for instance, he has a large Medicare

11  population, and you're sitting here trying to tell him how

12  great this drug is.  It could be the greatest thing in the

13  world, but if it's not covered, he's not going to prescribe

14  it.

15      Same thing with these medications.  You want to know

16  who is covering because the doctor doesn't want to sit here

17  and talk to a patient and say, "Hey, I know exactly what's

18  going to help you," or "I'm going to do this for you," and

19  then the patient calls back and says, "Hey, the product that

20  you wrote for me isn't even covered by my insurance," so

21  then the doctor has to go back and find out what will work

22  for that insurance.  So it is a big pain in the butt.

23      So you want to know ahead of time who is covering your

24  product and who is not and the same thing with these

25  compound pharmaceuticals.  And it helped to recruit people,

1    too.  So knowing their places of employment and knowing

2    whether or not that particular insurance where that person

3    worked covered it was a very big deal, that way people

4    didn't spend their time trying to recruit people to get

5    prescriptions that couldn't get it.

6    **Q**    You mentioned that Lemma told you you were running out

7    of time?

8    **A**    Yeah.

9    **Q**    What did you understand that to mean?

10   **A**    So the way we understood it is that when a product

11   first comes to market, that's usually when the biggest

12   margin is or the most that insurance companies will pay out

13   on it.  And we understood that as time went on, more and

14   more insurances weren't covering the medication, or paying

15   less and less and less.  So Lemma telling us that was

16   basically saying, you know -- we interpreted it as they are

17   not going to continue to pay this much money for these

18   prescriptions.  This is normal.

19   **Q**    Did you talk to Kevin about recruiting people or about

20   the Jeep plant?

21   **A**    Yes.

22   **Q**    What were those discussions?

23   **A**    That Jeep was covering and that my aunt was recruited,

24   and she was building the sales team.

25   **Q**    Did Loni, your aunt, do some work for you and Kevin

**Maluchnik (Direct)**

1   related to the business beyond simply recruiting people?

2   **A**     That was mostly all she did that I recall was just

3   recruiting the Jeep people.  I mean, she would -- probably

4   after a month or two, she had so many people that she was

5   kind of preparing her own, like -- showed her Excel and how

6   to organize it so she could prepare her own statements to

7   the sales rep, because, monthly, they wanted to know what

8   they were being paid and what they were being paid on.

9   **Q**     Did nearly all of the employees at the Jeep plant who

10  got these prescriptions go to Dr. Huenefeld?

11  **A**     Yes.

12  **Q**     How did that come about?

13  **A**     It was probably in the first month or so when one

14  person went to their own doctor.  That doctor had used

15  somebody else's prescription, and so when the month came

16  around, that person said, "Hey, I got my medication.

17  Where's my payout?"  And they sent a picture of the

18  medication.  And we're, like, "That's not Central RX

19  Pharmacy."  They went to some other pharmacy.  So at that

20  point, it kind of -- in that small-knit community, they all

21  told themselves, "Shoot, we're not going to get paid unless

22  it goes to this pharmacy, and the only way to ensure it goes

23  to this pharmacy is if we go to this Dr. Huenefeld."

24        And the other part to that I would say is, you know,

25  according to my Aunt Loni, she said a lot of these people

**Maluchnik (Direct)**

1    who wanted to get the prescriptions didn't really have a

2    primary care physician yet.  And so I recall, at that time,

3    since I knew Dr. Huenefeld, I'm calling call her up and I

4    said, "Hey" -- actually, I went to the office.  And I said,

5    "Hey, there's a lot of people who work at Jeep who want to

6    get this prescription, and they don't have a primary care

7    doctor.  Would you mind if they came your way?  And she was,

8    like, "Absolutely.  Send them my way."

9    **Q**    Did she ever ask you for a cash or a bribe or anything

10   in return for this business?

11   **A**    When I first met with her, she did say, you know, "I

12   got this other guy who is selling this, and he gives me a

13   little piece of the action.  What are you going to do for

14   me?"  And I kind of chuckled and laughed.  To this day, I

15   don't know if she was serious or not, but it was enough to

16   make me uncomfortable.  So I did tell Kevin that, that, you

17   know, she said this to me.  So Kevin reported it to the

18   pharmacist and said, "Hey, you know, just so you know, we're

19   not paying her or anything, but she did make this statement

20   to Matt, and we just want to be all up front because, you

21   know, it's a -- to pay a physician is a big no-no."

22   **Q**    You went to her to get a prescription for pain cream?

23   **A**    Correct.

24   **Q**    Did you go back to her for anything else?

25   **A**    Maybe went back once or twice.

**Maluchnik (Direct)**

1    **Q**     What was your opinion of her as a physician?

2    **A**     She was a very caring physician.  She was passionate

3    for her patients.  I heard her yelling, you know, at other

4    physicians on behalf of her patients.  You know, little dogs

5    running around.  I wouldn't say it was the cleanest place,

6    but, you know, she's a little oddball, though, and I think

7    that's due to the drinking.

8    **Q**     But you didn't want to go back to her for anything

9    else?

10   **A**     No.  If it was something serious, I didn't feel

11   comfortable talking to her in that capacity.

12   **Q**     Are you familiar with currently Kevin Clay's spouse,

13   but his girlfriend at the time, Kim Forren?

14   **A**     Yes.

15   **Q**     Who is she?

16   **A**     His wife.

17   **Q**     In 2013 and 2014, were they married?

18   **A**     Not yet, nope.

19   **Q**     Did she do any work for Theramedical?

20   **A**     Not that I recall.

21   **Q**     Okay.  Did you and Kevin have some other companies, or

22   at least on paper, that sort of you would manage some of

23   these entities through?

24   **A**     Yeah.  We had a couple different things going on.  At

25   some point, we had a little catering company.  We had a

**Maluchnik (Direct)**

1    music production company.  We were trying to start a real

2    estate company towards the end -- that was before the search

3    warrant was issued.  A couple of things, yeah.

4    **Q**    Did Kim Forren get paid by any of your companies?

5    **A**    Yes.

6    **Q**    Did she do any work for any of them?

7    **A**    Let me rephrase that.  Was Kim Forren paid for any of

8    my companies?  No.  So one of Kevin's companies.

9    **Q**    Which company was that?

10   **A**    KCMM Management.

11   **Q**    Did she do any work for that company that you're aware

12   of?

13   **A**    Not that I know of.

14   **Q**    Did she do any work for any of the other companies

15   that you're aware of?

16   **A**    Not that I know of.

17   **Q**    Did paying that money to her lower the taxable income

18   for your company?

19   **A**    It lowered the taxable income for Kevin.

20   **Q**    Were you aware of whose idea it was to pay her that

21   money?

22   **A**    Bennett Speyer.

23   **Q**    Who is that?

24   **A**    An attorney here locally.

25   **Q**    Did you communicate with Kevin regularly about

**Maluchnik (Direct)**

1    Theramedical's business?

2    **A**    Yes.

3    **Q**    Did you communicate by email regularly?

4    **A**    Mostly in person, on the phone.  We were together most

5    of the day.

6    **Q**    Let me show you Exhibit 12.  The other pages are

7    attachments, so let me show you the top of page 1.  What's

8    the email header there?

9    **A**    Oh, the subject?  You're asking for the subject?

10   **Q**    Well, I'm just identifying for you that this is the

11   header so you can read it and familiar yourself.

12   **A**    Yeah.  This is an email.  I think I was at a company

13   meeting in Arizona, a company that I was still employed

14   there.

15   **Q**    Okay.  What's the date on it?

16   **A**    February 17th of 2014.

17   **Q**    Okay.  And where in the lifespan of the compounding

18   cream business would this have fallen?

19   **A**    Month two.

20   **Q**    And who are you sending this email to?

21   **A**    This is going to Kevin Clay and Andrew Backus.

22   **Q**    Who is Andrew Backus?

23   **A**    He worked at Pfizer with Kevin, and Andrew was one of

24   the first people we recruited in that January time frame to

25   get a prescription.

**Maluchnik (Direct)**

1   **Q**    All right.  Does this email reflect that you're

2   communicating early on in the business, communicating with

3   Kevin about it?

4   **A**    Yes.

5   **Q**    What's page 2 here?

6   **A**    This is possibly the attachment that was in that

7   email, and it has a list of individuals who I believe we

8   signed up as reps, so they signed paperwork and went and got

9   prescriptions.

10   **Q**    Go to pages -- looks like the cutoff part of a

11   spreadsheet there.

12       Going back to page 1.  Your -- well, in the body, does

13   it talk about reps, an attached list of reps that had been

14   signed up?

15   **A**    Yep.  And green means they received a new packet, so

16   that was the starter packet we brought up earlier.

17   **Q**    Similar to what we looked at earlier?

18   **A**    Correct.

19   **Q**    Okay.  And you identify yourself as Matt Maluchnik of

20   The MOMA Groupe.  What's The MOMA Groupe?

21   **A**    That was the bigger entity that was housing all of our

22   other entities that we were working on.

23   **Q**    Let me show you Exhibit 18.  Let's look at that for a

24   second.  Okay.  What's the date?

25   **A**    So this is July of 2014, so just a few months after

**Maluchnik (Direct)**

1    that other email, and it's going to the pharmacist, Lemma,

2    with a copy to Kevin.  And it appears as though I'm probably

3    attaching another statement of a list of representatives.

4    **Q**    This is page 2.  Is that a --

5    **A**    Yeah.

6    **Q**    What's reflected there?

7    **A**    I'm sending the list of names and email addresses to

8    these representatives and their assigned number.

9    **Q**    Okay.  And the date on this email was July of '14.

10   Were you getting paid by Central Rx on a regular basis at

11   this point in time?

12   **A**    Yes.

13   **Q**    Some months hundreds of thousands of dollars?

14   **A**    I believe so.

15   **Q**    Did it become an issue at some point in time with

16   patients not paying co-pays for the medications?

17   **A**    Yes.

18   **Q**    What was that about?

19   **A**    So everybody -- well, let me not assume that.  So when

20   you go get a prescription from a pharmacy, depending on the

21   tier of the prescription, you will have a co-pay.  Most

22   pharmacies will collect it from you, you know, at the

23   counter.  In this case, since there was no counter and

24   everything was being shipped, Lemma was not collecting

25   co-pays, which he's supposed to do.  And so when he was

**Maluchnik (Direct)**

1    being audited -- which I don't have the date of when this

2    audit was.  It was probably not too far after this, but he

3    was being audited by the insurance companies, and they

4    wanted to ensure that he was actually collecting co-pays for

5    individuals.  Well, he called us freaking out, "I'm being

6    audited.  I'm being audited.  They are going to claw back

7    all these hundreds of thousands of dollars unless people pay

8    their co-pay."

9        And so we had to notify everyone, "Hey, here's how

10   much your co-pay is.  You need to pay this right away.  You

11   can do it by calling in the pharmacy, mailing in a check,"

12   whatever.

13   **Q**    Talk to Kevin about that?

14   **A**    Yes.

15   **Q**    What was that discussion?

16   **A**    I believe Lemma actually told Kevin first, not me, and

17   I just -- I had trouble talking to Lemma a lot.  I couldn't

18   understand his accent too well, but Kevin could understand

19   him pretty good.

20   **Q**    Were there email communications about his co-pay

21   problem?

22   **A**    I believe so.

23   **Q**    Let me show you Exhibit 11.  Look at the header.  So

24   what's the date on this email?

25   **A**    So this was February of 2015.

**Maluchnik (Direct)**

1  **Q**    And so this is about month 13 of that operation?

2  **A**    Yes.

3  **Q**    Who is this from?

4  **A**    That's from Harman.  She worked for Lemma in the

5  pharmacy.

6  **Q**    And who is it to?

7  **A**    It is to me.

8  **Q**    And?

9  **A**    Kevin.

10  **Q**    Both?

11  **A**    And copied Lemma, yep.

12  **Q**    Well, that doesn't help much, but if you could read

13  that for a second.  It's directed to both you and Kevin?

14  **A**    Correct.

15  **Q**    And does it reflect a conversation about the co-pay

16  situation we just described?

17  **A**    Yes.

18  **Q**    Is there an attachment --

19  **A**    Yes.

20  **Q**    -- to this email?

21        What's reflected on this attachment?

22  **A**    So this is a list of all the prescriptions that they

23  do not have co-pays elected for.  So what you're going to

24  see, if you scroll all the way over to the right, that

25  bolded column, that's the dollar amount of the co-pay that

**Maluchnik (Direct)**

1    they owe.

2    **Q**    Okay.  You have the patient name here on the left; is

3    that correct?

4    **A**    Uh-huh, yep.

5    **Q**    What about the doctor?

6    **A**    That's the doctor.

7    **Q**    That doesn't help much, but seem to be a common doctor

8    there?

9    **A**    Yes, sir.

10   **Q**    Who is it?

11   **A**    Suzette Huenefeld.

12   **Q**    Seem to be a common insurance company?

13   **A**    Yes, Caremark.

14   **Q**    And who did you understand Caremark to provide

15   insurance benefits for?

16   **A**    Jeep.

17   **Q**    What about this column?

18   **A**    That is the amount that the insurance company paid for

19   that particular prescription.

20   **Q**    Where you indicated before, does this indicate that

21   some of these creams are 14-plus thousand dollars for one

22   prescription?

23   **A**    Yes.

24   **Q**    And this goes on for about eight pages, the last pages

25   are, again, a bit of a cutoff spreadsheet.  But what date

**Maluchnik (Direct)**

1    range does this spreadsheet cover?  One month, or the whole

2    operation of Theramedical?

3    **A**    Wait.  Rephrase or state question again.

4         This document shows the dates there.  I believe he

5    sent over the individuals who were being audited.

6    **Q**    Does this -- are these the only ones for the month of

7    January of 2015?

8    **A**    That's what it appears in here.  I'm not sure how far.

9    **Q**    Okay.  Here's page 2.  Any other months besides

10   January?

11   **A**    I'm still seeing January.

12   **Q**    Okay.  Lots of Huenefeld, lots of Caremark?

13   **A**    Yep.

14   **Q**    Lots of ten-thousand-plus reimbursements?

15   **A**    Correct.

16   **Q**    Who was this email sent to, again?

17   **A**    Me, Lemma and Kevin.

18   **Q**    Page 4, lots of Huenefeld; correct?

19   **A**    Correct.

20   **Q**    How about the insurance company?  Who is that?

21   **A**    Caremark.

22   **Q**    Okay.  And we're still in the same month of January?

23   **A**    Yep.

24   **Q**    Page 5, 6, 7 and page 8.  Do you know an individual

25   named Chad Shade?

**Maluchnik (Direct)**

1   **A**   Name is familiar, but I. . .

2   **Q**   Was he a sales rep, do you know?

3   **A**   I can't recall, honestly.

4   **Q**   Okay.  How about Mark Garrett?

5   **A**   Yes.  So those are probably for Mark and Mike.

6   **Q**   Who is Mike?

7   **A**   His son.

8   **Q**   Let me -- how about J. Garrett?  Do you know a J.

9   Garrett?

10  **A**   I think Mark's wife.

11  **Q**   They're all getting prescriptions in January?

12  **A**   Yes.

13  **Q**   From which doctor?

14  **A**   Huenefeld.

15  **Q**   Using which insurance?

16  **A**   Jeep.

17  **Q**   How about Loni Peace?  Did Kevin know that Loni was

18  working for Theramedical?

19  **A**   Yes.

20  **Q**   Commissions being paid for Loni's own prescription?

21  **A**   Yes.

22  **Q**   What about the column "shipped"?  Does that indicate

23  that these prescriptions have actually been shipped?

24  **A**   Correct, yeah.

25  **Q**   And they were shipped without the co-pay having been

**Maluchnik (Direct)**

1    made?

2    **A**    Correct.

3    **Q**    All right.  What, again, was the date of this email

4    with the spreadsheet?

5    **A**    February of 2015.  The spreadsheet was looking at

6    January's.

7    **Q**    And you had been receiving money for quite a number of

8    months from Central Rx prior to this; is that correct?

9    **A**    Correct.

10   **Q**    Do you have bank accounts for Central Rx -- I'm

11   sorry -- did you have bank accounts for Theramedical?

