<pre>
                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
                         WESTERN DIVISION


UNITED STATES OF AMERICA,         Case No. 3:21-CR-00205-JZ
                                  COA No. 23-3923
                                  Toledo, Ohio
          Plaintiff,

     vs.                          Monday, October 30, 2023


KEVIN CLAY,

              Defendant.



              TRANSCRIPT OF SENTENCING PROCEEDINGS
            BEFORE THE HONORABLE JACK ZOUHARY
             SENIOR UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:      Gene Crawford,
                        Dexter Phillips,
                        Assistant United States Attorneys



For the Defendant:      Richard M. Kerger, Esquire
                        Joshua S. Lowther, Esquire




Official Court Reporter:   Stacey L. Kiprotich, RMR, CRR
                           United States District Court
                           1716 Spielbusch Avenue, Suite 120
                           Toledo, Ohio 43604
                           (419) 213-5520

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.
</pre>

1              **Monday, October 30th, 2023**

2                      **-  -  -**

3                 **(Afternoon session)**

4                      **-  -  -**

5              THE COURT:  We're here on Case Number

6    21-cr-205, United States versus Kevin Clay.

7         The defendant is present in court along with counsel

8    Rick Kerger and Joshua Lowther.

9         On behalf of the Government, we have Gene Crawford

10   and?

11              MR. CRAWFORD:  Agent Erin Marciniak from the

12   FBI.

13              THE COURT:  Thank you.

14        There you are.  I was looking for Dexter Phillips who

15   is also here on behalf of the Government.

16        This matter is before me today for a sentencing.  A

17   presentence report was prepared by Amanda Winner, and she is

18   present along with Christina Truesdell from Pretrial and

19   Probation.  That presentence report is Document 85 on the

20   court docket.

21        I spoke briefly with counsel prior to taking the

22   bench.  There were a number of objections to that

23   presentence report.  They are contained in the addendum.

24   And I've shared with counsel a proposed order that will be

25   filed with respect to those objections and that order is

1    captioned Order Denying PSR Objections, Document 85,

2    Addendum.

3         There were some additional objections that were raised

4    more recently by the defendant that is contained in the

5    defendant's sentencing memo, Document 90, filed on

6    October 23rd.  And I've discussed with counsel several of

7    those objections that would affect the guidelines range.

8    And after consulting with the group, I have decided to amend

9    the guidelines range.  And.

10        For the record, in particular, I was to reference that

11   there was a change made to paragraph 29, an 18-level

12   enhancement was changed to a 16-level enhancement; and to

13   paragraph 34, a base offense level was changed

14   coincidentally, again, from an 18, based upon a loss of

15   $403,481, to an Offense Level 16, based upon a loss of

16   $137,015.  And that loss on paragraph 34 references Count 4

17   only, and does not include the number from Count 3, which

18   defendant was acquitted.

19        That change or, I should say, those changes resulted

20   in a final offense level or, more accurately, a total

21   offense level of 27, with a Criminal History Category I.

22   That results in a guideline range of 70 to 87 months.

23        I also want to indicate that, by statute, the

24   defendant on Counts 1 and 2 on which he was found guilty is

25   a maximum of ten years each.  And on Count 4 on which he was

1    found guilty is a maximum of three years.  Again, those are

2    by statute.

3         The guideline range for supervised release, by

4    statute, the maximum for Counts 1 and 2 each is three years,

5    for Count 4 is up to one year.

6         With respect to the guideline range, those numbers are

7    similar, if you will:  Counts 1 and 2, a one- to three-year

8    range; and Count 4, a one-year range.

9         I believe I've covered the matters with respect to the

10   guidelines.

11        Let me confirm with counsel if they have any comments

12   they want to place on the record with respect to those

13   guidelines, including any guideline changes that have not

14   been discussed that they wish to discuss at this point.

15        Government?

16             MR. CRAWFORD:  Your Honor, I would object to

17   the loss amount being reduced to 16.  The Government, at

18   trial, presented a number of exhibits, including Exhibit 43,

19   which was a summary of all the claims paid by Fiat Chrysler

20   for prescriptions written by Dr. Huenefeld.  That's a very

21   limited subset -- or a somewhat limited subset, the ones

22   that clearly fell within the heart of the fraud scheme that

23   was proven at trial.  Those claims paid amounted to

24   $7.7 million, which would be a loss level of 18 and not 16.

25        And I realize that in the defendant's sentencing memo,

1    they included a letter from Dr. Nabity describing pain

2    creams and his use of them, but I think it would also be

3    helpful to have me read at length Dr. Nabity's interview

4    memorandum with the FBI.

5        "Nabity recalls Kevin Clay as being a sales rep for

6    multiple sclerosis drugs for Pfizer.  He recalls Clay being

7    in the office for Pfizer and informing Nabity that he was

8    doing business on the side for a company pharmacy.

9        "Clay was considered to be a patient once at Nabity's.

10   Nabity was able to pull an electronic record from July of

11   '14 where Nabity telephonically prescribed Clay pain cream

12   for low back pain.

13       "September of '14, Nabity shows a record of

14   prescribing a scar cream for Clay without any underlying

15   notes identifying the purpose of the prescription.  Dr.

16   Nabity called this a minor deal.

17       "Dr. Nabity had no idea Clay had any financial

18   incentive in receiving the prescriptions."

19       I would note that the trial testimony, too,

20   Your Honor, and certainly from his proffer, Mr. Clay

21   indicated that he did not receive prior treatment for pain

22   and scars, and just as an adult decided to go to Nabity to

23   get these creams.

24       "Dr. Nabity describes how he began lecturing other

25   doctors that Clay and Maluchnik brought in for lunches.

1    Usually, there was only one other doctor present for these

2    lunches, and yet he'd get paid on average a thousand dollars

3    for his time.

4         "At no point in time did Clay ever inform Nabity the

5    dollar amount he profited from the prescription that Nabity

6    prescribed for him.  Once he learned of this fact, he was

7    shocked."

8         This is a quote from Dr. Nabity:  "But for Kevin's

9    relationship with Central Rx, I would not have sent any

10   prescriptions there."

11        So the individual they were relying on to suggest that

12   there may be some use or some necessity for these creams

13   pretty clearly indicated that he understood that a kickback

14   scheme like this is fraudulent, and he wanted to distance

15   himself as far as possible.

16        And he also indicated that he had sent hundreds of

17   prescriptions to Central Rx, which would suggest that the

18   $7 million for simply Huenefeld is likely a low estimate.