12   **A**    Yes.

13   **Q**    With which bank?

14   **A**    PNC.

15   **Q**    On the right-hand part of your screen, let me show you

16   Exhibit 31.  What's the information at the top of this bank

17   statement?

18   **A**    Looks like a monthly statement for Theramedical.

19   **Q**    Okay.  And what's the primary account number, the last

20   four?

21   **A**    9582.

22   **Q**    Was that your primary Theramedical account for

23   receiving funds from Central Rx?

24   **A**    I believe so.

25   **Q**    All right.  So on Exhibit 31 on the right, let's go to

**Maluchnik (Direct)**

1    page 25 okay.  Is this another bank statement for

2    Theramedical?

3    **A**    Yep.

4    **Q**    What's the time period cover?

5    **A**    This is end of 2014, same bank account.

6    **Q**    So essentially the month of December?

7    **A**    Correct.

8    **Q**    Would this have been the month before the spreadsheet

9    that we saw --

10   **A**    This would have been before the spreadsheet we just

11   saw from 2015.

12   **Q**    So on this bank statement for December of 2014, the

13   month before that spreadsheet, can you describe for the jury

14   the deposits that Theramedical received from Central Rx?

15   **A**    Can you un-zoom?  I'm seeing $350,000 deposit,

16   December 11th; on December 17th and 18th, $400,000,

17   $400,000; Apothecary Pharmacy in December gave us 244-plus

18   thousand dollars; and at the very end, 12/30, Central Rx

19   gave us another $200,000.

20   **Q**    And the zoom does not help?

21   **A**    Well, no.  I have to see -- I had to put it in context

22   of the whole statement.

23   **Q**    I see.  And how do you know it comes from Central RX

24   Pharmacy?

25   **A**    It says it right there.

**Maluchnik (Direct)**

1   **Q**   Kevin was a 50/50 partner in this business?

2   **A**   Correct.

3   **Q**   Is he a signer on this account?

4   **A**   Yes.

5   **Q**   All right.  Let's advance to page 34 of the bank

6   statement.  What's the time period cover here?

7   **A**   March of 2015.

8   **Q**   Okay.  And when's it in relation to the email with the

9   spreadsheet that was sent to you and Kevin?

10  **A**   Like a month or two later, one month later.

11  **Q**   And in this month, what are the reimbursements from

12  Central Rx?

13  **A**   1.1 million from Central Rx.

14  **Q**   So for one month?  Is that for one month?

15  **A**   I couldn't tell you, but I think he -- probably was

16  for one month, yes.

17  **Q**   So the one we looked at before was approximately

18  1.3 million total?

19  **A**   Okay.

20  **Q**   Would you like to see it?  Or add it up in your head?

21  **A**   No.  But it was a lot of money.

22  **Q**   And this month was 1.1 million?

23  **A**   Correct.

24  **Q**   Were those about probably two of the biggest months

25  you had, if you can recall?

**Maluchnik (Direct)**

1    **A**    Yes.

2    **Q**    Were there other months where there was still hundreds

3    of thousands of dollars?

4    **A**    Yes.

5    **Q**    Let me show you Exhibit 20.  Highlight the header a

6    bit.  Is this later in time?

7    **A**    Yes.  So now we're in June of 2015.

8    **Q**    So you've been operating roughly 17 months or so?

9    **A**    Yep.

10   **Q**    Okay.  And what's this email about?  Well, first of

11   all, can you identify the senders and the recipients?

12   **A**    Yep.  So this is from me to Binoy and to Kevin.

13   **Q**    Who is Binoy?

14   **A**    So Binoy had a company out in New Jersey who we ended

15   up meeting through somebody else.  So the background is more

16   and more insurances were not paying for these

17   pharmaceuticals, these compound creams.  Jeep -- I believe

18   it was roughly this same time frame when the Jeep insurances

19   stopped paying for this.  So after they stopped paying, we

20   were at some convention -- I can't remember why -- but we

21   were also working on a laboratory company, and I think we

22   were there for that.  But at this convention, we saw a

23   compound pharmacy and we started talking to these guys,

24   like, "Hey, how are you guys still getting these compounds

25   covered?"  And they started talking about things that they

**Maluchnik (Direct)**

1  were doing that -- it sounded like they were tricking the

2  insurance companies, and it wasn't really jiving well with

3  us.  So they put us in contact, though.  They said, "Hey,

4  maybe this other guy can help you guys out.  He's linked to

5  a pharmacy called Precision Pharmacy."  And so we ended up

6  contacting Binoy and made an agreement with him to work

7  through this Precision Pharmacy to see if the Jeep

8  individuals could still keep getting paid.

9       And so this looks like we're sending this to Binoy,

10  basically explaining to him here are the individuals and

11  here's what your company needs to pay them because now,

12  instead of Theramedical paying them, his company was going

13  to pay them, but we brought him the business, if that makes

14  sense.

15  **Q**    And what was the response from Emgenex?

16  **A**    They said, Hey, all of these people that they're

17  paying out are the same people who got prescriptions.  And

18  our response, "Okay."

19  **Q**    You say "our response."  Who is us or "our"?

20  **A**    You know, me and Kevin.  We're, like, okay, so we've

21  been doing this through Central RX Pharmacy, so it was very,

22  you know -- at that time, we were just accustomed to it.

23  But their response was "We're not doing this," and so that's

24  where that ended.  They basically told Binoy, "Hey, we're

25  not doing this.  We're not comfortable doing this."

**Maluchnik (Direct)**

1    **Q**    Let me show you Exhibit 24.  What's Exhibit 24?

2    **A**    Okay.  So we went back to 2014.  Email:  Matt, Kevin,

3    and Lemma, and Wesson.  I think it's pronounced Wesson, but

4    he works at Lemma's pharmacy.  He's, like, a

5    second-in-command.

6    **Q**    And who is it sent to?

7    **A**    Me and Kevin and copied Lemma.

8    **Q**    And it says it's a final report.

9           What's this information?

10   **A**    So I'm assuming that I audited a pay statement.  If

11   you recall -- well, let me backtrack.  So Harman, we saw in

12   another email, she also worked for Lemma.  She actually took

13   Wesson's spot because Wesson was not very detail-oriented,

14   and he was providing the payout statements to us and kept

15   making a lot of mistakes.  And so I believe I must have

16   followed up with Wesson and told him, "Hey, there's a lot of

17   missing stuff."  And I think this was his response back of,

18   "Hey, the reason you didn't get paid, for example, on Andy

19   Backus, is because he didn't have any refills left," meaning

20   he needed to go back and get another prescription.

21   **Q**    Does this reflect you and Kevin needing to get paid

22   for your own prescriptions?

23   **A**    Correct.

24   **Q**    Let me go back to Exhibit 23.  Actually, this may have

25   been, chronological, right before the email we just saw, but

**Maluchnik (Direct)**

1  who wrote this?

2  **A**    Me.

3  **Q**    Okay.  And what are you asking here?

4  **A**    Oh.  Once again, just auditing Wesson's report he had

5  sent us, just letting him know that we're missing

6  prescriptions or being paid for prescriptions on the

7  following individuals.

8              THE COURT:  When you get to a convenient spot,

9  we'll be taking our lunch break shortly.

10             MR. CRAWFORD:  Five minutes I think,

11 Your Honor.

12             THE COURT:  That's fine.

13 **BY MR. CRAWFORD:**

14 **Q**    So we talked a bit about the money flow, and we looked

15 at your PNC bank account 9582.  Some money was deposited

16 into your PNC accounts from Central Rx; is that correct?

17       How did it get dispersed to you and Kevin?

18 **A**    Explain what -- from Central Rx?

19 **Q**    How did you take your pay or your share of the profit?

20 **A**    For the first year, we were both still working full

21 time, and so we didn't touch the money.  We just let it stay

22 in the account, and then at the end of the year is when we

23 dispersed the money equally.

24 **Q**    Did it flow through this MOMA Groupe or this MOMA

25 Entertainment Groupe?  Or do you recall now that. . .

**Maluchnik (Direct)**

1    **A**    I do not recall.

2    **Q**    Did you issue payments to folks who were marketers or

3    paid patients?

4    **A**    Yes.

5    **Q**    How did you pay them?

6    **A**    We set up with a payroll company locally.  I forget

7    the name of it, but we would just direct deposit to them.

8    **Q**    Were they a 1099 employee --

9    **A**    Correct, 1099.

10   **Q**    -- or W-2?

11   So did you all withhold tax from them?

12   **A**    No.

13   **Q**    Did you instead have a 1099 sent to them and then

14   leave that to them to handle their taxes?

15   **A**    Correct.

16              MR. CRAWFORD:  Okay.  Your Honor, I think I'm

17   ready to move on to a different subject.  Probably

18   20 minutes remaining?

19              THE COURT:  That's fine.  We'll let you do

20   that after lunch, if that's okay.

21   I think those who ordered lunch, the lunch has

22   arrived.

23   Ladies and gentlemen, we're going to take a one-hour

24   recess.  You may stay and eat lunch, or you may go outside

25   and get fresh air.  You may do as you wish, but I would like

**Maluchnik (Direct)**

1    to start as promptly as we can around 1:00 p.m.  Please

2    remember all the rules.

3          Thank you.  We're in recess.

4                    (Recess taken at 11:59 a.m.)

5                         -   -   -

6                    (Court reconvened at 1:05 p.m.)

7                         -   -   -

8                    THE COURT:  Welcome back, ladies and

9    gentlemen.  At the new courthouse, one of the things we're

10   going to try and get are cup holders for the jury box.

11                   Advanced notice:  On Monday, I have a matter

12   between 1:00 and 2:00 o'clock, so I'm going to ask that we

13   take a late lunch break on Monday, just FYI, so you can plan

14   out your breakfast for that day and your lunch as well.

15   Thank you.

16         The witness has resumed the stand and the witness, is

17   still under oath, and, Counsel, you may resume your inquiry.

18   **BY MR. CRAWFORD:**

19   **Q**    Mr. Maluchnik, you indicated in 2013, you and Kevin

20   lived very close to one another.

21   **A**    Correct.

22   **Q**    And where was that?

23   **A**    I forget the name.  I think it was called Waterstone

24   Landing.

25   **Q**    What city?

**Maluchnik (Direct)**

1    **A**    Perrysburg.

2    **Q**    And how close were your apartments?

3    **A**    Probably, like, a hundred feet away door to door.

4    **Q**    And how long did the two of you live in those

5    apartments?  2013 or before did you move?

6    **A**    I want to say I moved in 2012.

7    **Q**    Okay.  What time did Mr. Clay move in?

8    **A**    That I don't recall.

9    **Q**    And how long did the two of you live in those -- that

10   apartment complex?

11   **A**    I think I moved out in 2016.

12   **Q**    Was Mr. Clay still living there?

13   **A**    I do not recall.

14   **Q**    In 2013, '14 and '15, how often did you and Kevin see

15   each other?

16   **A**    Every day.

17   **Q**    Every day.

18        First thing in the morning?  Second thing in the

19   morning?

20   **A**    Second or third thing in the morning.

21   **Q**    What was your daily routine with Mr. Clay?

22   **A**    Usually we would go to work out in the morning, so I

23   would probably see him around 8:00 a.m. or so, get about an

24   hour workout in, and then we would part.  We're usually

25   constantly talking business and stuff.  We would part, come

**Maluchnik (Direct)**

1    back together, and resume whatever we're doing for the day.

2    **Q**    And that was daily for the life of Theramedical?

3    **A**    Correct.

4    **Q**    You mentioned Kevin was a signer on the bank accounts

5    for Theramedical?

6    **A**    Yes.

7    **Q**    Is he a signer on the City Wide bank accounts?

8    **A**    I don't recall.

9    **Q**    Go to Exhibit 9, if we could.  What is Exhibit 9?

10   **A**    This looks like account registration for City Wide,

11   and then I saw at the bottom it does have him as a signer.

12   **Q**    All right.  And was this an account or a business that

13   received income from the sale of compounding creams?

14   **A**    Possibly early on, like, those first few months

15   because, remember, this was the LLC that we started with

16   Lemma.  We eventually switched to calling us Theramedical.

17   So we opened up a different LLC, I believe, and in that LLC

18   opened up a new bank account, something like that.

19   **Q**    Okay.  On this account, what is the account number it

20   is opened for?

21   **A**    You want me to read the whole thing, or the last four?

22   **Q**    The last four is fine.

23   **A**    Okay.  9849.

24   **Q**    Let me show you Exhibit 8.  This is a bank statement

25   for what account?

**Maluchnik (Direct)**

1    **A**    City Wide Solutions and, again, 9849.

2    **Q**    What's the date for this bank statement?

3    **A**    So this is for the month of June of 2014, so

4    approximately six months into the business, we were still

5    using City Wide Solutions, and there is a Central RX

6    Pharmacy deposit.

7    **Q**    What is Exhibit 46?

8    **A**    This is The MOMA Groupe Entertainment LLC account

9    registration for PNC Bank as well.

10   **Q**    Is that one of the businesses that you and Kevin

11   shared?

12   **A**    Yes.

13   **Q**    And is he a signer on this bank account?

14   **A**    Yes.

15   **Q**    How about Exhibit 48?  What's this?

16   **A**    So that is another entity of ours called The MOMA

17   Groupe LLC.

18   **Q**    And "entity of ours," you mean you and Kevin?

19   **A**    Yes.

20   **Q**    Is he a signer on that account, too?

21   **A**    Yes.

22   **Q**    And this is a reflection of how close your

23   relationship was with Mr. Clay?

24              MR. KERGER:  Objection to the form of the

25   question, Your Honor.

**Maluchnik (Direct)**

1           THE COURT:  Overruled.  He may answer.

2    **A**    Can you restate the question?

3    **Q**    Is this a reflection of your closeness of the

4    relationship between you and Mr. Clay?

5    **A**    Yes, we are close, yep.

6    **Q**    You had some dealings with organization called Cheer

7    for a Cure?

8    **A**    Yes.

9    **Q**    What was that?

10   **A**    So Cheer for a Cure was an organization that my

11   brother-in-law and sister-in-law -- I'm sorry my brother and

12   sister-in-law originally started up.  And it was, basically,

13   we had a series of cheerleading competitions that we would

14   post starting in Genoa was the first one.  So it was

15   originally set up to honor the passing of my mother-in-law

16   who is a cheerleading coach in the Genoa community, and we

17   had our first event.  And after that, it kind of took off,

18   and I became the lead executive director of that

19   organization after my brother and sister-in-law no longer

20   wanted to do it, but I kept doing it and did it in other

21   communities.

22   **Q**    Was it a charitable organization?

23   **A**    Yes.

24   **Q**    Did it accept donations?

25   **A**    Yes.

**Maluchnik (Direct)**

1   **Q**    Were those donations deductible from the income of the

2   people who made the donations?

3   **A**    Yes.

4   **Q**    And if someone were to donate money to Cheer for a

5   Cure, generally speaking, would that lower their income tax

6   liability?

7   **A**    Yes.

8   **Q**    You mentioned that you and Kevin paid individuals who

9   were marketers for you.  Can you remind the jury again how

10  they were paid?

11  **A**    With 1099, contractors for Theramedical.

12  **Q**    And you would send -- you would get your income from

13  Central Rx --

14  **A**    Okay.

15  **Q**    -- and then you would send money where to pay these

16  folks?

17  **A**    So we had a payroll company that would direct deposit

18  into their accounts.

19  **Q**    Okay.  Do you recall what the name of that payroll

20  company was?

21  **A**    Data something.  It's in Toledo.  I don't know if it's

22  still around -- Data --  but I saw it on one of the bank

23  statements you showed earlier, Data central or something.

24  Data Service Center I think is what it was, Data Service

25  Center.

**Maluchnik (Direct)**

1   **Q**    Okay.  Let me show you Exhibit 32 quickly.  Hold on,

2   sorry.  31 rather.

3        Again, this is a bank statement for which

4   organization?

5   **A**    Theramedical.

6   **Q**    Down at the bottom, is there disbursements?

7        What are these?

8   **A**    These are disbursements to individuals through Data

9   Service Center, the payroll company.

10   **Q**    That was the payroll company you were referring to?