19        So, You Honor, for the record, that's the objection I

20   would make for lowering the loss amount.

21                  THE COURT:  Any comments from defense counsel?

22                  MR. KERGER:  Yes.  I'm not exactly sure what

23   the purpose of that was.

24        Dr. Nabity made a fairly focused statement about the

25   fact that pain creams do have a legitimate medical purpose.

1    It was done to counter the suggestion that seemed to be that

2    the creams were in and of themselves a scam.  They weren't.

3    And that's all Dr. Nabity was asked to say, and he did, and

4    it's true.  And the rest of the stuff I'm going to ignore.

5         Thank you, Your Honor.

6              THE COURT:  So I don't think there is any

7    question that there can be a legitimate use of creams they

8    may have for patients with legitimate pain.

9         I think the Government's position is that any

10   prescription, whether medically necessary or not, that

11   includes a kickback or a fraud should be included as the

12   loss amount for purposes of the paragraph cited.

13        I've decided to take the cautionary approach and

14   compare the amount of prescriptions before and after the

15   fraud.  And clearly there was a rise in prescriptions, as

16   more and more people were brought into the doctor's office

17   for the script.

18        So I'm being careful, conservative.  Both sides have a

19   point to make, and I'm going to stand by the two-level

20   reduction based on a still high but somewhat lower loss

21   amount.

22        Anything else from the Government?

23              MR. CRAWFORD:  No, Your Honor.

24              THE COURT:  Defendant?

25              MR. KERGER:  No, Your Honor.

1          THE COURT:  Let me confirm with you, Mr. Clay,

2    that you've had an opportunity to review this presentence

3    report which we've begun to discuss, and you've discussed it

4    in full with your counsel; is that correct?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  I heard from both of you on that?

7       Did the court reporter get both.

8          THE COURT REPORTER:  I didn't hear from the

9    attorney.

10          MR. KERGER:  I didn't know you were asking.

11   You asked Mr. Clay.

12          THE COURT:  I did.

13          MR. KERGER:  Oh.  We've had an opportunity, of

14   course, Your Honor.

15          THE COURT:  You as well with him?

16          MR. KERGER:  Yes.

17          THE COURT:  Thank you.

18       And that report then will remain filed under seal and

19   available as necessary.

20       I'm going to ask all of you, if you speak, take that

21   microphone and do what I'm doing right now.  Put it closer

22   to you in the event you don't project very well so we can

23   hear you, and especially so the court reporter can hear you.

24   Thank you.  And you can always hit the push button if you

25   want to silence yourself.  Remember, when the red light is

1   lit, that means it's on.  It's somewhat counterintuitive,

2   perhaps.

3        I want to confirm that I have reviewed defendant's

4   sentencing memo, obviously the PSR with all of its

5   attachments, defendant's sentencing memo with all of its

6   attachments, including letters.  I have also received a

7   separate letter from Mr. Clay.  That was recently forwarded

8   by email and I have read that as well.

9        I think that covers my introductory remarks, and so

10  I'm happy to hear from defense counsel argument for an

11  appropriate sentence on the client's behalf; then I'll talk

12  to Mr. Clay; and then I'll hear from the Government, please.

13               MR. KERGER:  Thank you, Your Honor.

14       I'm going to stay seated because I'm closer to the

15  microphone that way.

16       I had chafed under the guideline system in connection

17  with amount of loss.  It becomes the driving factor in many

18  sentences, and I think it ignores what the famous lawyer

19  Cicero told us in Ancient Rome, which is the punishment

20  should fit the crime.  And I would suggest to you the crime

21  is determined not by dollar amount necessarily, but by an

22  intent and by actions about what the defendant was trying to

23  accomplish.

24       And as I made the point, you can have violations that

25  are easy to calculate as criminal -- robbing a bank, selling

1    drugs -- clearly violative.

2         In this instance, we have two young men, one of whom

3    is before you now, who attempted to start a business, and he

4    went to the extreme of getting the largest law firm in

5    Toledo to provide him legal advice.  And in connection with

6    the investigation in this case, Mr. Clay voluntarily

7    approached the Government and said he waived the privilege

8    as to the documents and the communication with his lawyers.

9         They checked, and there is absolutely no evidence that

10   Mr. Clay didn't do exactly what he was told and approved by

11   the lawyers, and that's pretty unusual in setting up a

12   business.  You have many cases, Judge, in which the lawyers

13   are involved as part of the scam.  That's not even imminent

14   here.  They were legitimate advisors.  He tried to follow

15   it.

16        Their purpose was to help people and make money.  They

17   were in the medical business in pharmaceuticals beforehand.

18   It was something they knew.  They wanted to have a business

19   the two of them could grow.  This looked like a good

20   opportunity.

21        They went to Cleveland and met with Lemma Getachew,

22   Lemma Getachew from Central Rx, who gave them the outline of

23   how to do it.  He gave them the compensation method, and he

24   approved the compensation method, and he was the one,

25   through his company, to submit all of the claims to the

1   insurance companies -- every one.

2        The thing that's interesting, it came out at trial in

3   the testimony of one of their witness's, Amy Smith, appears

4   on page 25 of the transcript.  She said that in June of

5   2015, a year before Kevin Clay was searched, CVS terminated

6   Central Rx as a supplier because it was engaged in price

7   gouging.  And yet, apparently, the next year, even though

8   the pharmacy benefit manager from Stellantis -- Central Rx

9   was still on that list, and no steps taken to take them off.

10  No steps to tell Stellantis or certainly TheraMedical that

11  CVS had a problem with them.

12        They're out running the business.  Are they making

13  sales?  Yes.  Did they make money?  Yes.  Did they make a

14  lot of money?  Yes.  The people at Stellantis' insured knew

15  what was happening.  There wasn't anything hidden.  There

16  was an issue of whether the patients getting payments was

17  unusual.  It's not.  Mr. Clay would tell you, Judge, that

18  happens all the time; patients get rebates from the

19  manufacturers, and so in his experience, that wasn't unusual

20  at all.  That's why no questions were asked about it.

21        They worked hard at this business.  It was one of

22  several that they were trying to set up, and he was proud of

23  what he had accomplished.  They employed a lot of people

24  they thought legitimately.  At no point -- and both Mr.

25  Maluchnik and Mr. Clay testified to this -- did they think

1    they were doing anything wrong.  I understand that is not a

2    defense, but it's not as if they all sat around with a

3    bottle of bourbon and said, "Hey, let's find a scam we

4    can" -- because that does happen in some places.