11   **A**    Correct.

12   **Q**    Okay.  Were some of the sales reps or patients, were

13   they upset at learning that they still had to pay taxes on

14   the income?

15   **A**    Yes.

16   **Q**    And did some of them complain to you?

17   **A**    Correct.

18   **Q**    Did you devise a way for at least one or two of them

19   to make a deduction, a donation to Cheer for a Cure to help

20   relieve them of some of the tax burden?

21   **A**    Yes.

22   **Q**    How did that work?

23   **A**    There was a couple individuals that I knew who

24   complained to me about the taxes, and I approached them and

25   basically said, "Here, let me give you an envelope of cash.

**Maluchnik (Direct)**

1    You give it to my nonprofit, which you will get the tax

2    write-off, which will help alleviate the burden of your

3    taxes," and then the nonprofit would benefit by getting

4    that -- getting the money from them.

5    **Q**    So they made a donation to Cheer for a Cure --

6    **A**    Correct.

7    **Q**    -- and you would reimburse them?

8    **A**    Yeah.  I basically gave them the money, yeah.

9    **Q**    Did you also make donations to Cheer for a Cure?

10   **A**    Yes.

11   **Q**    Did you take a tax deduction for that?

12   **A**    Yes.

13   **Q**    Did you buy a Range Rover --

14   **A**    Yes.

15   **Q**    -- with money from Cheer for a Cure?

16   **A**    Yes, I did.

17   **Q**    Did Kevin start a charitable foundation?

18   **A**    Yes.

19   **Q**    What was it called?

20   **A**    I forget.

21   **Q**    You don't recall the name?

22   **A**    No.

23   **Q**    Does Clay Foundation sound familiar?

24   **A**    Clay Foundation.

25   **Q**    You and Kevin split things 50/50 in Theramedical?

**Maluchnik (Direct)**

1   **A**     Yes.

2   **Q**     Did he have a large amount of income that could have

3   gone into the Clay Foundation?

4   **A**     I believe so, yes.

5   **Q**     What did Kevin tell you about the Clay Foundation?

6   **A**     He was -- had a couple different things he wanted to

7   do with the Clay Foundation.  I know scholarships for

8   individuals, helping small businesses start up were kind of

9   the two things he had an interest in wanting to do.

10  **Q**     Was there a large tax benefit to the donations that

11  Kevin made to the Clay Foundation?

12  **A**     Yes.

13  **Q**     Did that money come from Theramedical?

14  **A**     Yes.

15  **Q**     Do you know a person named Valentine Ononye?

16  **A**     Yes.

17  **Q**     Who was that?

18  **A**     A friend of ours, mutual friend.

19  **Q**     Was Kevin in a business relationship with Valentine?

20  **A**     Yeah.  I don't know what he was considered.  I think

21  he was, like, a subcontractor is what you would consider

22  him.

23  **Q**     Doing what?

24  **A**     Cutting hair.

25  **Q**     At a business location that Valentine owned?

**Maluchnik (Direct)**

1    **A**    Yes.

2    **Q**    Where was that?

3    **A**    Perrysburg.

4    **Q**    What was it called?

5    **A**    V. Couture.

6    **Q**    All right.  You mentioned at the beginning of your

7    testimony, you were charged for your role in the things

8    you've been testifying about today; is that correct?

9    **A**    Yep.

10    **Q**    What did you plead guilty to?

11    **A**    Two counts of -- relating to taxes, and then one count

12    of healthcare fraud.

13    **Q**    Did you sign a plea agreement with the Government?

14    **A**    Yes.

15    **Q**    Did it have a specific sentence in there?

16         Did it have a specific term?

17    **A**    Oh, correct.  Yes.

18    **Q**    What was that?

19    **A**    21 months of incarceration.

20    **Q**    Okay.  Has the Judge -- Judge Zouhary accepted that

21    plea agreement yet?

22    **A**    No.

23    **Q**    Whose ultimately going to decide what your sentence is

24    in this case?

25    **A**    The Judge.

**Maluchnik (Direct)**

1    **Q**    Did you agree to forfeit close to $750,000 from

2    various bank accounts?

3    **A**    Yes.

4    **Q**    Did you agree to pay $225,000 in restitution to

5    various entities?

6    **A**    Yes.

7    **Q**    Did you also sign a cooperation agreement?

8    **A**    Yes.

9    **Q**    What are you hoping to get out of that cooperation

10   agreement?

11   **A**    I would say leniency.

12   **Q**    Are you hoping to get a favorable sentencing

13   recommendation from the Government?

14   **A**    Yes.

15   **Q**    And what is your understanding of what your obligation

16   is under that cooperation agreement?

17   **A**    To be here today and answer your questions.

18   **Q**    Answer them how?

19   **A**    Truthfully, honestly.

20                  MR. CRAWFORD:  No other questions, Your Honor.

21                  THE COURT:  Can you give us and spell the name

22   of the barbershop again, the Valentine who is referenced?

23                  THE WITNESS:  Yes.  So the business is called

24   V. Couture, C-o-u-t-u-r-e.  I'd have to look at it.

25                  THE COURT:  V for Valentine?

Maluchnik (Cross)

1          THE WITNESS:  Yes.

2          THE COURT:  Thank you.

3          **CROSS-EXAMINATION MATTHEW MALUCHNIK**

4   BY MR. KERGER:

5   **Q**    Good afternoon.

6   **A**    Good afternoon.

7   **Q**    You told this jury that Dr. Huenefeld asked you, as

8   you understood it, to give her some money for helping fill

9   those scripts?

10  **A**    Correct.

11  **Q**    And then you told her no?

12  **A**    Correct.

13  **Q**    And you went to Kevin and told him that?

14  **A**    Correct.

15  **Q**    And Kevin in turn notified Central Rx?

16  **A**    Correct.

17  **Q**    Didn't conceal it?

18  **A**    Correct.

19  **Q**    Now, you pointed to a number of emails where you and

20  Kevin were both copied?

21  **A**    Yes.

22  **Q**    Do you know if Kevin responded to any of those?

23  **A**    I do not know.

24  **Q**    Did you respond to them?

25  **A**    Emails that I get, yes, I respond to them.

**Maluchnik (Cross)**

1    **Q**    So getting it doesn't mean you had to do anything with

2    it?

3    **A**    Fair assessment.

4    **Q**    Now, pointed out the large amounts of monthly charges

5    for certain of those prescriptions, 15,000 for the scar

6    medication?

7    **A**    Yeah.

8    **Q**    That went to the insurance companies?

9    **A**    Correct.

10    **Q**    Not hidden?

11    **A**    Correct.

12    **Q**    They knew exactly what they were paying?

13    **A**    Correct.

14    **Q**    And eventually in Stellantis, they stopped, and to

15    your knowledge, they could have stopped at any point before

16    that?

17    **A**    Correct.

18    **Q**    They had all the information to understand what they

19    were paying and what it was for?

20    **A**    Correct.

21    **Q**    Now, you said that both you and I think Matt -- or

22    Matt and Kevin both got payments from their own scripts, the

23    test scripts they did for Central Rx?

24    **A**    Correct.

25    **Q**    And the decision to pay to you and Kevin was made by

**Maluchnik (Cross)**

1    Central Rx?

2    **A**    Correct.

3    **Q**    And that wasn't news to you because Tracy Eisaman --

4    that's the Tracy you've been talking about; right? --

5    **A**    Correct.

6    **Q**    -- had told you that at lunch down in southern Ohio?

7    **A**    At a lunch.  It was in Toledo, Ohio, though.

8    **Q**    But he said --

9    **A**    Yeah, but I said, "at a lunch."

10   **Q**    -- "My wife and I are getting paid by Central Rx for

11   our own scripts"?

12   **A**    Correct.

13   **Q**    So that wasn't news to you?

14   **A**    Correct.

15   **Q**    Now, you've had conversations with Dr. Huenefeld

16   during this period.  Did you ever tell her not to do an

17   examination of patients?

18   **A**    No.

19   **Q**    Did you ever tell her to ignore medical necessity?

20   **A**    No.

21   **Q**    Now, you said Kim Forren, now Kevin's wife, didn't do

22   much for Theramedical?

23   **A**    Correct.

24   **Q**    You don't recall seeing emails from her dealing with

25   Theramedical business?

**Maluchnik (Cross)**

1   **A**      I don't recall.

2   **Q**      And so just so the jury is clear, "I don't recall"

3   doesn't mean it didn't happen --

4   **A**      Correct.

5   **Q**      -- it just means "I don't remember it"?

6   **A**      Correct.

7   **Q**      You were shown an email when you came back from a trip

8   to Arizona, sending it to Backus and to Kevin asking "Here's

9   the people I show as being sales people.  Do you have

10  anybody else?"

11  **A**      Anybody else at that time?

12  **Q**      Yeah.  That you wanted them to update you as to who

13  the sales reps might have been brought in while you were on

14  vacation?

15  **A**      What's the question?

16  **Q**      My question is that you are asking them for

17  information for you to put into your system; right?

18  **A**      If I'm recalling the email, which maybe if we could

19  pull it up again, I think I was notifying them of the

20  information.

21  **Q**      And asking them "If there's anybody else, let me

22  know"?

23  **A**      Okay.  That sounds. . .

24  **Q**      Because you have to keep track of all those folks?

25  **A**      That is correct.

**Maluchnik (Cross)**

1    **Q**    And your computer had all the records?

2    **A**    Correct.

3    **Q**    For Theramedical?

4    **A**    Yes.

5    **Q**    Not Kevin's?

6    **A**    Correct.

7    **Q**    Yours?

8    **A**    Yes.

9    **Q**    And the bank statements came to your apartment, didn't

10   they?

11   **A**    Yes.

12   **Q**    Not to Kevin's?

13   **A**    Correct.

14   **Q**    Now, you mentioned a problem with co-pays and that

15   Lemma Gettachew got into trouble over that?

16   **A**    Yes.

17   **Q**    Not you?

18   **A**    Correct.

19   **Q**    Not Theramedical?

20   **A**    Correct.

21   **Q**    That was Lemma's problem?

22   **A**    Yes.

23   **Q**    But you agreed to try to help him?

24   **A**    Yes.

25   **Q**    Now, you talked about Kevin making his large donation

**Maluchnik (Cross)**

1      of his own money to the Clay Foundation, $400,000 or so?

2      **A**      Uh-huh.

3      **Q**      And you say he got a tax break; right?

4      **A**      Yeah.

5      **Q**      How big was the tax break?

6      **A**      You don't pay taxes on that 400,000, so if it's

7      25 percent tax bracket. . .

8      **Q**      So he got rid of $400,000 to save $100,000?

9      **A**      Yeah, there you go.

10     **Q**      The three people you were involved in this tax scam

11     with were Mr. Eisaman, Mr. Ports and Mr. Lee?

12     **A**      Correct.

13     **Q**      All of them sales reps for Theramedical?

14     **A**      Yes.

15     **Q**      And the deal was if they would write a check to Cheer

16     for a Cure, your charitable foundation, you would give them

17     an envelope containing cash?

18     **A**      Correct.

19     **Q**      And I think it was as much as $20,000; right?

20     **A**      Yep.

21     **Q**      Where did the cash come from?

22     **A**      Me.

23     **Q**      And, I apologize, I misread your record.  I didn't

24     realize you plead guilty on the taxes.

25              But you disposed of, if the Judge accepts it, three

**Maluchnik (Cross)**

1  federal felonies for a 21-month sentence, and your -- well,

2  I can't ask you that because that's lawyer's advice.

3        Have you told -- excuse me -- had you told Kevin about

4  the tax scam?

5  **A**    I don't recall.

6  **Q**    You had, hadn't you?

7  **A**    I don't recall.

8  **Q**    You hid that from him?

9  **A**    I don't recall.

10  **Q**    And at least one of those -- two of those three got

11  their employers to contribute as well?

12  **A**    Correct.

13  **Q**    They had some employers do matching charitable

14  donations?

15  **A**    Yes.

16  **Q**    Dr. Huenefeld had an office manager, Shelby Domonkos?

17  **A**    Yes.

18  **Q**    And you were friends with her?

19  **A**    Yes.

20  **Q**    And over the years, if she got tight for money, you

21  would give her money?

22  **A**    Yes.

23  **Q**    Maybe 8- to $10,000?

24  **A**    Over the course of time, yeah.

25  **Q**    And she was the office manager for Dr. Huenefeld?

**Maluchnik (Cross)**

1    **A**    Yes.

2    **Q**    And so you mentioned an incident when the doctor

3    became intoxicated and you thought you maybe enhanced your

4    position with the staff by avoiding an embarrassing

5    situation.

6         True?

7    **A**    No.  Did the event occur?  Yes.  The intention you

8    said was to enhance my reputation or --

9    **Q**    No, no, no, no.

10   **A**    Okay.

11   **Q**    Did the incident and the way you handled it --

12   **A**    Yeah, I did --

13   **Q**    -- have --

14                    (Court Reporter clarification)

15                    THE COURT:  Time out.  Gentlemen, I was going

16   to interrupt you earlier.  You're talking over each other.

17   The court reporter can't get it down.  We can't fully

18   understand.  Let the lawyer finish the question and the

19   lawyer let the witness finish the answer, take a little

20   pause and then continue.  So let's reboot.

21        Where you left off was -- or the answer was "Did the

22   event occur?  Yes.  The intention you said was to enhance my

23   reputation?"

24                    MR. KERGER:  And I said, "No."

25   **BY MR. KERGER:**

**Maluchnik (Cross)**

1    **Q**    What I was saying is the way you handled it seemed to

2    have enhanced your reputation with the office staff --

3    **A**    Correct.

4    **Q**    -- correct?

5          And Shelby's getting 8- to $10,000 from you as well?

6    **A**    Correct.

7    **Q**    Did you tell Kevin about making the payments to

8    Shelby?

9    **A**    I don't recall.

10   **Q**    Now, when you were meeting with Mr. Gettachew to set

11   up the initial relationship, he told you about the system

12   they used to make payments to patients?

13   **A**    Lemma told us what?

14   **Q**    When you met with him in Cleveland --

15   **A**    Yep.

16   **Q**    -- did he not tell you the way he used his system that

17   included making payments to patients?

18   **A**    Yes.  Lemma was fully aware that patients were being

19   paid.

20   **Q**    That's what he did with you?

21   **A**    Yes, yep.

22   **Q**    And you didn't think anything was wrong with that, did

23   you?

24   **A**    No.

25   **Q**    Now, while you talked with Kevin all the time,

1 essentially the administrative and financial matters of

2 Theramedical were yours?

3 **A** Correct.

4 **Q** You were the guy who had the master's degree from The

5 Ohio State University that you did going at night?

6 **A** Correct.

7 **Q** And you told the jury about your Aunt Loni joining

8 Theramedical?

9 **A** Yes.

10 **Q** And there was a sea change in the way the business

11 operated when she arrived; right?

12 **A** Yes.

13 **Q** And she had an advantage because she understood -- she

14 ran a company called Herbalife, or not run the company, but

15 had an operation tied to Herbalife?

16 **A** Yes.  Herbalife was a network marketing company.

17 **Q** And that was similar to Theramedical, the way it is

18 structured?

19 **A** Correct.

20 **Q** And when Loni got these people involved over the two

21 years, she owned -- earned over $400,000 in commissions?

22 **A** That sounds about right.

23 **Q** And other family members of yours were sales reps?

24 **A** Correct.

25 **Q** And got paid?

**Maluchnik (Cross)**

1   **A**    Yes.

2   **Q**    And if I were to suggest to you that the total

3   payments to your family, excluding you, was over $700,000,

4   would that sound about right?

5   **A**    That sounds about right.

6   **Q**    And you and Loni worked closely together after she

7   started; right?

8   **A**    Yes.

9   **Q**    She would come to your apartment once a month to go

10  over finances?

11  **A**    Correct.

12  **Q**    And you would help her make the apportionment of

13  amounts of income to the various sales representatives?

14  **A**    So she would come once a month.  Usually it was -- I

15  think it was just the first few months because I was

16  teaching her how to do the Excel spreadsheets so she could

17  do it, which she eventually just ended up doing it from her

18  home.