5         And under the guidelines, they don't make a difference

6    between them, unless you decide it is appropriate to vary

7    because of the conduct, actions and intent of the defendant.

8         There are factors here that I think clearly warrant a

9    downward departure in a significant amount.  Again, you have

10   the involvement of the law firm.  In terms of possible

11   sentences, and I don't mean to disrespect Matt Maluchnik, he

12   is a good young man, but his IRS involvement was clearly

13   wrong.  You can't take a check from somebody for a

14   charitable donation and then give them cash, an equal

15   amount, without necessarily understanding you violated the

16   law.

17        Kevin went to a good law firm.  They set up this

18   foundation, and there was a considerable fuss at trial,

19   "Well, was it private or was it public?"  The fact is, at

20   the end of the day, it is still a charitable foundation, and

21   nobody will know for five years if something is a charitable

22   foundation or a private foundation.  That's the IRS

23   regulation.  And Mr. Fischer, the witness called by the

24   Government, said it could take five years, and at the end of

25   five years, if you are not a public foundation, if you

1    haven't proven that, you revert to being a private

2    foundation, and you have to pay whatever taxes you should

3    have paid that you didn't and have a penalty that goes with

4    it.  That's all.  And nobody -- there were three our four

5    witnesses from the IRS called by the Government.  None of

6    them said that was wrong.  None of them challenged that

7    testimony.

8          You know, the conviction here is predicated on a

9    willful blindness, and that certainly is a legal -- you can

10   do that, you can substitute intent.

11         So in terms of sentencing, in terms of deciding what

12   sentence to impose, it's hard for individuals in this

13   setting to recognize that, and they didn't perceive it to be

14   an intentional violation.

15         His co-defendants have not been sentenced yet, but it

16   is a factor, Your Honor.  And since you will be sentencing,

17   you must have some idea of what their sentence will be.  It

18   is a factor that you can consider in whether they should get

19   a downward variance so there is not a huge disparity.

20         Judge, Kevin Clay did his best to do things right.

21   Nobody told him he should disclose to the people at the

22   pharmacies or the insurance companies that the patients were

23   getting paid because, in his experience, that was not

24   unusual, and nobody did ask him that.  And he wound up where

25   he is because I think of unintentional missteps.  And I

1    think that the guideline calculation of a sentence for him

2    severely overstates what's necessary.

3         And I would leave you with a thought of what is

4    benefited in terms of 18 U.S.C. 3553 criteria by sentencing

5    him to a period of incarceration?  The only thing is

6    punishment.  He doesn't need rehabilitation.  He doesn't

7    need education.  In the seven years he's out, he on his own

8    established a profitable business in Toledo operating in a

9    couple of locations of employing a number of people, and

10   he's the person who did that.  And in many respects, he

11   built it -- physically built it with his own hands,

12   financially built it with his own money.  It's a business he

13   created, notwithstanding the specter of this criminal charge

14   pending over him, a criminal charge as to which he had to

15   waive the statute of limitations six times in order for the

16   Government to decide a crime had been committed.

17        When you put all these factors together, Your Honor,

18   I'm satisfied you would conclude that there should be

19   substantial downward variance, and I would urge you to not

20   impose a period of incarceration.

21        Thank you.

22             THE COURT:  Mr. Clay, anything you wish to add

23   to what your lawyer has just said?

24             MR. KERGER:  If you want to, go ahead.

25             THE DEFENDANT:  Can you hear me?

1          THE COURT:  Yes.

2          THE DEFENDANT:  Okay.  Great.  Thank you, Your

3   Honor, and thanks for the opportunity to speak.

4      I mean, I will let my lawyers do their job, and, you

5   know, state the legalese of this whole situation, but I

6   literally just want to take the time to clear the air, you

7   know, in here.  And I am -- I'm grateful for the journey,

8   and I know I'm in a tough situation right now, but I'm

9   grateful for the journey and the person that I've become in

10  the journey.  I think you got two options when you're faced

11  with a trauma or a hardship in your life:  You can choose to

12  take the wrong road, or you can choose to take the right

13  road.  And I think, you know, through this journey I've had

14  that opportunity, just as well as I've had through my life,

15  to take the high road.  And in this journey, I've chosen to

16  take the high road.

17      And it's easy to be bitter, you know, angry and have

18  resentment, you know, against, you know, those that -- the

19  Government and, you know, the FBI, but I don't my -- heart

20  is clear.

21      And I'm grateful that I've walked through this journey

22  to become a better man.  I wasn't married before.  I'm now

23  married.  My beautiful wife is in the back.  I've got three

24  beautiful children.  We employ about 11 people now.  I'm

25  working hard to continually grow my business, House of Him,

1    and the dream that I have in my heart to, you know, help

2    people.  And I think this journey just re-emphasized the

3    reason and purpose that I'm here and that's just to help

4    people and without being able to, you know, not be bitter,

5    not be angry and not be able to forgive.  I don't think that

6    I am the right person to actually, you know, give

7    forgiveness.  You've got to forgive to get it, right, and so

8    I'm grateful for the journey.  And I appreciate you giving

9    me time to speak.

10          And this might not be the right thing to say, but I

11   really do, I love everybody, you know, in this room, and I

12   appreciate the journey that I am walking with us all.

13          Thank you for your time.

14                 THE COURT:  Tell me, Mr. Clay, what have you

15   learned from this experience?

16                 THE DEFENDANT:  You know, when preparing my

17   statement, I was sending it back and forth to the lawyers,

18   and I had things about unforgiveness in there.  And they're,

19   like, "Oh, I fear that you're, you know -- it's going to be

20   seen as blaming people, you know, for where you ended up."

21          And I'm, like, "No.  That actually is not what I'm --

22   I'm not talking about, you know -- I'm not talking about

23   blaming anybody, you know."

24          When you grow up and you don't have, as a man, a

25   father in your life, there are a lot of opportunities for

1    you to, you know, give responsibility to somebody else

2    because you don't feel like you are enough.

3         In this situation, and it's a been a long egregious

4    seven years, I'm not going to lie, but I've learned to

5    forgive.  I forgive my father, you know, for not being there

6    as a young man, and thereby I'm able to -- like I just said,

7    I'm able to forgive other people.  That is a, you know, a

8    soulical part that I've learned in this and I think is going

9    to make me a better person.