19  **Q**    But that was just you and Loni meeting on that?

20  **A**    Correct.

21  **Q**    We heard about these prescription pads that Central Rx

22  put out?

23  **A**    Yes.

24  **Q**    The replacements would be mailed to your apartment?

25  **A**    Correct.

**Maluchnik (Cross)**

1    **Q**    Not to Kevin's?

2    **A**    Correct.

3    **Q**    Now, the Government has interviewed you on two

4    different occasions?

5    **A**    Possibly three.

6    **Q**    Agent Marciniak was the one interviewing you, whether

7    it was two or three?

8    **A**    Yes.

9    **Q**    She took notes?

10   **A**    Yes.

11   **Q**    Were you aware that what was prepared was called an

12   FBI 302 or a report of interview?

13              MR. CRAWFORD:  Objection, Your Honor.  It's

14   not a statement.  It's the agent's statement.

15              THE COURT:  Understood, but I think the

16   question was merely if he was aware of what the description

17   of the report was, if it was a certain number.  If he knows,

18   he can answer.  If he doesn't know, he'll say, "I don't

19   know."

20   **A**    I did not know what that was called, no.

21   **Q**    And you never reviewed any of those reports?

22   **A**    I did, eventually.

23   **Q**    And when did you review them?

24   **A**    A few weeks ago.

25   **Q**    Did you see anything in those reports that you

**Maluchnik (Cross)**

1    considered erroneous?

2  **A**    Define "erroneous."

3  **Q**    A mistake, that it was wrong.

4  **A**    Wrong, okay.

5  **Q**    Misquoted you or something like that.

6  **A**    There were little details.

7  **Q**    I'm sorry?

8  **A**    There were little details that were off.

9  **Q**    Nothing significant?

10  **A**    No, nothing significant.

11  **Q**    Now, you do want to get as low a sentence as you can?

12  **A**    Absolutely.

13  **Q**    You're a married man?

14  **A**    Yes.

15  **Q**    You have a family?

16  **A**    Correct.

17  **Q**    How many children?

18  **A**    Four.

19  **Q**    And you want to stay home if you can?

20  **A**    Absolutely.

21  **Q**    And put differently, you want to be gone as short a

22    period of time as you can?

23  **A**    Correct.

24  **Q**    And that's important to you?

25  **A**    Yes.

**Maluchnik (Cross)**

1  **Q**  Birthdays, Christmas, Thanksgiving, Fourth of July all

2  matter?

3  **A**  Correct.

4  **Q**  And you've got a big family in this area?

5  **A**  Uh-huh.

6  **Q**  Beyond your own immediate family?

7  **A**  Yes.

8  **Q**  Aunts and uncles and cousins and such?

9  **A**  Yes.

10  **Q**  And you understand that cooperating with the FBI and

11  the prosecutors can help you in that regard?

12  **A**  Correct.

13  **Q**  Now, when you and Kevin were setting up Theramedical,

14  do you recall him mentioning to you a lawyer by the name of

15  Bennett Speyer?

16  **A**  Yes.

17  **Q**  And Bennett Speyer was with -- a member of the largest

18  law firm in Toledo.  Did you remember that?

19  **A**  Yes.

20  **Q**  Shumaker, Loop & Kendrick.

21      And you met with Mr. Speyer on occasions?

22  **A**  Correct.

23  **Q**  And he also introduced you to other lawyers in the

24  firm who would do other projects for Theramedical?

25  **A**  Yes.

**Maluchnik (Cross)**

1   **Q**   And Bennett was Kevin's customer, wasn't he?

2   **A**   Yes.

3   **Q**   Kevin cut his hair?

4   **A**   Correct.

5   **Q**   And that's how he got hooked up with that law firm was

6   through Bennett's haircutting by Kevin?

7   **A**   Yep.

8   **Q**   And they gave you advice?

9   **A**   Yes.

10  **Q**   And you tried to follow it?

11  **A**   Correct.

12  **Q**   They prepared all the documents for the company?

13  **A**   The sales rep agreements, yes, and the corporation

14  documents, yes.

15  **Q**   And Kevin was involved, as were you, in talking about

16  how you get that set up?

17  **A**   Yes.

18  **Q**   And you spent a fair amount of money with the law

19  firm?

20  **A**   Correct.

21  **Q**   In the vicinity of $70,000?

22  **A**   Sounds about right.

23  **Q**   And you did that because you wanted to get it done

24  right?

25  **A**   Correct.

**Maluchnik (Cross)**

1    **Q**    Now, you mentioned a Range Rover that Cheer for a Cure

2    paid for.  It also bought a Jeep for you, didn't it?

3    **A**    Correct.

4    **Q**    So you had two cars out of the foundation?

5    **A**    Yes.

6    **Q**    You had a decent relationship with Mr. Gettachew?

7    **A**    Not sure how to answer that.

8    **Q**    Well, let's --

9    **A**    It was a transactional relationship.  I had a trouble

10    understanding him a lot.

11    **Q**    And it didn't prevent you from going to his box to

12    watch a Cleveland Browns game, did it?

13    **A**    No, it didn't.

14    **Q**    You remember that?

15    **A**    Yeah, I do.

16    **Q**    He had a group of his particularly enjoyable

17    representatives there; right?

18    **A**    That's correct.

19    **Q**    Was Kevin there?

20    **A**    Yes.

21    **Q**    You've always had an interest in setting up

22    businesses?

23    **A**    Yes.

24    **Q**    That's something you really enjoy?

25    **A**    Correct.

**Maluchnik (Cross)**

1   **Q**     And you've created a dozen to 15 limited liability

2   companies over time?

3   **A**     Probably.

4   **Q**     And you did them yourself?

5   **A**     I used to, yeah.

6   **Q**     Didn't hire lawyers back then.  You just put them

7   together?

8   **A**     Correct.

9   **Q**     Because you had the skill sets to do that?

10  **A**     Correct.

11  **Q**     And you recall going to South Africa with Kevin, don't

12  you?

13  **A**     Yes.

14  **Q**     And while you were down there, you met one of these

15  fellows who was going to be a scholarship candidate, did you

16  not?

17  **A**     So backtracking to the original question about the

18  Clay Foundation.  He had intentions of scholarships and also

19  helping people who want to get their businesses started, and

20  so I believe the individual that I met was one who was

21  trying to create a tourism company, and so Kevin engaged him

22  at that time to help him set up.

23  **Q**     Do you remember his name?

24  **A**     I can't really.  If you said it, I would probably, but

25  then there was a young kid later on that I remember who

**Maluchnik (Redirect)**

1    Kevin met somehow maybe through him.

2    **Q**    Boycie Zozo?

3    **A**    That sounds like the scholarship candidate.

4    **Q**    Yeah.

5    **A**    Correct.

6    **Q**    And the other one got educated in part by money from

7    the foundation, did he not?

8    **A**    That's true, yeah.

9    **Q**    And before the search, you didn't think you had done

10   anything wrong, did you?

11   **A**    No, I did not.

12           MR. KERGER:  That's all I have.

13        Thank you, Your Honor.

14           THE COURT:  Pause a moment before redirect.

15        **REDIRECT EXAMINATION OF MATTHEW MALUCHNIK**

16   **BY MR. CRAWFORD:**

17   **Q**    Mr. Maluchnik, the documents given to the lawyer

18   didn't say anything about paying patients to get

19   prescriptions, did it?

20   **A**    No, it did not.

21   **Q**    And communications with insurance companies, you and

22   Kevin didn't say anything about paying patients to get

23   prescriptions, did you?

24   **A**    No, we did not.

25   **Q**    Your Aunt Loni made some money from these

**Aossey (Direct)**

1   prescriptions, about $400,000?

2   **A**    Sounds about right.

3   **Q**    Less than half of what Kevin got?

4   **A**    True.

5   **Q**    And the individual that apparently got a scholarship

6   that you recall, did he actually get that money?  Or was it

7   just promised to him and it never came through?

8   **A**    I don't know.  And the reason I say that is because I

9   recall -- I thought he completed some schooling in South

10  Africa, but later on was trying to come to the states and go

11  to BGSU, which I don't think that happened, but there was

12  possibly an education portion covered in South Africa.

13  **Q**    Do you know anything about the Clay Foundation having

14  its charitable status revoked for not having filed any tax

15  returns ever?

16  **A**    No.

17              MR. CRAWFORD:  No other questions, Your Honor.

18              THE COURT:  You may step down.

19        Thank you.

20              MS. KING:  Government calls Jameil Aossey.

21                    (Witness was sworn)

22        <u>**DIRECT EXAMINATION OF JAMEIL AOSSEY**</u>

23  BY MS. KING:

24  **Q**    Good afternoon.

25        Could you please state your name for the jury.

**Aossey (Direct)**

1    **A**    Jameil Aossey.

2    **Q**    And where do you work?

3    **A**    Security Detection.

4            THE COURT:  You don't have to get that close.

5            THE WITNESS:  It's a radio voice.

6    **Q**    There you go.

7        And what do you do with Security Detection?

8    **A**    We sell and rent x-ray machines and metal detectors.

9    **Q**    Do you know the defendant, Kevin Clay?

10   **A**    Yes.

11           MR. KERGER:  Stipulate to identification,

12   Your Honor.

13           THE COURT:  So noted.

14   **BY MS. KING:**

15   **Q**    Where did you meet him?

16   **A**    At his barbershop.

17   **Q**    And did you ever get your hair cut by Mr. Clay?

18   **A**    Yes.

19   **Q**    And do you know approximately when you met him?

20   **A**    2012.

21   **Q**    And when you met him, in addition to cutting hair, did

22   he have another job?

23   **A**    Yes.

24   **Q**    What was that?

25   **A**    I believe he worked for Pfizer.

**Aossey (Direct)**

1    **Q**    And did you learn that at some point he started his

2    own medical company?

3    **A**    Yes.

4    **Q**    Do you know who he started that company with?

5    **A**    Yes.

6    **Q**    Who was that?

7    **A**    Matt Maluchnik.

8    **Q**    Did he at some point -- did Kevin Clay ask you to help

9    him out with that company?

10   **A**    I don't recall who.  I thought it was Matt, but some

11   of them -- one of them did.

12   **Q**    And that was Theramedical?

13   **A**    Yes.

14   **Q**    And what did they ask you to do?

15   **A**    Admin work, spreadsheets, adding reps to spreadsheet

16   and making welcome packets.

17   **Q**    And did you agree to do that work for them?

18   **A**    Yes.

19   **Q**    And did they pay you for that work?

20   **A**    Yes.

21   **Q**    What was the pay arrangement for that administrative

22   work?

23   **A**    I believe it was hourly.

24   **Q**    So you mentioned welcome packets.  What exactly did

25   you do with the welcome packets?

133

**Aossey  (Direct)**

1    **A**    Piece all the materials together, and then fill out

2    the prescription pads with the rep number and send them in

3    the mail to the new reps.

4    **Q**    I would like to show you what's been marked as

5    Exhibit 83.  Can you identify that material?

6    **A**    I'm sorry?

7    **Q**    Can you identify that material?

8    **A**    Yes.  This is the packet that I would put together,

9    the pads and welcome letters and pamphlets.

10   **Q**    And what's the name of the company on the front of

11   that folder?

12   **A**    Theramedical.

13   **Q**    And is this one of the prescription pads that you help

14   put into these packets?

15   **A**    Yes.

16   **Q**    And you said something about writing a rep number on

17   these.  How would you do that?  Would that just be on the

18   front of the pad or every page?

19   **A**    Every page.

20   **Q**    And why -- do you know why or what the purpose of that

21   was?

22   **A**    I believe to identify the person that it was sent to.

23   **Q**    Was it your understanding that that helped ensure that

24   that person would get paid for their prescriptions?

25   **A**    Yes.

**Aossey  (Direct)**

1   **Q**    Where did you perform the administrative work that you

2   did for Theramedical?

3   **A**    My house or backyard.

4   **Q**    And where did you go to get the materials?

5   **A**    I would get them from Matt.  He would either bring

6   them to me or I would pick them up.

7   **Q**    And when you did that, did you ever bump into Kevin

8   Clay?

9   **A**    Yeah.  They lived in the same apartment complex.

10  **Q**    About how long did you work for Theramedical doing

11  that work?

12  **A**    It wasn't too long.  It felt like a few months, but it

13  spanned over, you know, call it a matter of months.

14  **Q**    Why did you stop?

15  **A**    Just had a full-time job.  It was a lot of work for me

16  to spend those extra few hours, you know, each day or

17  whenever it was, and it became too much for me, and it

18  wasn't worth the money.

19  **Q**    Did you know what kind of product Theramedical was

20  marketing?

21  **A**    I recall pain creams.

22  **Q**    Did you ever get any of those creams yourself?

23  **A**    I did not, but my wife and my mom did once.

24  **Q**    And do you know where they went to get them?

25  **A**    Just their personal doctor.

**Aossey (Direct)**

1   **Q**    Do you know if your wife or your mom or yourself ever

2   got paid for those prescriptions?

3   **A**    I don't recall a hundred percent.

4   **Q**    Do you know where they got those prescriptions filled?

5   **A**    I don't recall as far as pharmacy goes.  I'm not sure.

6   **Q**    During the time period that you were working with Matt

7   and Kevin in Theramedical, did you see any change in their

8   lifestyle?

9   **A**    Yes.

10  **Q**    What kind of changes?

11  **A**    That, I mean, they were pretty successful, had a lot

12  of money, cars.  They always had nice clothes, you know, the

13  first time I met them, so -- but, yeah, and they definitely

14  came off very successful, more so than maybe when we first

15  met.

16  **Q**    Did Kevin Clay ever show off a little, brag a little

17  about how much money he was making?

18  **A**    Yeah.  There was a time I saw a couple million in the

19  bank on a screenshot.

20  **Q**    So he showed you a screenshot of his bank statement?

21  **A**    Yes.

22  **Q**    Did you think that was a little odd?

23  **A**    It was a lot of money.

24  **Q**    You mentioned some cars.  What kind of cars did Matt

25  and Kevin buy?

**Aossey (Cross)**

1    **A**    Range Rovers.

2    **Q**    And did they get them around the same time?

3    **A**    I believe so.

4    **Q**    And did you notice anything in particular about those

5    Range Rovers that they bought?

6    **A**    Not really.  I mean, they look the same, just

7    different colors.

8    **Q**    What colors were they?

9    **A**    Black and white.

10                    MS. KING:  No further questions.

11              **CROSS-EXAMINATION OF JAMEIL AOSSEY**

12   **BY MR. LOWTHER:**

13   **Q**    Good afternoon, Mr. Aossey.

14   **A**    Hello.

15   **Q**    My name is the Joshua Lowther, and I represent Mr.

16   Clay.  Just a few questions.

17   **A**    Sure.

18   **Q**    You met Mr. Clay when he was cutting your uncle's hair

19   first; correct?

20   **A**    I'm sorry?

21   **Q**    You met Mr. Clay when he cut your uncle's hair?

22   **A**    Used to cut my uncle's hair, correct.

23   **Q**    And then you became his customer?

24   **A**    Correct.

25   **Q**    And he cut your hair about weekly?

**Aossey (Cross)**

1    **A**    Correct.

2    **Q**    And at some point while you were going in and out of

3    the shop, you realized or you understood that he was

4    starting a new business with Mr. Maluchnik?

5    **A**    Correct.

6    **Q**    Okay.  And Mr. Maluchnik advised you that they needed

7    some help doing this administrative or some paperwork --

8    **A**    I --

9    **Q**    -- correct?  As best as you recall?

10   **A**    Yeah, as best as I recall.

11   **Q**    And they agreed to pay you, what, $10 an hour, I

12   believe; correct?

13   **A**    I don't remember the exact amount but, I mean, it was

14   probably in that range.

15   **Q**    Okay.  And you didn't work -- it wasn't a 40-hour week

16   job?  You just worked periodically when they needed this

17   done?

18   **A**    That's correct.

19   **Q**    And you negotiated your compensation with Mr.

20   Maluchnik?

21   **A**    I don't recall that.

22   **Q**    Okay.  And when you did -- when you assembled these

23   packages and whatnot, you did that along with Mr. Maluchnik?