10        But also as a business person, I've learned to really

11   just dig into and focus on each aspect of my company.  I've

12   got two little stores right now that in the future will grow

13   to be notable that everybody in here will know about because

14   I believe that's what, you know, I've been purposed on this

15   earth to do -- help people.  And I've learned how to be

16   conscientious and not to feel like just because a person

17   knows more than what I know, you know, that they are better

18   than I am.  I know that in the last seven years, I've been

19   able to, you know, develop a toughness that allows me to

20   stand up in the face of adversity and have courage, you

21   know, and continue to build and grow strong.

22        And my hopes are that I can turn around and give that

23   same thing, you know.  There are going to be people in life

24   that, you know, hurt you.  And I want to be a person that

25   can turn around and say, "Hey, man, it hurt, and you might

1       have hurt me, but I'm actually here to be a healer and

2       deliverer for you.  I want to help you through your

3       journey."

4            And so I really do, I have a -- I'm just grateful,

5       like, I can't even explain it.  And, you know, I've got, you

6       know, close friends and family texting, like, "Oh, I hope

7       you're okay."  But I'm like, "No, I'm actually in a good

8       spot in my head and my heart."

9            And I've learned both of those things, to conclude

10      what you just asked, you know, to be able to forgive my

11      family, forgive myself, you know, just forgiveness so that I

12      can also be seen in that regard; and then, secondly, to

13      really be honed in and conscientious and focused on the

14      business of my endeavors.  It's my vision.  It's my

15      responsibility to, you know, make sure that I am, you know,

16      carrying out a beautiful vision that's been laid on my

17      heart.

18                      THE COURT:  You started out talking about not

19      blaming others.  Do you blame yourself at all for what

20      brings us together today?

21                      THE DEFENDANT:  You know, I've had that

22      conversation with myself, too.  You know, there are a

23      certain amount of factors that go into the way that a person

24      becomes, right, and when I say, "a person becomes," I'm

25      talking about the person that is sitting in front of you

1    today.  I did not choose the life that I was born into.  I

2    didn't choose the parents that I was born into, neither did

3    any of us in this room choose those things.  Certain things

4    choose you, and that thing chose me, right, how I was born

5    into this earth.

6         Building on top of that, there are certain things that

7    you learn from your parents or the absence of your parents

8    that create some blind spots and deficits in your life,

9    right, and I certainly had those, and they were truly

10   revealed in the last seven years.  I had those deficits, and

11   I'm sure there are others that I'll have in the future but

12   I'll learn from.  But the blaming of myself, you now, I look

13   at my past and see the way that I was raised, and I'm, like,

14   you have an opportunity to blame everything.  You can blame

15   yourself, you can blame the way that you were raised.  So as

16   it pertains to blaming me in this situation, like, my

17   responsibility in it is being able to look holistically

18   into -- if we're talking about this situation specifically,

19   is being able to look, you know, from a birds-eye view and

20   the fine details, all the way top and bottom, in business.

21   And I hate to say that I blame me because -- or anyone for

22   that matter because I don't think there's a lot of freedom

23   in that, right.  What I do say is that I take responsibility

24   for my -- for the place that I'm in today, you know, the

25   person that I am today.  I take 100 percent responsibility

1    for that.

2                    THE COURT:  Thank you.

3         Let's hear from the Government.

4         I do have some questions for you, based on the

5    defendant's sentencing memo, but why don't you say your

6    piece, and then if you don't address them through your

7    comments, I'll raise them with you.

8                    MR. CRAWFORD:  Your Honor, Mr. Clay paid

9    people to go to the doctor -- paid them a lot to go to the

10   doctor.

11                   THE COURT:  I'm sorry.  I'm going to pause

12   you.

13        I'm having technical difficulties.  Let's reboot.  I

14   lost you, Stacey.

15                   (Pause in the proceedings)

16                   THE COURT:  Sorry, Counsel.  We are back

17   online, and you may begin or continue.  You hardly began

18   when I stopped you.

19                   MR. CRAWFORD:  Your Honor, Mr. Clay and his

20   co-defendants paid people to go to the doctor, not a little

21   bit, but a lot.  Some of these single prescriptions, I think

22   some of these folks got upwards of maybe $1,700 for one

23   prescription to go to the doctor.

24        And most of what you heard in the defense argument

25   today is just relitigating the case, denying responsibility,

1   denying that any crime took place.  Calling it a rebate?

2   It's almost laughable.  I mean, who gets a rebate of a

3   thousand dollars for going to a single doctor's appointment?

4   Of course Mr. Clay knew this was what was going on because

5   he went to the doctor himself and got some of these

6   prescriptions.  I just read Dr. Nabity's statement that he

7   got prescriptions, and he got paid for it.  This was not a

8   flaw in the business plan.  This was not an unusual aspect

9   of the business plan.  This was the business plan, because

10  in Exhibit 49, a letter to prospective patients who

11  identified Kevin Andrew -- Clay -- as your contact person as

12  the vice president of sales, it says, "Most sales affiliates

13  are able to get their very own prescription or even a family

14  member's prescription in the first week."  This is sales

15  lit.  This was the scheme to pay people to go to the doctor.

16          Let me talk a little bit about the law firms.  It's a

17  mistery why defense [sic] of counsel was not raised as a

18  defense in this case, but I don't think it's hard to

19  understand why.  Defense [sic] of counsel means that you

20  fully inform your counsel and you reasonably act on their

21  advice.  I do not recall anyone telling them, saying that

22  they advised Mr. Clay that it was okay to pay people to go

23  to the doctor.  That's the advice he needed.  We didn't hear

24  anything about that at trial.  And I think the reason we

25  didn't was because he didn't tell the lawyers what the

1  business model was.  One, because he probably knew what

2  their answer was going to be, and if he didn't, he didn't

3  want to know.  So the part about the lawyers is trying to

4  obfuscate, and that actually hurts him more than it helps

5  because it suggests an effort to cover up what he did and

6  come up with a ready-made excuse of relying on lawyers to do

7  something that was clearly fraudulent.

8      Your Honor, I'll just make one point about sentencing.

9  The defense talks about pure punishment.  Deterrence is a

10  big issue here.  And in a lot these cases, particularly when

11  it comes to trials, you have a lot of supporting documents,

12  you have a lot of statements from defendants and a lot of

13  letters from supporters, but they never get to this

14  fundamental question:  Yes, but how did we get here?  And

15  we've heard nothing today to describe it, because from what

16  I've heard, if given a chance to do it all over again, Mr.

17  Clay wouldn't change a thing because none of this was

18  illegal and there was no fraud.