24   **A**    Along with him?  Or -- I'm sorry.

25   **Q**    I mean, he -- you were doing that for him.  You

**Aossey (Redirect)**

1    collaborated with him when you were doing this; correct?

2    **A**    I would put them together myself.  It wouldn't be both

3    of us in the room at the same time.

4    **Q**    Right.

5    **A**    But I was getting the materials from Matt.

6    **Q**    I guess that's what I so inarticulately trying to say.

7    You got the materials from Matt, and you did it at his

8    direction?

9    **A**    Correct.

10   **Q**    Mr. Clay didn't help you with any of that?

11   **A**    As best as I recall, it was Matt with the direction on

12   the packets.

13              MR. LOWTHER:  That's all I have.

14        Thank you, sir.

15              THE WITNESS:  Thank you.

16              THE COURT:  Redirect?

17        **REDIRECT EXAMINATION OF JAMEIL AOSSEY**

18   **BY MS. KING:**

19   **Q**    I'm going to give you another look at this welcome

20   packet, and in particular, the letter.  Is that one of the

21   items that you assembled?

22   **A**    Yes.

23   **Q**    And whose name is at the bottom of that welcome

24   letter?

25   **A**    Kevin Andrew.

**Marciniak (Direct)**

1    **Q**    Who is Kevin Andrew?

2    **A**    Kevin Clay.

3    **Q**    Do you know why he went by the name Kevin Andrew on

4    that letter?

5    **A**    I don't.

6                    MS. KING:  No further questions.

7                    THE COURT:  You may step down.

8            Next up?

9                    MS. KING:  Your Honor, the next witness is

10   probably going to go about an hour.  I don't know if you

11   want to take a break now or --

12                   THE COURT:  Let's start, and then we'll

13   take -- if it's all right, we'll take a break in the middle

14   of his testimony.

15                   MS. KING:  Fair enough.

16                   THE COURT:  His or her.

17                   MS. KING:  The Government calls Agent Erin

18   Marciniak.

19                       (Witness was sworn)

20       **<u>DIRECT EXAMINATION OF SPECIAL AGENT ERIN MARCINIAK</u>**

21   **BY MS. KING:**

22   **Q**    Good afternoon.

23           Can you please introduce yourself to the jury?

24   **A**    Sure.  My name is Special Agent Erin Marciniak.  It's

25   M-a-r-c-i-n-i-a-k, and I'm an agent with the FBI.

**Marciniak (Direct)**

1   **Q**    And what is your educational background?

2   **A**    I went to college at the Loyola University in Chicago

3   for four years, came back to The University of Toledo for

4   law school and then -- that was in 2000 I graduated law

5   school, and in 2018 I then obtained a master's degree in

6   health informatics from Northwestern University.

7   **Q**    And how long have you been with the FBI?

8   **A**    I've been employed with the FBI for 19 years.

9   Previous to working here in Toledo, I was assigned to

10  Washington D.C. after graduating in Quantico.  I was doing

11  international terrorism investigations for a number of years

12  that took me overseas, Afghanistan and whatnot.

13  **Q**    And when you came back to Toledo from D.C., did you

14  focus on a different type of investigation?

15  **A**    My first few years, I continued international

16  terrorism investigations.  And then at some point in 2015, I

17  was assigned to a white collar squad that then has me

18  focusing on healthcare fraud.

19  **Q**    And in investigating healthcare fraud, do you work

20  with other government agencies?

21  **A**    I do.  I work with both state and federal agencies.

22  So a lot of times our investigations are co-investigative

23  with Health and Human Services, DEA, Drug Enforcement

24  Agency, state pharmacy boards, state medical boards,

25  different state agencies as well.

141

**Marciniak (Direct)**

1    **Q**    And when did the investigation into Theramedical

2    occur?

3    **A**    I opened an investigation in April of 2015.  It came

4    to my attention for a couple of reasons, one of which Amy

5    Myers who is a partner with -- she's currently a supervisor

6    with the state medical board.  She brought it to my

7    attention that she had been investigating some allegations

8    into Dr. Suzette Huenefeld.  The state medical board has

9    authorities only administratively.  So if they believe after

10   their baseline investigation that it is more than

11   administration, it should be a criminal matter, they usually

12   bring it to the FBI's attention.  So based on a couple of

13   months of her own investigation, she believed that there was

14   some criminal activity, as well as she was provided a lead

15   from an individual who was approached to be a sales rep.

16   And this individual who reported that to Amy thought it was

17   very suspicious, and so that's how the investigation

18   basically got kicked off.

19   **Q**    And around the same time, had you learned some

20   information from a local bank?

21   **A**    Yes.  Also, almost simultaneously, Jeep Federal Credit

22   Union, which is a local credit union here in Northwest Ohio,

23   who basically the majority of their customer base is Jeep

24   employees, they had noticed an influx of money coming into

25   their credit union from an outside source.  That outside

**Marciniak (Direct)**

1    source was City Wide Solutions and Theramedical.  They

2    thought it extremely suspicious that between the months of

3    August 2014 and July of 2015, so just shy of a year, there

4    was over $800,000 into their credit union for their Jeep

5    employee customers.

6    **Q**    And would these be deposits that were in addition to

7    or separate from the payroll these employees were getting

8    from Jeep?

9    **A**    Yes.  They were ACH deposits that were outside of

10   their Jeep payroll.

11   **Q**    And they were from Theramedical and City Wide?

12   **A**    Correct.  Started out as City Wide the majority, and

13   then transferred to Theramedical, and some of the deposits

14   were greater than their actual salary deposits.

15   **Q**    And how did you -- with respect to the state medical

16   board concerns and Dr. Huenefeld, how did you start

17   investigating that allegation?

18   **A**    So we knew that the allegation was her conducting --

19   or not conducting medical exams on a lot of these new

20   patients.  We knew, based on it's called an OARRS report.

21   It is the Ohio pharmacy -- it keeps a list of all the

22   pharmacy -- prescriptions that are brought in, excuse me.

23       So we ran a check of Suzette Huenefeld's compound

24   prescriptions, and leading up to 2014, she had only had 21

25   compound scripts, one of which was sent to Central Rx.  Post

**Marciniak (Direct)**

1    2014 through 2016, she had over 657 compound scripts, and I

2    believe 595 of them were sent to Central Rx, and 70 were

3    sent to Denton pharmacy in Texas.

4    **Q**    In your investigation of Dr. Huenefeld, did you notice

5    any other patterns?

6    **A**    Yes.  Her patient base was lacking, if you will.  She

7    didn't really have a large practice.  She was floundering,

8    as you've heard.  She had a drinking problem.  She just

9    wasn't a very well-respected doctor.  She didn't have a lot

10   of income as a physician.  And then post 2014 through 2016,

11   she had an extremely high influx of patients, a lot of

12   family members, a lot of Jeep employees, and we were able to

13   track all that data.

14   **Q**    And with that data, did you match up names from folks

15   that had been identified by the credit union?

16   **A**    Yes.  So we were able to receive from the credit union

17   all the members who received these deposits from

18   Theramedical or City Wide.  With those names, we then

19   tracked it to Suzette's practice and recognized that they

20   were family members.  So it wasn't just one Jeep employee.

21   It was the Jeep employee plus all their family members were

22   now all of a sudden seeing Dr. Huenefeld, to include Matt

23   Maluchnik's family, Kevin Clay's family, and Chad Shade's

24   family and Mark Garrett's family and many different

25   employees.

**Marciniak (Direct)**

1    **Q**    And at some point, did you end up seizing physical

2    records from Dr. Huenefeld's office?

3    **A**    We did.  In June of 2016, we executed search warrants

4    simultaneously at Kevin Clay's apartment, Matt Maluchnik's

5    apartment, PNC Bank, and as well Suzette Huenefeld's office.

6    I was in charge of those search warrants.  We seized 90

7    patient charts.  Dr. Huenefeld's practice wasn't quite up to

8    date with the electronic medical records.  So normally when

9    we execute a search warrant today, you usually get a data

10   influx of computer access; but Huenefeld's office was more

11   old school, if you will, had the paper charts or hard copy

12   charts, and we were able to receive 90 of the charts that we

13   were seeking.

14   **Q**    So I would like to take a moment to show you portions

15   of what's been marked as Exhibit 84, so the physical

16   exhibit.

17        Let me give you a stack of five folders from that

18   exhibit.  Can you identify what those are and who they are

19   for?

20   **A**    Yes.  This is for the Shade family.  So my

21   investigation led me to actually interview Chad Shade, who

22   was the Jeep employee, and these folders are all the patient

23   charts of he and his family, his wife and children, the

24   youngest being eight at the time of this patient file.

25   **Q**    Let me show you another couple of folders from

**Marciniak (Direct)**

1  Exhibit 84.  And can you identify who those are for?

2  **A**    Yes.  This is Keyston Saxton and Pam Saxton.

3  **Q**    And was one of the Saxtons also a Jeep employee?

4  **A**    Yes.  Pam Saxton.

5  **Q**    And if you could take a moment to flip through that

6  and tell us if you see a prescription form included in that

7  medical file.

8  **A**    Yes.  So these files -- these patient charts are very

9  reflective of a summary of all the charts we ended up

10  seizing.  And on them, they contain this pink sheet.

11  Initially, we didn't know what the initials "NPGTDKO," which

12  basically meant new patient get to know.  So we didn't know

13  what that was initially.  We learned what it was.  All these

14  initial pages basically end up saying why the patient is

15  there.  This one specifically just has some basic health

16  information on them.

17      But then in the back, it has all the initial insurance

18  data, where they are employed, basic health information.

19  And then at the very back is the Central RX Pharmacy script,

20  and it identifies the rep, who the person gave this to.  It

21  signs Suzette Huenefeld's name, how many refills and what

22  the cream is that they are obtaining.  That is for both of

23  these, but, again, it is almost on every single chart that

24  we seized.

25  **Q**    If I could draw your attention to this file for Pam

1    Saxton and the yellow sheet.  Could you read aloud for the

2    jury what it notes there?

3    **A**    So this says that "NPGTK," so that was what we learned

4    was new patient get to know.  "Referral for cream.  Possible

5    PCP.  Patient has a lot of joint pain.  Patient also notices

6    hand swelling a little bit."  And then it says "Jeep" on the

7    side, and it shows that she received a compound cream and a

8    scar cream.

9        Again, based on our investigation, we learned that on

10   all these charts, it would ultimately say whether or not the

11   patient was referred by Loni, Matt or just Jeep, so they

12   would know where the patient was referred from.

13   **Q**    And among those records, did you find a file for Matt

14   Maluchnik?

15   **A**    We did.

16   **Q**    Now, you mentioned that towards the back, you would

17   find a prescription form.  Were those similar to the

18   prescription forms that we heard Mr. Aossey testify about?

19   **A**    They were identical.  They were just filled out.  The

20   ones that Mr. Aossey testified to were just the blank raw

21   ones, but  n the patient charts, they were almost always

22   filled out.

23   **Q**    You mentioned that you compared the information from

24   the federal credit union with Dr. Huenefeld's records.  Once

25   you confirmed that connection, did you reach out to the

**Marciniak (Direct)**

1    health insurance companies or to Jeep?

2    **A**    Yes.  We reached out to Jeep and did a request for

3    information, an RFI, to all the different insurance

4    companies.  So I sought out dozens of insurance information,

5    realizing that the majority of the insurers were from Blue

6    Cross Blue Shield and/or Medical Mutual, both of which --

7    the Fiat Chrysler was a self-insured party.  The other one,

8    the insurance company administered their benefits.

9    **Q**    And did Jeep have any other data that corroborated

10   what your investigation had found that far?

11   **A**    Yes.  I had been working closely with one of their

12   internal investigators, who has since retired, and I was

13   asking seeking through subpoena information for their claims

14   data.  So I was trying to obtain all their raw claims that

15   they received from the insurance because Fiat Chrysler isn't

16   an insurer.  They were an employee -- or employer, I should

17   say, and they housed all the medical claims.  And I wanted

18   to see all the medical claims that they paid out from

19   Suzette Huenefeld.

20   **Q**    And were you able to obtain that data?

21   **A**    I was.  They provided all that information to me,

22   initially which was housed through TrueVIN.  And I believe

23   you heard through Brad Thompson that that information is

24   housed in a third-party vendor -- IBM Truven -- who at the

25   time we received all the analytic claim data from.

**Marciniak (Direct)**

1    **Q**    And would you pull up Exhibit 39.

2          Can you identify this document, please?

3    **A**    Yes.  This was data that was provided to us from Jeep,

4    Fiat Chrysler or Stellantis that was based on all the claims

5    that Fiat Chrysler paid out to Suzette Huenefeld, which

6    identifies a significant influx in patient payouts.  And as

7    I stated earlier, as you can see, in quarter '13, Suzette

8    Huenefeld didn't have a very large patient base.

9          Come 2014, it increased significantly.  There's a

10   brief dip and that was when the payouts -- the insurance put

11   an edit in place where they attempted to stop making

12   payments.  And then they, as you heard, kind of modified

13   their pain and scar creams, and then the influx went back up

14   again.

15   **Q**    You can take that down.

16         You heard Mr. Maluchnik testify earlier about all the

17   entities that he and Kevin owned together.  Did

18   Theramedical's orientation change over time through the

19   course of their scheme?

20   **A**    Yes.  Matt would -- I learned through the

21   investigation that Matt and Kevin were best friends.  They

22   didn't do anything separate and apart from each other.  They

23   were big wannabe successful business owners.  They created

24   many different businesses, LLCs, to try and accumulate

25   wealth.

**Marciniak (Direct)**

1      Ultimately, once they realized that this compound

2    cream scheme was being shut down through the insurance

3    company, always being a day late and dollar short, as I say,

4    falling behind, they moved on to the next scheme, which

5    would have been the wellness and then this urine lab

6    business.  At the time, the opioid crisis was crazy and

7    doctors were finally doing urine drops on everybody that

8    they would prescribe a narcotic to.

9      Suzette Huenefeld, previous to this, never once

10   dropped -- we call it a urine drop on a patient where they

11   basically test them to make sure that the narcotic that

12   they're prescribing is actually in their system.  And this

13   was a lucrative business to get into because now all of a

14   sudden many, many physicians were doing urine drops on their

15   patients to make sure that the narcotics either were in

16   their system if it was meant to be, or not in their system

17   if it's not supposed to be.  And so Matt and Kevin started

18   Theramedical Laboratories which they were trying to get into

19   the business.

20   **Q**   And you mentioned, as part of it, that they also

21   looked into a wellness medication or supplement as part of

22   one of their schemes?

23   **A**   Yes.  The wellness supplement was simply a resveratrol

24   pill.  And the joke always amongst them, apparently, was

25   just that it's a lot of red wine.  But they were told that

1    that wouldn't pay out because insurance companies were

2    paying that for proactive wellness.  And so they tried

3    getting their patients to go back to Suzette Huenefeld to

4    obtain this wellness supplement, and many of these

5    patients/sales reps would go to Suzette Huenefeld simply

6    saying that they are there for the new product because that

7    was the new product that Matt and Kevin were trying to get

8    in on.

9    **Q**    So I would like to show you another folder from

10   Exhibit 84.  Can you identify whose patient folder that is?

11   **A**    This is Mark Garrett.

12   **Q**    And if you could flip to the yellow sheet in there and

13   take a moment to review it.

14   **A**    Yeah.  I'm familiar with this.

15   **Q**    So does it note an appointment in August of '14?

16   **A**    It does.

17   **Q**    And what was the appointment for?

18   **A**    Specifically, it states "Patient wants pain and scar

19   cream.  Patient also complains of back pain."

20   **Q**    And is there a note related to another visit in March

21   of 2015?

22   **A**    It does.  It is the follow-up appointment, and that

23   simply says, "Patient here today for a new product."

24   **Q**    And what's the date on that 2015 note?

25   **A**    March 20th, 2015.

Marciniak (Direct)

1    **Q**    I would like to show you two more folders from

2    Exhibit 84.  Can you please identify whose patient folders

3    those are?

4    **A**    Kevin Clay and Kim Forren.