19      If you come to that conclusion, then you have to ask

20  yourself how importance is deterrence in this case, and what

21  is it going to take from the Court to get Mr. Clay to

22  understand that this was a fraud scheme, extremely obvious

23  one, and that he needs to be deterred from doing this sort

24  of conduct in the future?

25      So, with that, I think a guideline sentence is

1      appropriate in this case, and I'm happy to answer whatever

2      questions you have.

3                    THE COURT:  You've answered some of the

4      questions that were raised in the defendant's sentencing

5      memo.  Let me pull that with some questions.

6          One of the arguments of defense counsel and today is

7      the calculation of the loss, that the financial loss is

8      driving the guideline range higher than it ought to be.

9          Your comment on that?  Because it is a significant

10     part of the enhancement in this case.

11                   MR. CRAWFORD:  Your Honor, I'm trying to

12     recall the other reasons given for why a loss wouldn't be

13     appropriate in a case like this.  I mean, Mr. Clay fully

14     knew what the loss was going to be because he went to get

15     his own prescription.  So he knows what sort of fees this is

16     going to generate, what sort of commissions.

17                   THE COURT:  Well, they also knew as it went on

18     because he was getting compensated.

19                   MR. CRAWFORD:  Of course.  He knew a

20     substantial number of patients were coming from Jeep.  So

21     the loss is no secret.  I mean, the income was coming to

22     him.

23         And the other factors I guess that the defense

24     mentioned are essentially denial of his responsibility, that

25     he didn't know he was doing anything wrong, which if --

1    that's not helpful in deciding what a sentence is because

2    he -- well, it is to the extent it heightens the need for

3    deterrence.

4         But, Your Honor, I mean, what's the alternative?  An

5    offense level of seven?  Loss has to count for something.

6    This is an undercount of the loss.  I mean, this is only

7    Dr. Huenefeld's loss, $7 million.  He's getting a two-level

8    break from that.  Dr. Nabity indicated that he sent hundreds

9    of prescriptions to Central Rx.  There were some other

10   doctors.  There were some other pharmacies.  So this is an

11   undercounting, if anything, of the loss in this case.

12              THE COURT:  Defendant also seems to make the

13   argument that the real guilty party here is Mr. Getachew --

14   that's G-e-t-a-c-h-e-w -- owner of Central Rx, that that's

15   the really bad guy in all of this.  Agree?  Disagree?

16              MR. CRAWFORD:  Well, I'm reminded that he

17   reached a civil agreement and at least admitted some

18   wrongdoing in some way, shape or form.  I wasn't involved in

19   the investigation, Your Honor, so I can't say what was done

20   there.  But blaming other people, which is probably the key

21   feature of the defense argument, still doesn't get us to the

22   point of what Mr. Clay did and what the appropriate

23   punishment for him is.

24              THE COURT:  Defense counsel commented on the

25   delays that occurred during the course of this case and

1    related cases and the extensions that he willingly granted.

2    What role does that play in the appropriate sentence?

3                    MR. CRAWFORD:  Well, the alternative to those

4    is to get charged now, and in my practice, most defendants

5    don't want that.  That's why they agree to these extensions.

6            I had another thought that's escaped me.

7                    THE COURT:  That happens to me, too.

8            We have applied -- go ahead.

9                    MR. CRAWFORD:  Your Honor, we can also talk

10   about the extensive efforts made to resolve the case, but we

11   probably don't want to get into that.  That can always play

12   a role in seeking waivers as well.

13                   THE COURT:  We have applied an enhancement as

14   an organizer, as a leader in this group, and I have applied

15   that enhancement.  Is it appropriate?

16                   MR. CRAWFORD:  It is.

17                   THE COURT:  Why?  And would you consider him

18   and his fellow, Matt, also to be -- the two of them to be

19   leaders, organizers in this, each with a role?  I know their

20   titles were, as defense counsel pointed out, CEO and CFO.

21   Did their conduct match those titles in some way such that

22   applying that enhancement is appropriate?

23                   MR. CRAWFORD:  Your Honor, the Government has

24   an agreement with Mr. Maluchnik that I need to be very

25   careful about.  I will say this, the conduct of --

1          THE COURT:  Just limit your comments to this

2    defendant then.

3          MR. CRAWFORD:  I will say that the conduct is

4    the same without commenting on Mr. Maluchnik's agreement.

5       All right.  Your Honor, I already mentioned

6    Government's Exhibit 49, which was the marketing materials

7    sent out over Mr. Clay's name recruiting individuals, urging

8    them to become sales affiliates -- really, patients --

9    making it quite clear to them that they could make a lot of

10   money simply by going to the doctor themselves, identifying

11   various pain creams and so forth.

12      There was trial testimony from an individual named

13   Andrew Backus, and in his interview with the FBI, he

14   indicated that -- or the interview memo says, "Backus was

15   then approached by Clay to recruit additional sales members

16   for TheraMedical."

17      Mr. Clay and Mr. Backus had a recruit list of I

18   counted one, two, three, four, five, six -- at least six of

19   folks of whom appeared on the Government's Exhibit 37, which

20   is the payroll for TheraMedical.  One of those individuals,

21   Matthew Ports, received a total of $99,500; Nicole Allicook,

22   $85,450; Andrew Backus himself was around $59,743.

23      And so, again, on Mr. Backus' list alone, as Trial

24   Exhibit Number 3, one, two, three, four, five, six -- at

25   least six individuals that were recruited by Mr. Backus who

1    was recruited by Mr. Clay appear as having received money

2    from the scheme, and, of course, by design, by nature was a

3    kickback scheme.

4         So all of these individuals, which the Court knows

5    Loni Peace, for example, was a participant, a patient in the

6    scheme.  She got charged, so she was criminally responsible,

7    as well as with many of these other folks.  Certainly,

8    someone like Nicole Allicook who made $85,000 could be

9    criminally responsible as a participant is what the

10   guideline calls for.

11        So with those things together, Your Honor, I think

12   it's clear enough that Mr. Clay is a leader/organizer of

13   five or more participants, and he recruited one -- at least

14   one, which is Andrew Backus, to participate in this scheme.

15             THE COURT:  Can you talk about the public

16   versus private charity, the scholarships and whether that

17   was a ruse, or an innocent mistake, or some other label

18   that. . .