5    **Q**    And if you could take a look at Kevin Clay's folder

6    and the yellow sheet.

7    **A**    Yes.  I have it in front of me.

8    **Q**    Is there a notation for an appointment in March of

9    2015?

10   **A**    There is.

11   **Q**    And what does it say?

12   **A**    "Patient in for supplements.  No concerns."

13   **Q**    And if you could turn to the next page in that.  What

14   was behind the yellow sheet in that patient packet?

15   **A**    The prescription for resveratrol.

16   **Q**    And are there similar notations and prescriptions in

17   Kim Forren's packet?

18   **A**    Yes.  On March 27th, 2015, "Patient in for supplement.

19   No concerns."  And on the last page it shows Kim Forren

20   receiving a prescription for resveratrol.

21   **Q**    And so did Kim and Kevin have an appointment with Dr.

22   Huenefeld on the same day in March of 2015?

23   **A**    They did.

24   **Q**    For the same product?

25   **A**    "No concerns," but there for the product, yes.

**Marciniak (Direct)**

1    **Q**    As part of your investigation, did you engage in

2    surveillance of Matt Maluchnik and Kevin Clay?

3    **A**    I did.  That's standard protocols for our

4    investigation.

5    **Q**    And what did you observe as part of that surveillance?

6    **A**    That they were always together.

7    **Q**    We've heard that they live in the same apartment

8    complex.  Did they go other places together?

9    **A**    They did.  They went to the gym together.  They went

10   to breakfast together.  They went to lunch together.  They

11   went to dinner and drinks together.  They went to the bank

12   together.  The bank tellers would tell me that they never

13   saw them without each other.  They were --

14                    MR. KERGER:  Objection.  Telling what the

15   teller told.

16                    (Court Reporter clarification)

17                    THE COURT:  Defendant made an objection.

18   Basically, a hearsay objection.

19        I will sustain that part of the answer.  It is

20   hearsay.  You might try to get it another way.

21   **A**    We were told -- we know that they were always

22   together.  There was, like, accusations that they actually

23   were lovers at one point.

24   **Q**    Can we pull up Exhibit 29, please.

25        Is this a photograph that you took during your

**Marciniak (Direct)**

1    investigation?

2    **A**    Yes.  I usually try to remain anonymous, and so it was

3    difficult to get photos of them head on.  But, yes, that is

4    Kevin Clay on the right and then Matt Maluchnik to the left.

5    **Q**    This is one of the times that you observed them

6    getting drinks together?

7    **A**    Yes.  I believe that was just midafternoon.

8    **Q**    Did you conduct any interviews in connection with the

9    investigation?

10   **A**    Yes.  I interviewed a lot of former Jeep employees or

11   current Jeep employees, as well as many others.

12   **Q**    And did they also corroborate what you had seen from

13   the records and the federal credit union statements?

14   **A**    Yes.

15   **Q**    You mentioned a search earlier of Matt Maluchnik and

16   Kevin Clay's apartments.  What was Kevin Clay's apartment

17   number in that complex?

18   **A**    1223.

19   **Q**    And do you recall the number for the apartment for

20   Matt Maluchnik?

21   **A**    1207.

22   **Q**    And when was that search warrant executed?

23   **A**    June 7th, 2016.

24   **Q**    And broadly speaking, what were you looking for?

25   **A**    We always look for fruits or evidence of a crime.  So

**Marciniak (Direct)**

1    that could be electronics, that could be drugs, that could

2    be medical information, that could be money, that could be

3    gold and -- it would be anything that could corroborate the

4    allegations of a crime being committed.

5    **Q**    I would like to -- and did you, as part of this

6    search, collect documents from their apartments?

7    **A**    Yes.  We knew of the foundations, both Cheer for a

8    Cure and the Kevin Clay Foundation.  So part of our search

9    warrant was seeking documents that pertained to any IRS

10   and/or nonprofit entities, any other business, and all of

11   their business entities were a part of that search warrant.

12   **Q**    So I would like to show you what's been identified as

13   Exhibit 81.  Would you explain to the jury what that is?

14   **A**    This was found in Kevin Clay's bedroom and it is all

15   of his -- well, some of his amended 1040 tax return, along

16   with a $100,000 check that was supposed to have been sent

17   in.  It was never sent in, and his signature is not affixed

18   to this amended return.

19              THE COURT:  What year?

20   **A**    2014.

21              THE COURT:  Thank you.

22   **A**    Let me just make sure.  Negative.  Forgive me.

23         2015 amended tax return, Your Honor.

24   **BY MS. KING:**

25   **Q**    And can you just, I'm sorry, take a look at the

**Marciniak (Direct)**

1    location information that was written on the outside of the

2    plastic envelope?

3    **A**    Yes.  This -- my apologies.  This -- Kevin Clay's tax

4    documents were actually found in Matt Maluchnik's Apartment

5    1207 location for the search warrant.  So it was unique to

6    us and because their apartments were so close and in the

7    same facility, general vicinity, we wanted to make sure that

8    we didn't mistakenly get Matt Maluchnik or Kevin Clay's

9    information in the wrong place.  Kevin Clay's tax amended

10   returns were actually found in Matt Maluchnik's apartment.

11   **Q**    If you can put that back together and to the side.

12        Give you what's been identified as Exhibit 79.  Can

13   you tell us what that consists of?

14   **A**    So this information was actually found -- let me make

15   sure -- in Kevin Clay's Apartment 1223.  In this, we have

16   the Theramedical business card that identifies Kevin Clay as

17   the co-founder, CEO, as well as his 2014 income tax return,

18   PNC documents, and then a copy of the $100,000 that he

19   attempted to donate to the Clay Foundation in December of

20   2015, as well as many other receipts and stuff that we

21   obtained during the search warrant.

22   **Q**    In that stack, is there a receipt for $200,000?

23   **A**    Let me find it.  Yes.

24   **Q**    And is that a portion of the $400,000 that you were

25   able to see from looking at bank statements that was

1    deposited into the Kevin Clay Foundation bank account?

2    **A**    Yes.  And what was wonderful about this search warrant

3    that you don't usually find is because they are formerly

4    pharmaceutical sales reps, they would keep the receipts and

5    notate on the receipts to always get reimbursed for their

6    monies spent.  So they were very meticulous in documenting

7    stuff on these receipts.  This receipt actually had

8    documentation stating that it was a donation to the Clay

9    Foundation, and it was a donation from Theramedical on this

10   receipt specifically.

11   **Q**    Included in there, is there a letter from Pfizer?

12   **A**    Yes.

13   **Q**    And could you take a moment to look at that and

14   perhaps summarize for the jury what that letter is saying?

15   **A**    Yeah.  This is dated July 14th, 2015, and it's

16   basically from the Pfizer Foundation, and it's stating that

17   they've received the request for a matching gift for the

18   contributions for your organization received from Kevin.  So

19   they received that Kevin was seeking a matching donation to

20   his organization.

21   **Q**    And is it making a request for some additional

22   documentation to support that?

23   **A**    Yes.  It has that you have to provide different

24   501(c)(3) documentation exemptions, and it said this was the

25   third request and final request for matching gifts program.

**Marciniak (Direct)**

1    The Internal Revenue Service requires proof of tax

2    deductible status.

3    **Q**    And also included in the documents found in Kevin

4    Clay's apartment, is there a letter from the IRS?

5    **A**    Yes.  I'm looking at it right now.

6    **Q**    Does that letter say anything about filing

7    requirements for a public charity foundation, perhaps, in

8    the upper right corner?

9    **A**    Well, it shows the effective date of exemption, and

10   then the contribution deductibility, that it is -- that

11   foundation is a public charity status and it requires

12   Form 990s, it says, yes.  And then it says contribution

13   deductibility, and then it says, yes.

14   **Q**    Do you want to take a moment to put that together?

15                THE COURT:  When you get to a good breaking

16   point, we'll take our afternoon recess.

17                MS. KING:  Now would be a good time,

18   Your Honor.

19                THE COURT:  Okay.  Then, ladies and gentlemen,

20   we'll take our afternoon recess.  Approximately 15,

21   20 minutes, please.

22        Remember all the rules.

23                    (Recess taken 2:27 p.m.)

24                        -  -  -

25                (Court reconvened at 2:49 p.m.)

**Marciniak (Direct)**

```
1                         -   -   -
2                    (Whereupon, the following discussion was held
3        outside the presence of the jury.)
4                    MS. KING:  We had briefed prior to trial the
5        issue of --
6                    COURTROOM DEPUTY:  No?  Wait?
7                    THE COURT:  One minute.
8                    MS. KING:  Sorry, Your Honor.
9                    THE COURT:  Go ahead.
10                   MS. KING:  -- before trial, the issue of
11       whether or not the elicitation of testimony and approach
12       taken by the defense might waive certain protections set
13       forth in a proffer agreement between the Government and Mr.
14       Clay.  And it's our view, based on the assertions of I guess
15       good faith, lack of knowledge, what have you, during opening
16       and on some of the crosses that that has, in fact, been
17       waived.  And so we intend to go into that area, and we just
18       wanted to draw your attention to it in case --
19                   MR. KERGER:  Before he testifies?
20                   MS. KING:  Yes.
21                   MR. KERGER:  I would object.  There's no
22       predicate for it under the agreement, but --
23                   MS. KING:  I'm --
24                   THE COURT:  Are you going to do it with this
25       witness?
```

**Marciniak (Direct)**

1          MS. KING:  Yes.

2          THE COURT:  Well, I guess I have to hear the

3   question and look at my notes on arguments that have made or

4   testified to, and maybe you can preface the question with an

5   intro that allows a connection, if you get my drift.

6          MS. KING:  I can certainly do my best to do

7   that.

8          THE COURT:  Not for every question, but

9   certainly once you approach the topic.

10          MS. KING:  Certainly, Your Honor.  Obviously,

11   he may or may not testify.  I understand that's your

12   assertion.  But if he's waived the proffer, we are entitled

13   to ask what statements he, as a party opponent, made to the

14   witness on the stand.

15          MR. KERGER:  I don't understand.  And I

16   apologize.  I don't understand why you think it's been

17   waived absent his testifying.  We don't know what he's going

18   to say.  So whether there's a conflict or not, doesn't yet

19   exist.

20          MS. KING:  Your Honor, they -- yeah, the

21   letter, the proffer letter that we submitted to the Court

22   says that:  Any argument or elicitation on cross-examination

23   asserting facts in contradiction to the statements made

24   under the protection of the proffer agreement waives the

25   agreement.  And we believe, given the substance of the

**Marciniak (Direct)**

1    opening argument and the substance of some of the questions

2    to Mr. Maluchnik and others, has waived that protection.

3              MR. KERGER:  Okay.  We're going to hear it at

4    some point maybe.  I still think they have the burden of

5    establishing what was said in the proffer because they don't

6    have a recording.  So whether there was a conflict or not,

7    is a little hard to determine.

8              THE COURT:  True, too.  So we will have to

9    cross that bridge when we get to it.  In the meantime, I

10   will take a look at the proffer agreement, but really

11   there's only one section of it that is important for this

12   purpose.

13             MS. KING:  Fair enough, Your Honor.

14             THE COURT:  Bring the jury in, please.

15             (Whereupon, the preceding discussion held

16   outside the presence of the jury concluded, and the

17   following proceedings were held in open court.)

18   **BY MS. KING:**

19   **Q**    In addition to documents, did you find anything of

20   value during the search of Kevin Clay's apartment?

21   **A**    Yes.  We found currency, gold and silver.

22   **Q**    Could we pull up Exhibit 10, please.

23        Can you identify this for the jury?

24   **A**    Yes.  It was three stacks of $100 bills that

25   ultimately totaled $29,000, and it was found in his bedroom.

**Marciniak (Direct)**

1    **Q**    And were you able to trace that cash to any particular

2    account or transaction?

3    **A**    It was $30,000 was withdrawn the week before we

4    executed the search on June 7th, 2016.

5    **Q**    And were you able to determine where that $29,000 in

6    three stacks came from?

7    **A**    We weren't able to specifically state where that came

8    from, technically.  However, he had quit Pfizer at that

9    time.  He quit Pfizer in January of 2015.  And in June of

10   2016, this was his Theramedical business and all underlying

11   businesses was his only form of income, so that came from

12   the Theramedical proceeds.

13   **Q**    And so we see cash.  We've heard some other witnesses

14   talk about the Range Rovers.  I believe you mentioned some

15   silver and gold?

16   **A**    Yes.

17   **Q**    And where was that found?

18   **A**    That was found in a suitcase under his bed.

19   **Q**    Draw up Exhibit 62, please.

20         And is this the bag of silver and gold that you were

21   just discussing?

22   **A**    Yes.

23   **Q**    Okay.  And in addition to the packets of bars, was

24   there any documentation related to the contents of this

25   suitcase?

**Marciniak (Direct)**

1   **A**     Yes.  We also found a packing slip with an invoice

2   that identified where the gold and silver was shipped to.

3   **Q**     Can we pull up Exhibit 63, please.  If we could zoom

4   in on the address.

5         And so who had that been shipped to?

6   **A**     Kevin Clay at Apartment 1223.

7   **Q**     And were you able to trace the transaction represented

8   by this packing slip to one of the accounts that Kevin Clay

9   controlled?

10  **A**     Yes, we were.  We were able to identify the exact

11  payment that he paid out for that gold and silver.

12  **Q**     And which account did he draw the funds from?

13  **A**     I believe it was 9582.  Theramedical account, I

14  believe.

15  **Q**     Did he purchase it with Theramedical funds?  Or did he

16  purchase it with foundation funds?

17  **A**     Excuse me.  He purchased it with Clay Foundation funds

18  through Clay Foundation account, but it was sent to and

19  shipped to Kevin Clay, not a Kevin Clay Foundation, just

20  Kevin Clay at his home.

21  **Q**     And with respect to the Range Rovers, were those

22  nearby the apartments you were searching?

23  **A**     Yes.  We also executed search warrants on the garages.

24  Both of them had garages at the same apartment complex.  We

25  seized both white and black Range Rovers.  We seized all of

**Marciniak (Direct)**

1    the valuables as well.

2    **Q**    During the -- after the search of the apartment,

3    subsequent to that, did you have any opportunity to

4    interview the defendant?

5    **A**    I did interview him on three different occasions.

6    **Q**    And in connection with that interview, did you provide

7    any warnings to Kevin Clay?

8    **A**    When -- yes.  When the FBI agents conduct interviews

9    of a subject of an investigation, we inform them that lying

10    to a federal agent is illegal.  It is a federal offense, and

11    so we usually cite 18 U.S.C. 1001, which is a federal

12    violation, lying to a federal agent.  So in that, he also

13    had his attorneys present, as well as U.S. Attorneys were

14    present with me when I was conducting the interviews.

15                     MS. KING:  If we could have a moment,

16    Your Honor.

17                     (Discussion held off the record between

18    Ms. King and Mr. Crawford.)

19    **BY MS. KING:**

20    **Q**    During the course of that interview where you said he

21    was represented by counsel and there was also some

22    Government attorneys there, did he make any statements

23    regarding what he knew about Jeep employees working for --

24                     MR. KERGER:  Objection, Your Honor.

25          Can we approach?

**Marciniak (Direct)**

1        THE COURT:  Sure.

2            (Whereupon, the following sidebar discussion

3    was held.)

4            MR. KERGER:  This is all predicated on there

5    being a breach of that agreement.  Until they establish what

6    they claim was breached, I don't think they're entitled to

7    go into this.

8            MR. CRAWFORD:  The statement of opening

9    argument was that Kevin was too busy to know what was going

10   on.  And this is an admission that he knew most of the

11   people were from Jeep and that they were getting paid and

12   doctors --

13           MR. KERGER:  I don't get -- I don't understand

14   a statement of too busy to know what was going on and then

15   tying it back to something like that.  It just doesn't seem

16   like a conflict.

17           MR. CRAWFORD:  It's inconsistent.  That's what

18   the proffer letter says.  They cannot make arguments,

19   questions, insinuations of anything that is inconsistent

20   with the proffer that allows a defendant to come in, tell us

21   one thing and tell this jury something else.