19             MR. CRAWFORD:  Well, Your Honor, there is a

20   jury verdict that he willfully made a false statement, which

21   means he knew it was false at the time he made it, which

22   this was going to be a public charity generating public

23   funds.  There were no public funds.  And, in fact, the

24   effort was minimal -- extremely minimal.  I think we showed

25   some emails at trial that suggested a year and a half after

1    they formed this foundation, they still were trying to

2    decide on a website.  The most significant purchases made

3    were gold and silver that were found in Mr. Clay's house.

4    There were no tax returns filed ever, which led to their

5    status being revoked.  I believe there's some testimony that

6    they were still soliciting donations even after the

7    revocation of the charitable status, which I think is an

8    important point in this concept that apparently it's okay to

9    do whatever you want with your charity for five years, and

10   once you hit the five-year mark, if you skate by, great, if

11   not, you pay your back taxes.  The problem was is that

12   during the five years -- they didn't even make it to five

13   years, so they never even filed a tax return and got

14   revoked.

15        So I think it's pretty clear from the trial evidence

16   that this charitable foundation was a sham.  In some

17   respects, similar to the law firm.  There is apparently an

18   effort to do something to provide some legitimacy to it, but

19   when you dig deeper and look at the facts and sequencing,

20   there is very little to indicate that it was going to be a

21   genuine charitable foundation.

22                    THE COURT:  Lastly, defense counsel argues

23   there's no opportunity here for recidivism.

24                    MR. CRAWFORD:  Your Honor, I think I addressed

25   that before.  From everything I've heard here today and

1    everything I've heard since the beginning of the case, if

2    presented with the same facts again in the future, I don't

3    have any reason to believe that Mr. Clay would do anything

4    different because today he does not recognize that a crime

5    was committed.  So I would expect him to engage in this

6    conduct again if presented the opportunity.

7                    THE COURT:  Thank you.

8           Last word for defense, if they wish.

9                    MR. KERGER:  Yeah.  I would like to touch with

10   that last point.

11          Mr. Clay is not an idiot.  He's not ever going to back

12   into the medical business, and it's almost offensive to his

13   intelligence to say that he would.  He's got a career ahead

14   of him, and he's going to follow it.  Recidivism is just not

15   on the table.

16          The business about Getachew is not to blame him.  The

17   purpose I made that analogy was to get into his head as to

18   what he thought happened.  Mr. Getachew was not being

19   prosecuted.  He was not being told what he was doing is

20   wrong, and he's the one who started it.  He's the one who

21   gave Kevin and Matt, both, the rebates when they got their

22   prescriptions.  There was nothing happening in that area

23   that told him what was going on was illegal.

24          And since Mr. Crawford was good enough to tell me how

25   I should have tried my case, let me just offer this thought:

1    There was not just one extension or two extensions or three

2    extensions or four extensions or five extensions.  There

3    were six.  The point being, if it was so clearly wrong, if

4    it was so clearly unlawful, it would not have taken six

5    extensions after several years of investigation to reach

6    that conclusion.

7        I think it overstates my client's culpability.  The

8    sanctions are greater than necessary.  We ask you to

9    recognize that in your decision, Your Honor.

10        THE COURT:  My sentence in this case, as in

11   all cases, is guided by U.S. Supreme Court decision in

12   *Booker* and later cases by that Court, as well as our

13   appellate court.  All require me to consider and confirm, as

14   I have done with all of you today, the applicable guideline

15   range.  That's an advisory benchmark.  I'm also to make an

16   individualized assessment based upon the facts presented.

17   For this particular defendant, that's a process that

18   involves more than math, but also involves an exercise in

19   judgment.

20        To assist me, I and all Judges are required to look at

21   3553(a), the statute that lists those factors, to make sure

22   my sentence is sufficient, but not greater than necessary,

23   and to arrive at a just punishment.  I'll next address those

24   factors and how I see them applying to your case, Mr. Clay.

25        First, let me make a couple introductory notes.  In my

1    view, the extensions could be for a variety of reasons, as

2    indicated, in addition to COVID because there's no question

3    that this case came up during a time period when we couldn't

4    try cases, and so extensions were made in a number of cases

5    that delayed what otherwise would have been a more efficient

6    process of the case.  And so I'm not finding that argument

7    to be persuasive.

8         And the fact that Mr. Getachew didn't tell Mr. Clay or

9    anyone else that what they were doing was going to be

10   illegal, I don't hold much water in that either.

11        I agree with you, Mr. Kerger, Mr. Clay is not an

12   idiot.  He's a smart guy.  He's a smart guy, and in that

13   regard, he did what he did.  He knew what he was doing.  And

14   I was present for the jury verdict, and I can't disagree

15   with the verdict in some legal or other way.  They debated,

16   discussed and arrived at their verdict and found Mr. Clay

17   guilty, and it is what it is.  I take the case from that

18   point on.

19        But I also know and want to comment about this

20   suggestion that Mr. Clay did not have any intent.  I don't

21   know what you're referring to when he didn't have the

22   intent, but he certainly knew, should have known, did know

23   that what he was doing was not right.  I don't buy the fact

24   that a patient gets a kickback is something that is okay and

25   is such a tricky legal theory that somebody wouldn't be

1    aware of it.

2         I also have to state that having been present for the

3    trial and having heard the testimony regarding the law firm,

4    Shumaker, Loop and Kendrick, and the testimony from one of

5    its lawyers, as I indicated in my order, they were not

6    provided with all of the information.  They were not

7    provided the information on what brings this case together

8    today.  You know, how you form a foundation or what steps or

9    papers you file is one thing, but they were not advised and

10   did not offer -- and I was present and didn't hear it -- an

11   opinion that they felt what he did in this situation was

12   legal.  That was not part of their legal advice, and so that

13   does not carry much weight with me.

14        Let me now turn to the 3553(a) factors, and, first,

15   the nature of the crime.  Again, we have a trial transcript

16   to give us the details.  It is also set forth in some detail

17   in the presentence report and that's reflected in paragraphs

18   7 through 18.  And it identifies Kevin Clay's involvement

19   with Matthew Maluchnik, and together they created an entity,

20   and together they operated as a marketing or sales firm with

21   regard to the prescriptions which we've touched on here

22   today.

23        It also talks about, as the Government did today in

24   paragraph 11, Mr. Clay's approach to Andrew Backus, a

25   pharmaceutical sales rep for Pfizer.  Also talks about the

1    role of Dr. Huenefeld, another one of the participants in

2    this scheme and her role as well, and that Maluchnik and

3    Clay split the profits of their entity equally, together,

4    from all of these sales that went out.  And it was not an

5    insignificant some of money, as noted by the Government, and

6    that Mr. Clay himself made similar agreements with two other

7    compounding pharmacies to increase the geographic area that

8    they would serve.  So they went above and beyond Central Rx

9    and extended the fraud even wider than originally intended.