22           MR. KERGER:  What is it that he said that --

23           MS. KING:  Clay was aware that a majority of

24   his sales force were Jeep employees.  Previously they were

25   ZipRecruiter employees hired on by Andrew Backus.  Loni was

**Marciniak (Direct)**

1    the Jeep contact, and paid out the 1099 employees their

2    share.

3                    MR. KERGER:  He was asked generally.  I said

4    he was too busy to get into the details.

5                    THE COURT:  Well, clearly, the theme of the

6    opening statement is that Matt was the bad guy, and your guy

7    didn't know everything that was going on --

8                    MR. KERGER:  Yeah.

9                    THE COURT:  -- right?

10                   MR. KERGER:  Yeah.

11                   THE COURT:  And so some of these comments are

12   intended to shed light that your guy was not totally blind

13   or deaf to everything that was going on.  In fact, there's

14   some things he may have done or said that show he was aware

15   of what was going on, even if he didn't know all the details

16   or everything.  And so in my view, it's up to the evidence

17   to show what he did or didn't know and let the jury decide.

18                   MR. KERGER:  But, Judge, I'm not conceding

19   that that document can be used to establish that.  A

20   witness, maybe, but not the documents.  That's the --

21                   THE COURT:  Here's the witness who was

22   present.

23                   MR. KERGER:  Ask her.

24                   MS. KING:  That's what I was attempting to do.

25                   MR. KERGER:  Oh.  Okay.

**Marciniak (Direct)**

1          THE COURT:  That's what she's doing, I think.

2          MR. KERGER:  I still don't think it is

3    proper --

4          THE COURT:  Okay.

5          MR. KERGER:  -- for them to go into that but

6    you do.

7          THE COURT:  I do.  There's a lot in here

8    that -- and some of it may be proper, and some of it may not

9    be, everything that I've read.  So I think we have to listen

10   to each attempt and see whether or not it does contradict

11   the opening or what has been said so far.

12         MR. KERGER:  Thank you, Judge.

13         THE COURT:  Yeah.  Sure.

14         (Whereupon, the preceding sidebar discussion

15   concluded and the following proceedings were held.)

16         THE COURT:  I've tried to get music played

17   during those sidebars, but I've been unsuccessful so far.

18   **BY MS. KING:**

19   **Q**    Agent Marciniak, you've been sitting at counsel table.

20   You heard the opening argument by defense counsel in which

21   they asserted that Mr. Clay may have been too busy to be

22   fully aware of the details of the pay for prescription

23   scheme?

24   **A**    Yes, I heard that.

25   **Q**    When you interviewed Mr. Clay, did he have -- express

**Marciniak (Direct)**

1    any indication about what his knowledge was of Jeep

2    employees working for Theramedical?

3    **A**    He had full knowledge that the Jeep employees were the

4    ones who were allowing for the profits to be as extreme as

5    they were into his account.

6    **Q**    And did he have knowledge of who at Jeep was perhaps

7    facilitating the number of employees involved with

8    Theramedical?

9    **A**    He knew that it was Loni Peace, who is Matt

10   Maluchnik's aunt, who was doing all the business for them.

11   **Q**    And did Kevin Clay, during those interviews, make any

12   statements regarding getting paid for his own prescription?

13   **A**    Yes.  He informed me that he did his own test run, and

14   he was ultimately paid between 14- and $20,000 for his first

15   prescriptions.  Personal check from Lemma Gettachew at

16   Central Rx.

17   **Q**    You may have heard this morning when defense counsel

18   during opening talked about Kevin Clay's work in connection

19   with the Clay Foundation.  Did Kevin Clay, in your

20   interviews of him, make any statements about what the Clay

21   Foundation did?

22   **A**    He stated the Clay Foundation did nothing because we

23   seized all his money.  They were never able to provide any

24   scholarships to anybody because we took all his money.

25   **Q**    During those interviews, did Clay make any statements

**Marciniak (Direct)**

1    about who was the primary contact with Lemma Gettachew and

2    Central Rx?

3    **A**    He had the relationship with Lemma Gettachew because

4    he could understand him better or had a better relationship.

5    He was the people person.  Matt was the administrator,

6    details guy.

7                   (Discussion held off the record between Ms.

8    King and Mr. Crawford.)

9    **Q**    Do you recall the approximate date of the three

10   interviews that you had with Mr. Clay?

11   **A**    I do, but I don't want to misdate.  I drafted FD-302s

12   for every single interview.  I believe two took place in

13   2017 and one took place in 2019.  My FD-302s would

14   accurately reflect the date in which I conducted those

15   interviews.

16   **Q**    Just going to show you the FD-302s.  And if you could

17   just identify the date of the interviews as indicated in the

18   memos.

19   **A**    The first interview was done on January 31st, 2017,

20   and the interview was written on February 6th, 2017.  The

21   next interview was done on February 9th, 2017, and drafted

22   that same date.  The next interview was dated June 25th,

23   2019.  So I was correct.  Two in '17 and one in '19.

24   **Q**    And so the interviews in 2017 were about nine months,

25   eight months after the search warrant?

**Marciniak (Cross)**

1    **A**    That's correct.  And he was represented by counsel at

2    that time.

3    **Q**    And then there was a follow up about a couple years

4    later?

5    **A**    Correct.

6                   MS. KING:  No further questions.

7                   THE COURT:  Defense counsel may inquire.

8                   MR. KERGER:  Thank you, Your Honor.

9         **CROSS-EXAMINATION OF SPECIAL AGENT ERIN MARCINIAK**

10   **BY MR. KERGER:**

11   **Q**    Clean up a little bit here.

12        Good afternoon.

13   **A**    Good afternoon.

14   **Q**    You said you're Special Agent Marciniak, but that's

15   not a special term, is it?

16   **A**    It's my title.

17   **Q**    But all FBI agents, short of executive ranks, are

18   called special agents?

19   **A**    That's correct.

20   **Q**    You mentioned, I thought, and maybe I misheard you,

21   that when you're looking at the bank records, you saw Kevin

22   Clay's family?

23   **A**    The bank records?  Or his patient charts?

24   **Q**    The bank records, I think.

25   **A**    Patient charts showed Kimberly.

**Marciniak (Cross)**

1    **Q**    And what was his family consisting of?

2    **A**    His mom, his wife and himself, then-girlfriend.  His

3    mom's name is also Kim.

4    **Q**    How many businesses have Kevin and Matt opened

5    together?

6    **A**    Between 7 and 12 off the top of my head.

7    **Q**    That they opened and operated?

8    **A**    Well, that they had LLCs together.

9    **Q**    Well, opening an LLC is simply a matter of filing with

10   the Secretary of State, is it not?

11   **A**    That's correct.

12   **Q**    You don't have to do anything?

13   **A**    No, you don't.

14   **Q**    The only two operating businesses they had was MOMA

15   and Theramedical?  True?

16   **A**    No.

17   **Q**    City Wide?

18   **A**    Yes.  Theramedical Laboratories.

19   **Q**    And did that operate?

20   **A**    It attempted to operate.  They received money for that

21   business, they did.

22   **Q**    You talked about resveratrol and the fact that he and

23   his then-girlfriend went in to see Dr. Huenefeld on the same

24   date?

25   **A**    That's correct.

**Marciniak (Cross)**

1   **Q**      That was back when the red wine craze was going

2   forward; right?

3   **A**      I have no idea.

4   **Q**      You didn't read the papers and see that everybody was

5   drinking red wine because they thought it had health

6   benefits?

7   **A**      I drink it because I because I enjoy red wine.  I

8   can't tell you whether it has benefits or not.

9   **Q**      Now, you were shown pictures of the gold and silver

10  bars?

11  **A**      Yes.

12  **Q**      And they were found where?

13  **A**      In a suitcase in his bedroom.

14  **Q**      Did the foundation have a business location then?

15  **A**      It had a P.O. Box, if I recall correctly.

16  **Q**      Is it easy to store gold and silver bars in a P.O.

17  Box?

18  **A**      They did have a safe deposit box they could have

19  stored it in.

20  **Q**      But it is kind of easier if it is in your house?

21  **A**      I have no idea.  I don't own gold and silver bars.

22  **Q**      And do you know if he considered those to be assets of

23  the fund?

24  **A**      Assets of the what?

25  **Q**      The fund.

1    **A**     The fund?

2    **Q**     The Clay fund.

3    **A**     The Clay Foundation?

4    **Q**     Yeah.

5    **A**     I think he alleged that they were assets that were

6    purchased for the Clay Foundation, yes.

7    **Q**     And do you have any evidence that proves that's not

8    true?

9    **A**     It didn't go to the Clay Foundation.  It was sent to

10   him at his home address in his name, not in the Clay

11   Foundation name.

12   **Q**     Would anybody have been confused, perhaps, if they

13   didn't know that was where the Clay Foundation owner lived?

14   If he'd sent it to the Clay Foundation at that address,

15   would somebody potentially have been confused?

16   **A**     I have no idea.

17   **Q**     Now, you express some surprise, I thought, at finding

18   his 2015 amended returns in Mr. Maluchnik's house.

19   **A**     It is odd.

20   **Q**     Did you know that Mr. Maluchnik helped him with every

21   returned he filed?

22   **A**     I do.

23   **Q**     And Maluchnik was much better with math and finance

24   than Kevin?

25   **A**     I can't say that for -- I don't know that.

**Marciniak (Cross)**

1    **Q**    But you know he did help him on his returns?

2    **A**    I know that, yes.

3    **Q**    And so that is, perhaps, why his return was in Mr.

4    Maluchnik's house?

5    **A**    Possibly.

6    **Q**    You said that there was a third request to get

7    information on the 501(c)(3).  Do you recall that?  I forget

8    who was asking for it.

9    **A**    It was a notice that the IRS provided and stated it

10   was the third request.

11   **Q**    Had he been granted -- had the foundation been granted

12   charitable status at that point in time?

13   **A**    You are going to have to refresh my memory as to the

14   date of that letter.  I don't know.

15   **Q**    Well, the foundation was granted charitable status in

16   August of '15.

17   **A**    Okay.

18   **Q**    Those would have been beforehand?

19   **A**    Correct.

20   **Q**    So he couldn't respond to the request?  True?

21   **A**    I don't follow.

22   **Q**    He didn't have evidence that he had been given -- that

23   he had been made a charitable foundation before August of

24   2015?

25   **A**    I still don't understand your question.  Forgive me.

**Marciniak (Cross)**

1    I don't. . .

2    **Q**    I will take it out, shoot it, and move on to another

3    one.

4    **A**    That's fine.

5    **Q**    Now, Central Rx sent that check to Kevin on his

6    testing of the cream?

7    **A**    That's what Kevin told me.

8    **Q**    It was their decision.  The money came from Central

9    Rx.  You said it was Mr. Gettachew's check?

10   **A**    That's correct.  Kevin said it was a personal check

11   from Lemma to him.

12   **Q**    Did you ever verify if that was true or not?

13   **A**    No.

14   **Q**    But you also didn't verify if it wasn't true?

15   **A**    I assume when I interviewed him and I gave him the

16   warning that lying to us was a federal offense, he was

17   telling me the truth then, which was that he didn't know

18   exactly the amount, but it was between 14- and $20,000.

19   **Q**    And it was a decision made by Lemma Gettachew, not

20   Kevin Clay, to do that?

21   **A**    Sure.

22   **Q**    Now, a raid and search does not take a business out of

23   existence, does it?

24   **A**    It doesn't have to.

25   **Q**    Now, you were never with Dr. Huenefeld when she

**Marciniak (Cross)**

1    interviewed those patients?

2    **A**    No.

3    **Q**    And you don't have any recordings, video or otherwise?

4    **A**    No.  Just interviews of the patients who were supposed

5    to have received an examination by her.

6    **Q**    And your understanding is that, generally, a

7    prescription goes from the doctor to whom?

8    **A**    Well, are we talking current day or back --

9    **Q**    Talking with Dr. Huenefeld at the time.

10   **A**    So a script typically would go from the patient would

11   make a complaint.  The doctor would diagnose.  The doctor

12   would see whether or not a prescription is necessary for

13   their ailment.  The doctor would either call into a CVS or

14   Walgreens or provide the little rectangular script pad where

15   the patient would then take that to their pharmacy, submit

16   it to their pharmacist, wait around, receive their

17   prescription.

18   **Q**    How did that get handled with Central Rx?

19   **A**    They received the prescription from the patient to Dr.

20   Huenefeld.  Dr. Huenefeld would fax it to Central Rx, and

21   then the patient, a few days later, would receive their

22   creams, and then a few weeks later would receive their

23   money.

24   **Q**    So once the script is written, nobody from

25   Theramedical would ever see it?

**Marciniak (Cross)**

1    **A**    No.

2    **Q**    And you knew that Matt was the contact with Dr.

3    Huenefeld as far as Theramedical was concerned?

4    **A**    Yes.

5    **Q**    You have no evidence that Kevin ever saw Dr. Huenefeld

6    as a representative of Theramedical?

7    **A**    No.  He went to a meeting with Matt and they took Dr.

8    Huenefeld out to a dinner once.

9    **Q**    A meeting?

10   **A**    Excuse me?

11   **Q**    A meeting?

12   **A**    A meeting, correct.  Yes.

13   **Q**    Did you determine in the course of your investigation

14   that new patients to Dr. Huenefeld were often told to say

15   Matt had sent me?

16   **A**    Matt sent me, or Loni sent me, or they're a Jeep

17   federal -- or Fiat Chrysler patient.

18   **Q**    And never Kevin sent me?

19   **A**    I don't think we ever saw that, no.

20   **Q**    And Central Rx and none of its distributors, other

21   than Theramedical, were ever charged with a crime or shut

22   down?

23   **A**    Central Rx and Lemma Gettachew were investigated by

24   the Health and Human Services after Lemma Gettachew

25   self-disclosed to the Federal Government that he was

**Marciniak (Cross)**

1   inaccurately billing Medicare and Medicaid for compound

2   scripts.  As a result, the Health and Human Services did

3   their own investigation into Lemma Gettachew.

4         This investigation was only involving private payers.

5   So private payers and CMS, which is Medicare and Medicaid,

6   are two separate entities.  HHS-OIG investigates Medicare

7   and Medicaid.

8   **Q**    Health and Human Services Office of the Inspector

9   General?

10  **A**    That's correct.

11  **Q**    Help the jury understand that.

12  **A**    Oh.  Thank you.

13        HSS-OIG investigates Medicare and Medicaid.  As this

14  investigation only resulted in fraud to private payers,

15  they've already had their own investigation into Lemma

16  Gettachew and Central Rx.  Therefore, I did not investigate

17  any further because they had their own going on.

18  **Q**    And that ended in a fine?

19  **A**    That ended in a lawsuit of some sorts.

20  **Q**    They stayed open though?

21  **A**    I don't know that.

22  **Q**    You didn't stop and go back or ever worry about what

23  happened to Central Rx?

24  **A**    I attempted to interview Lemma Gettachew through his

25  attorney, but the attorney had passed away.  I was never

**Marciniak (Cross)**

1  able to interview him.

2  **Q**    And in Northwest Ohio -- I mean, Central Rx did have

3  other representatives of the company in Northwest Ohio, did

4  it not?

5  **A**    There was a complaint about a sister and brother team

6  that was doing some sales before Matt and Kevin got on the

7  scene.  But according to our investigation, Matt and Kevin

8  basically ran them out of town, if you will, and so Matt and

9  Kevin were the only reps in Northwest Ohio for Central Rx.

10  **Q**    And before that there were none?

11  **A**    There was the one brother-sister team.

12  **Q**    How about the Eisenfelds [phonetic]?

13  **A**    I didn't know that -- you mean Eisaman?

14  **Q**    Yeah.

15  **A**    Tracy and Judy Eisaman?

16  **Q**    Yeah.

17  **A**    They -- Judy was doing it through the brother-sister

18  team, if I recall correctly.

19              MR. KERGER:  Thank you very much.

20              THE WITNESS:  My pleasure.

21              THE COURT:  Any redirect?

22              MS. KING:  No, Your Honor.  No redirect.  We,

23  in light of some of our witnesses being a little quicker, we

24  do have another witness coming.  He'll be about eight

25  minutes.