10        Where does this fall?  Well, health care fraud is a

11   serious problem.  We seem to have more and more cases

12   involving health care fraud of one type or another.  So on

13   the scale of severity, yes, it's a serious crime.

14        The defendant's character and background.  I want to

15   acknowledge, Mr. Clay, the letters that I've read and

16   received from you, from friends, from fellows, members of

17   the church, from work and from your family, your current

18   marriage and children, and all those go on the plus column,

19   there is no doubt about it.

20        I also acknowledge that you grew up with an absent

21   father and an addiction.  Many cases I have involve people

22   who had a very tough start in life.  Yours is a different

23   story.  You overcame those difficulties and those

24   disadvantages.  You set goals for yourself that were good

25   and pushed yourself to do something different, creating a

1       better life for yourself, with the help of mentors along the

2       way.  That part goes in the plus column as well.

3            What's disappointing is that with the education you

4       received, with the comments that you make yet here today --

5       again, you made some good decisions along the way.  I would

6       hope you would acknowledge that this was one of those bad

7       decisions.  Having worked hard to succeed, having promised

8       yourself whatever promises you made to make a difference in

9       the lives of others, you had the smarts.  You had the sales

10      skills; right?  You had good jobs along the way.  How

11      disappointing that this event, this conspiracy, at this

12      point, after the gains you had made, took hold of you, some

13      might find hard to explain.

14           But you and Matt hooked up and together you saw a

15      way -- and let's call it what it is -- a way to cheat the

16      system and make some quick money -- some big, quick money.

17           And the details of this conspiracy were not hidden

18      from you.  You helped it.  You were involved with it.  You

19      had a role with it.

20           You knew what Loni was doing, and you knew what Dr.

21      Huenefeld was doing and others at Jeep were doing;

22      recruiting and obtaining many prescriptions for a lot of

23      money for which you were rewarded, and as the Government has

24      noted here today, you, in fact, recruited for that very

25      purpose.  With the efforts of a number of people, you and

1    Matt Maluchnik earned some good money, not the right way;

2    the wrong way.

3          Your character and background is also summarized in

4    the presentence report, and that is -- let me also add the

5    victim impact is also discussed at paragraphs 19 through 23.

6          Your character, personal and family data summarized,

7    and I've already touched on this already, in paragraphs 57

8    through 60.

9          Nothing too remarkable about your physical condition,

10   mental and emotional health, substance abuse.  Those are

11   paragraphs 61 through 63.  I see no role of that or those

12   issues in either of the crime or the punishment.

13         Your educational, vocational and special skills in

14   paragraphs 64 and 65.  I've commented on that.  That's a

15   plus.

16         Your employment record, 66 through 68.  Commented on

17   that.  You were a pharmaceutical sales rep for Pfizer.  You

18   understood the business and the industry a bit, working for

19   Pfizer in Toledo from 2006 to 2010, and then in Michigan

20   from 2010 to 2015.

21         Despite being requested, I don't have all of your

22   financial information, which is another part of the

23   presentence report.  And I've asked if the presentence

24   writer requested it, and she indicated that she had several

25   times without an answer.

1       So we have, again, a mixed bag, so to speak.  There's

2   also a need for the sentence to reflect the seriousness of

3   the crime, promote respect for the law, and provide for a

4   just punishment; deter you and others from crimes like this;

5   and protect the public.

6       Counsel here today seem to have a different view of

7   whether recidivism may happen or not with you, and I would

8   like to think it would not.  Deterrence is important, not

9   just for you; however, it is also important that a sentence

10  deter others from committing crimes like this, and

11  protecting the public from crimes, whether they be financial

12  fraud or otherwise.

13      I note your letter to me, Mr. Clay, suggests, and your

14  lawyer has emphasized it again today, hoping for a sentence

15  of probation.  I have examined this case thoroughly and read

16  everything, and, again, had the benefit of the trial.  That

17  is simply not a sentence that I can in good conscience make,

18  evaluating all of the factors under 3553(a).

19      I look, as has been asked, at the potential sentences

20  for others in this case.  And as counsel knows, those will

21  be following if not yet today, tomorrow as well.

22      You talk in your letter and you talk again today about

23  your life journey, a journey that will continue for you no

24  matter what I do today.  The only question that will be:

25  What is it that you will do henceforth, what is it, if

1    anything, you have learned from this experience.  You have a

2    blemish on your record with this felony.  Others have had

3    blemishes and gone on to lead successful lives.  What you do

4    with it, I have no crystal ball.  I would like to think,

5    given the letters you've shared with me and your family,

6    that this is not something that will happen to you again.

7    And I should also note at this point, especially because

8    your wife is present, it's something I say in many cases,

9    that when someone commits a crime, it is often the family

10   that becomes the collateral damage from that crime and that

11   is, unfortunately, part of what happens.  You can't just

12   punish a person in isolation without consequences flowing to

13   others, and, for that, I'm often sorry.  But to comply with

14   3553(a) and the factors, that's just one of those

15   consequences that happens when someone commits a crime,

16   whether it be a crime of violence, or, in this case, what

17   I'll call a crime of agreed.

18        Consequences.  Not only are the victims hurt, but

19   sometimes the defendant and those around the defendant are

20   hurt as well, maybe not physically, but otherwise, which

21   reminds me, I need to reflect that the Government and the

22   defendant have agreed to a forfeiture in this case reflected

23   in Document 90 -- I'm sorry -- 72 and 95, and those are

24   going to be adopted as part of my order in this case.

25        So having balanced all of those factors, some prison

1    time I believe is necessary.  The question becomes how much?

2    What is sufficient, but not greater than necessary, under

3    the facts of this case?

4         I'm going to take a line from your letter to me where

5    you talk about what you've accomplished in your life, all

6    the experiences that you've had that taught you how to lead,

7    have compassion to serve, all that work, all the positions

8    you had, and then connecting with Matt Maluchnik, and you

9    say, quote, "Together, we dreamed of impacting the world, of

10   making the quality of other people's lives better," end

11   quote.  Certainly, some of what you did may have been toward

12   that goal, but this case is not one of those that fits that

13   description.