**Worley (Direct)**

1          THE COURT:  Okay.  Why don't we --

2          MR. KERGER:  About eight minutes?

3          MS. KING:  Eight minutes.  That is the latest

4     report.

5          THE COURT:  We are moving at a brisker clip

6     than we thought.  Let's take a sitting/standing break for

7     ten minutes or so.  If it's okay, we'll all stay in here.

8     Keep the noise down.  You can have light chatter and banter,

9     if you wish.  Don't discuss the case, however.

10         And I would ask everyone else to please remember we're

11    in a courtroom.  And if you want to stand, of course, you

12    may.

13              (Recess taken at 3:24 p.m.)

14                     -  -  -

15              (Court resumed at 3:37 p.m.)

16                     -  -  -

17         THE COURT:  We're going to go back on the

18    record.  Everyone quiet, please.

19         Thank you.

20         MS. KING:  The Government calls Steven Worley.

21              (Witness was sworn)

22         **DIRECT EXAMINATION OF STEVE WORLEY**

23    **BY MS. KING:**

24    **Q**    Good afternoon.

25    **A**    Hello.

**Worley (Direct)**

Q    Could you please introduce yourself to the jury?

A    Sure.  My name is Steve Worley.  I'm the owner of Data
Service Center, Inc.

Q    And what does Data Service Center, Inc. do?

A    So we're a payroll service company locally owned and
operated here in Toledo, Ohio, and we do full service
payroll, taxes W-2s, 1099s, quarterly processing, direct
deposit for a multitude of businesses here in Northwest
Ohio.

Q    And approximately how many company clients does Data
Service have?

A    We service just over 1,900.

Q    And does the work that Data Service does for its
clients, does that change if an employer has W-2 or 1099
employees?

A    Sure.  So if they have a W-2, we withhold the proper
taxes, the employment taxes as far as if you get a pay stub,
federal tax, social security, Medicare, city, state, local,
that type of stuff.  When it is a 1099, we're provided a
dollar amount that is then paid to the individual and/or
LLC, if it is a business, and no taxes are withheld
whatsoever.

Q    And can you maybe explain for the jury, if they are
not aware, the difference between a W-2 employee and a 1099
person?

**Worley (Direct)**

1  **A**    Sure.  So a W-2 employee is someone who is hired by an

2  employer that is paid by the hour.  They're directing them

3  what to do, how to do it, when to do it, and instruct them,

4  and are in full control of how they do it.

5      A 1099 contractor is what it is.  It is for contract

6  work.  It is for a person who will submit an invoice to that

7  employer and they will turn around and pay them a set dollar

8  amount on that invoice for the job performed.  There is a

9  beginning and there is an end.

10      Employment then is an ongoing agreement between the

11  employee and the employer until, in fact, the employee is

12  terminated.

13  **Q**    Thank you.

14      Do you know Matt Maluchnik?

15  **A**    Yes.

16  **Q**    And how do you know him?

17  **A**    So I first met Matt probably back 2013, 2014,

18  somewhere in there.  He started a nonprofit called Cheer for

19  a Cure where he had cheerleading competitions to raise

20  awareness for I believe cancer, maybe, something along those

21  lines.  It was a nonprofit to raise money -- to raise funds

22  for his nonprofit.

23  **Q**    And did you ever have a meeting with Mr. Maluchnik in

24  connection with a business called Theramedical?

25  **A**    Yes.

**Worley (Direct)**

1    **Q**    And did Theramedical engage your company services?

2    **A**    Yes, they did.

3    **Q**    When you had that meeting, was Kevin Clay present?

4    **A**    I don't believe so, but I don't remember.

5    **Q**    Did you ever do work for a company called City Wide?

6    **A**    That sounds familiar.

7    **Q**    And in your work for Theramedical, who was your main

8    point of contact?

9    **A**    It would have been Matt Maluchnik.

10   **Q**    And do you recall approximately when that started?

11   **A**    2014, 2015.  Probably 2014, I think.

12   **Q**    And what types of payroll did your company process for

13   Theramedical?

14   **A**    It was primarily 1099s, although I think we did have

15   one W-2 employee that he processed where we withheld taxes

16   and filed a W-2?

17   **Q**    I would like to show you Exhibit 1.  And can you

18   identify that document, please?

19   **A**    Sure.  That's a 1099 miscellaneous form from tax year

20   2014, made out to an individual.  Box 7 indicates how much

21   they were paid throughout the year.

22   **Q**    And if we can scroll down a little bit.

23         And would this be a printout for the entire year of

24   2014?

25   **A**    Yes.  It appears to be with the multiple pages, yes.

**Worley (Direct)**

1   **Q**    And it looks like there's about two employees on each

2   page of this 49-page document?

3   **A**    That's correct.

4   **Q**    And if we could look at Exhibit 2, please.  And is

5   this a similar document showing 2015 1099 income for a

6   variety of people?

7   **A**    That is correct.

8   **Q**    And, again, two people per page on this document that

9   appears to be 57 pages long?

10  **A**    That's correct.

11  **Q**    How does Data Services charge its customers?

12  **A**    We charge on a per check basis.  So as a customer

13  communicates to us the number of individuals they want to

14  pay, whether it's W-2 or 1099, they communicate that to us,

15  whether it's weekly, bi-weekly, monthly, or as needed.  We

16  charge on the number of checks that we process on that

17  particular payroll.

18  **Q**    And how is the money obtained to process that payroll?

19  **A**    You mean to pay the individuals?

20  **Q**    Yes.

21  **A**    So after they give us the information on who is

22  getting paid what, we electronically debit their account for

23  the grand total.  Then, a couple days later, we send that

24  money to the individuals' bank accounts via ACH or direct

25  deposit.  If they do not have direct deposit, we cut a live

**Worley (Direct)**

1    check for it.

2    **Q**    And so would the Data Service's payroll debits, the

3    pulling from the account you mentioned, would that be

4    reflected as ACH withdrawals from, for example,

5    Theramedical, their bank account?

6    **A**    That's correct.  It would actually have a line item

7    that would say "Data Service Center payroll" on their bank

8    statement.

9    **Q**    And in addition to payrolls, does your company, I

10   believe you mentioned, processes quarterly tax filings?  And

11   what are some of the quarterly forms that your company does

12   for its clients?

13   **A**    Sure.  So we process the federal Form 941, which is a

14   quarterly reconciliation of the wages and taxes withheld for

15   that particular quarter.  So, like, for first quarter, we

16   would do January, February and March, produce a quarterly

17   941 that would encompass all the wages and taxes from that

18   quarter to then report to the IRS.  We would also process,

19   you know, Ohio withholding, Toledo withholding, school

20   district withholding, also the quarterly unemployment

21   payments to Ohio Job and Family Services for state

22   unemployment and then federal unemployment.

23   **Q**    And would you do those kinds of filings for 1099

24   employees?

25   **A**    No, we would not.

**Worley (Direct)**

1    **Q**    So that's only for W-2?

2    **A**    That is only for W-2.

3    **Q**    In addition to Theramedical, did you process payroll

4    or other quarterly or annual filings for some of the other

5    companies owned by Matt Maluchnik and Kevin Clay?

6    **A**    Yes.

7    **Q**    What were those companies, if you recall?

8    **A**    So they used abbreviations of their names, like, MMKC

9    or vice versa, KCMM, and then maybe LLC at the end.

10   **Q**    If we could take a look at Exhibit 85.

11        I'm sorry.  That's the wrong one.

12        One moment.  I'm sorry.  It is Exhibit 85, page 14.

13             THE COURT:  85?

14             MS. KING:  Yes.  Exhibit 85, page 14.

15             THE COURT:  Thank you.

16   **BY MS. KING:**

17   **Q**    Can you identify this document, please?

18   **A**    Yes.  So this is a personnel report we produce with

19   every payroll, kind of giving the employer a snapshot of

20   where that employee is at at this point in time.  This one

21   dated 5/22/15 in the top right corner tells me that this

22   employee Kimberly.  If you look towards the right, the third

23   column from the right has year-to-date totals $60,000 wages,

24   and the federal and local -- or FICA, city, state and school

25   tax withholdings.

**Worley (Direct)**

1    **Q**    All right.  And --

2    **A**    This is -- actually, this was produced, yes, but this

3    is for tax year 2014.

4    **Q**    Okay.  And if we could look at page 15, the following

5    page.  And what is this?

6    **A**    So this is an earnings record that's produced at the

7    end of the year that's given to the employer, again, a recap

8    of the year of the detail of when that person was paid.  So

9    here it says Kimberly was paid it looks -- on the far left,

10   it says 12/31.  That was the date that she was paid, the

11   dollar amount, taxes withheld.  The far right gives the net

12   amount that would have been generated for her.

13   **Q**    And can you tell from looking at this document, was

14   there just one payment for Ms. Forren during 2014?  Or was

15   she getting some kind of weekly salary?

16   **A**    There was just one payment on 12-31.

17   **Q**    A what was the amount of that payment?

18   **A**    Gross was $60,000.  The net was 24,578.95.

19   **Q**    And is there an indication of, perhaps, a contribution

20   that she made to a Roth 401(k)?

21   **A**    That's correct.  Deduction to their Roth 401(k)

22   indicates 17,500 was withheld for a retirement plan

23   contribution.

24   **Q**    And is that the column where that is showed?

25   **A**    Yes.

**Worley (Cross)**

1    **Q**    Does this also show the date that Kim Forren was hired

2    by what appears to be KCMM Management?

3    **A**    Yes.  If you follow the line over where her name is

4    listed, we X out part of her social security number, we show

5    her exemptions, and then next to that it says hired 12-4 of

6    '14.

7                    THE COURT:  Why don't you blow that up so the

8    jury can read it.  Take that section and help them out.

9           Thank you.

10   **BY MS. KING:**

11   **Q**    So it appears that she was hired -- from this

12   document, she was hired on December 4th of '14 or put on the

13   KCMM payroll, and then earned $60,000 just in the month of

14   December of 2014?

15   **A**    That's how it looks.

16                   MS. KING:  No further questions.

17              **CROSS-EXAMINATION OF STEVEN WORLEY**

18   **BY MR. LOWTHER:**

19   **Q**    Good afternoon, Mr. Worley.

20   **A**    Good afternoon.

21   **Q**    My name is Jeff Lowther, and I represent Mr. Clay.

22          You don't know the reason Ms. Forren was paid that

23   money, do you?

24   **A**    I do not.

25   **Q**    Your company processes payroll?

**Worley (Cross)**

1    **A**    Correct.

2    **Q**    So you process the information that's given to you by

3    your customers?

4    **A**    Uh-huh.

5    **Q**    And you're not --

6              THE COURT:  That's a yes?

7    **A**    Yes.  I'm sorry.

8    **Q**    And you're not concerned with whether they actually

9    worked, whether they didn't work, or the reason they're

10   receiving the money; correct?

11   **A**    We have no way of knowing that.

12   **Q**    So you don't recall if Mr. Clay was present when you

13   first met Mr. Maluchnik about Theramedical; correct?

14   **A**    Correct.

15   **Q**    But you do recall that Mr. Maluchnik or Maluchnik was

16   your point of contact from that point forward?

17   **A**    Correct.

18   **Q**    So if you needed anything, you would contact him?

19   **A**    Uh-huh.

20   **Q**    And he would either send you the information for you

21   to process payroll, or have it sent to you?

22   **A**    When he would send the information, yes, he would send

23   it.  I do believe there is an email copied -- Mr. Clay was

24   copied in on the emails by appearance.

25   **Q**    Right.  Mr. Clay was copied.  But Mr. Clay has never

**Worley (Cross)**

1    responded to an email or sent you an email directly;

2    correct?

3    **A**    Not to my memory.

4                   MR. LOWTHER:  Okay.  Thank you.

5                   THE WITNESS:  Yep.

6                   THE COURT:  Anything further?

7                   MS. KING:  No, Your Honor.

8                   THE COURT:  You may step down.

9         Thank you.  And thank you for coming on short notice.

10                  THE WITNESS:  No problem.

11                  THE COURT:  Does that conclude testimony for

12   today?

13                  MS. KING:  Yes, Your Honor.

14                  THE COURT:  So, ladies and gentlemen, you get

15   an early quit.  It's Friday.  Why not, right?

16        A couple of things before I let you go.  I want to let

17   you know that at the end of the case, you are going to get

18   several things.  You are going to get final jury

19   instructions.  You are going to get an exhibit list that

20   will have an exhibit number with a description of it.  I

21   know some of you are taking notes, and I just want to alert

22   you to that fact.  Hopefully, that will help you in your

23   deliberations if you are trying to find a particular

24   exhibit.  You are also going to receive a witness list in

25   the order that the witness testified.  And we're going to

1    provide today's list to you on Monday, and you can put them

2    in your notebooks.

3        Again, jurors have told us that that helps them

4    sometimes when they're trying to recall "Who was that?  Oh,

5    yes, now I see who it was that said whatever."  So those are

6    meant for you to use as you wish, if they assist you in your

7    deliberations.

8        Because we have a bit of an unusual break time on

9    Monday, I'm going to suggest that everyone, including

10   counsel, try to be here by 9:00 and that we shoot for a

11   start time of 9:15.  Should there be anything you need to

12   bring to my attention, Counsel, you can do so.  I will be

13   here well before 9:00 so you can reach me.

14       Jury I want to get you here timely on Monday so we can

15   start promptly at 9:15, please.  Keep in mind we're going to

16   break for lunch around 12:30.

17       I'm going to let you go home for the weekend.  I want

18   you to, please, remember all of the rules.

19       I happened to read in the paper about someone who was

20   on a jury recently, and to make sure that that person

21   complied with the Judge's rule, he took himself off Facebook

22   for the period of the trial.  That's one way to make sure

23   that you don't slip or receive something or say something.

24   I'm not asking you to do that.  I just point that out as an

25   example of how serious that juror took his responsibility

1     with his oath for that trial.

2          So I know there may be a temptation to say something.

3     I, again, encourage you to not open the door.  If you answer

4     one question, I guarantee you you will get a second question

5     or maybe more, and the best answer is "I know you're

6     interested.  I'm happy to share with you, but the Judge has

7     asked, and I had took an oath, and I can't say anything

8     until the trial is over."  So please, do try and comply with

9     that.  You haven't heard all of the evidence yet.

10         I think that's all I have.  Anything else from counsel

11    before we adjourn for the day?

12                    MR. KERGER:  No, Your Honor.

13                    MS. KING:  No, Your Honor.

14                    THE COURT:  Okay.  Be safe.  Enjoy the

15    weekend.  See you on Monday.

16                    (Whereupon, the following discussion was held

17    outside the presence of the jury.)

18                    THE COURT:  Anything else?

19                    MR. CRAWFORD:  One more thing to discuss at

20    the side, please.

21                    THE COURT:  Do you need a record?

22                    MR. CRAWFORD:  Please.

23                    (Whereupon the following sidebar discussion

24    was held.)

25                    MR. CRAWFORD:  Your Honor, I believe Mr.

1    Clay's parents have been in the courtroom.  I think his

2    father is in the courtroom right now -- left in the

3    courtroom.  Mr. Clay's father greeted several of the jurors

4    as they walked out of the courtroom, wishing them a good

5    weekend, "Hi.  How are you doing?" and so forth.  Could we

6    please put an end to that?

7               MR. KERGER:  Yeah.  We'll talk to him.  We had

8    no idea he was doing that.

9               THE COURT:  I don't think anybody is

10   suggesting that.

11              MR. KERGER:  I would be glad to take care of

12   it.

13              THE COURT:  I would ask Counsel to admonish

14   him that he shouldn't be talking to the jurors in any way,

15   shape or form, or greeting them or anything like that.

16              MR. LOWTHER:  Of course.

17              THE COURT:  Thank you.

18              (Proceeding adjourned at 4:01 p.m.)

19                        -  -  -

20                  **C E R T I F I C A T E**

21       I certify that the foregoing is a correct transcript
     of the record of proceedings in the above-entitled matter
22   prepared from my stenotype notes.

23            */s/ Stacey L. Kiprotich*          *10/23/2023*
             STACEY L. KIPROTICH, RMR, CRR          DATE
24

25