14        Having balanced all those factors under 3553(a), given

15   what I have been presented with as far as your role in the

16   crime in this case; outside this case, the charitable

17   service and good works that you have done, your employment

18   record, your family ties and responsibilities -- and I

19   applaud you for taking your father back and trying to help

20   him in later years, despite his absence in your early

21   years -- your lack of youthful guidance, this is a

22   nonviolent offender.

23        There has been some presentence efforts on your behalf

24   that obviously go in the positive column.

25        Deterrence is a factor that I think does play a role

1    here, which is why I believe that some reduction is

2    appropriate, along with these other factors, as well as the

3    general statement, the seriousness of the crime, the respect

4    for the law, and a just punishment.

5         Pursuant to the Sentencing Reform Act, I'm going to

6    vary downward three levels for a sentence of 51 months.  I'm

7    going to -- and, by the way, that's on Count 1 and Count 2,

8    concurrent one to the other.

9         Count 3, 30 months.  That will run concurrent with

10   each of the previous counts, Counts 1 and 2.  That's a total

11   sentence therefore, for anyone trying to do that math, of

12   51 months.

13        I'm going to put you on supervised release for a

14   period of two years on Counts 1 and 2 each, one year on

15   Count 4, each of those to run concurrent one to the other,

16   for a total supervised release of two years.

17        Restitution is a discussion that we're going to

18   finalize and give counsel a chance to discuss that among

19   themselves.  And do we need to put a time frame?

20             (Discussion held off the record between the

21   Court and Courtroom Deputy.)

22             THE COURT:  November 27.  That's a Monday.

23   It's about 30 days from now.  I would like your briefs

24   either sequentially or together at that time.

25             MR. KERGER:  Your Honor.

1          THE COURT:  Did I misspeak?

2          If I misspoke, the 30 months was on Count 4, not

3     Count 3.  Apologies.  Count 3, obviously, was one that was

4     acquitted on.

5          I'm going to order a special assessment for the three

6     counts, Counts 1, 2 and 4, $100 each, a total of $300.

7          I'm going to waive the fine in this case, given the

8     other financial penalties that have been or will be imposed

9     in this case.

10          And prior to my taking the bench, Mr. Clay, you had an

11     opportunity to review with your lawyer supervised release.

12     There's one document on mandatory conditions, the other on

13     special conditions, and there also will be another one that

14     will deal with restitution once that is figured out and

15     supplied to the Court.  These documents have your signature,

16     your lawyer's signature, and today's date.

17          Do you have any questions of me about these documents?

18               THE DEFENDANT:  No, sir.

19               THE COURT:  With respect to -- well, first,

20     let me ask.  Counsel for either side know of any reason not

21     previously made why the sentence I have just outlined should

22     not be imposed?

23               MR. CRAWFORD:  No, Your Honor.

24               MR. KERGER:  No, Your Honor.

25               THE COURT:  Have I addressed all of your

1    arguments?

2                    MR. CRAWFORD:  Yes.

3                    MR. KERGER:  Yes.

4                    THE COURT:  Mr. Clay, you obviously have the

5    right to appeal both your conviction and your sentence, and

6    those appeal rights should be filed within 14 days after

7    judgment is entered, and your lawyer will advise you when

8    that will be.  It likely won't be today.  It will take a few

9    days, perhaps later this week.  Anyway, I want to make sure

10   that you understand your lawyers will remain with you on

11   this case until you make a decision on whether to file a

12   notice of appeal, and those conversations should take place

13   promptly.

14        Do you have any questions for me about that?

15                    THE DEFENDANT:  No, sir.

16                    THE COURT:  Have you discussed with Mr. Clay

17   where he might like to spend his time?  And I assume the

18   Government, by the way, has no objection to his release

19   pending reporting for his sentence?

20                    MR. CRAWFORD:  No, Your Honor.

21                    THE COURT:  Thank you.

22                    MR. KERGER:  Your Honor, we have, and he's

23   picking Yankton, South Dakota.

24                    THE COURT:  It can be beautiful at times of

25   the year.  Not sure now, but. . .

1        Spell it.

2                MR. KERGER:  Y-a-n-k-t-o-n.

3                THE COURT:  I'm going to recommend, and if you

4       want to change your mind about Yankton, you may.  I'm not

5       suggesting you do that.  But I'm going to recommend certain

6       programs for you.  And you, by the way, Mr. Clay, can

7       certainly help yourself and others where you go because you

8       have the ability to do so.  I'm going to recommend a

9       cognitive course.  That's a course on making good decisions.

10      There are other courses you can take.  There may be

11      educational/vocational opportunities, community college

12      classes, mental health, if that's something you think you

13      need.  Those are all opportunities that I encourage you to

14      inquire about.  I will make a couple of recommendations no

15      matter where you go.  And if you decide within the next

16      24 hours you want to select another place, you may do so.

17           Because you're being allowed to self-report, it will

18      be your responsibility to get yourself to that place on the

19      date and time that it indicates.  And I need to remind you

20      that if you fail to do that, that is another crime which can

21      create further problems for you.

22           And all of the conditions that we've placed on you

23      pending today, before trial and after trial, still remain in

24      effect, so I encourage you to abide by all of those

25      conditions that were previously established for you.

1          Counsel for either side, anything else before we

2     adjourn?

3                    MR. CRAWFORD:  No, Your Honor.

4                    MR. KERGER:  The only question I have,

5     Your Honor, is does it make sense for you to say whether you

6     would like simultaneous briefing on restitution or. . .

7                    THE COURT:  I'll let you talk first with each

8     other.  If you can reach an agreement, fine.  If not, I

9     assume by talking, you'll maybe know where the other person

10    is coming from.  I prefer simultaneous because it forces you

11    to talk first, as opposed to getting something that you may

12    not have expected.  And so let's run with that date and see

13    if it works.  If you find it's not going to work, let us

14    know.

15                   MR. KERGER:  Fine, Your Honor.

16                   THE COURT:  Mr. Clay, I wish you well,

17    obviously I do, although maybe not so obvious to you or your

18    wife today.  This is one of the hardest things I do as a

19    Judge.  It's not easy.  It's difficult.  I certainly hope

20    this experience is one that, in your words, as part of your

21    life's journey, you can learn from and make up for it in

22    some way.

23         We are adjourned.

24                    (Proceedings concluded)

25                         -   -   -

1

**C E R T I F I C A T E**

2

  I certify that the foregoing is a correct transcript
of the record of proceedings in the above-entitled matter

3

prepared from my stenotype notes.

4

    */s/ Stacey L. Kiprotich*    *1/11/2024*
    STACEY L. KIPROTICH, RMR, CRR   DATE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25